DOCKETED
FILED JAN 1 1 2002

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS,**
**EASTERN DIVISION**

02 JAN 11 AM 10: 31

CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| RAYMOND SPAGNOLA, Individually And On Behalf Of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| GREGORY J. KILREA, LOU WEISBACH, JOHN R. KELLEY JR. and MARC S. SIMON, | ) ) ) |
| Defendants. | ) ) ) |

**02C 0270**

Case No.

**JUDGE HOLDERMAN**

*JURY TRIAL DEMANDED*

MAGISTRATE JUDGE SCHENKIER

**CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by HA-LO Industries Inc., ("HALO" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.       This is a federal class action on behalf of purchasers of the common stock of HALO between February 18, 1999 and November 23, 2001, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  As HALO has filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code, is it not named as a defendant herein.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of the materially false and misleading information, occurred in substantial part in this District. Additionally, HALO maintains its chief executive offices and principal place of business within this District.

5.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Raymond Spagnola as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of HALO during the Class Period and has been damaged thereby.

7.     HALO is a marketing company with full-service brand marketing capabilities such as advertising, promotions, merchandising, direct and database marketing, retail planning and event, field and sports marketing.  The Company's business is organized into two segments, promotional products and marketing services, with the former category accounting for approximately 85% of the

2

Company's revenues. The Company is incorporated in Delaware and maintains its principal executive offices in Niles, Illinois. On July 30, 2001 HALO filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code and is therefore not named as a defendant herein.

8.     Defendant Lou Weisbach served, as HALO's Chief Executive Officer, President, and Chairman of the Board of Directors. Weisbach stepped down as President and Chief Executive Officer in November 1999.

9.     Defendant John R. Kelley Jr. served as HALO's President and Chief Executive Officer beginning in November 1999 until February 15, 2001, and thereafter served as a director.

10.     Defendant Marc S. Simon served as HALO's Chief Executive Officer from February 15, 2001.

11.     Defendant Gregory J. Kilrea served, at all relevant times, as HALO's Chief Financial Officer.

12.     Because of defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

13.     It is appropriate to treat defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined

3

group of defendants identified above. Each of the above officers of HALO, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and

were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with HALO, each of the defendants had access to the adverse undisclosed information about HALO's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about HALO and its business issued or adopted by the Company materially false and misleading.

16.     Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

17.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of HALO common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding HALO's business, finances, financial statements and the intrinsic value of HALO common stock; and (ii) caused plaintiff and other members of the Class to purchase HALO securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of HALO between February 18, 1999 and November 23, 2001, inclusive, and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is imprac-ticable.  According to HALO's most recent Form 10-K, HALO had approximately 69.7 million shares of common stock outstanding as of March 13, 2001.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by HALO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

6

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial statements of HALO; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

24.     HALO is a marketing company with full-service brand marketing capabilities such as advertising, promotions, merchandising, direct and database marketing, retail planning and event, field and sports marketing.  The Company's business is organized into two segments, promotional products and marketing services, with the former category accounting for approximately 85% of the Company's revenues.  The Company is incorporated in Delaware and currently maintains its principal

7

executive offices at 500 Lake Cook Road, Deerfield, Illinois 60015, and was previously located at 5800 and 5980 West Touhy Avenue, Niles, Illinois 60714. On July 30, 2001 HALO filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

25. On November 23, 2001, HALO issued a press release announcing that it would be restating its financial statements for fiscal years 1998, 1999 and 2000, and potentially for the first quarter of 2001, due to improper revenue recognition by a subsidiary. The Company explained that the restatement was necessary to "adjust accounts primarily at a non-core market services subsidiary. These adjustments, which were identified during the Company's internal financial review, relate principally to the recording of revenue." Specifically, the Company revealed that the restatement will affect its previously reported financial results as follows:

-- a $6.9 million decrease in pretax income for 1998;

-- a $2.7 million increase in pretax loss for 1999;

-- a $4.2 million increase in pretax loss for 2000; and

-- a $1.2 million increase in pretax loss for the first quarter of 2001.

26. As now revealed, at all times during the Class Period, defendants issued materially false and misleading financial statements and press releases concerning HALO's revenues, income and earnings per share. The financial statements of the Company made during the Class Period, all of which implicitly and/or expressly were prepared in conformity with generally accepted accounting principles (GAAP), were materially false and misleading because the Company materially overstated its revenues, income and earnings.

### Pre-Class Period Materially False And Misleading Statements

27. On April 30, 1998, when HALO issued a press release announcing record results for the first quarter of 1998, the period ended March 31, 1998. The Company reported net income of $1,910,2227, or $0.09 per share, a 199% increase over the first quarter of 1997, according to the press release. Sales rose a reported 31% over the 1997 first quarter, to $109,376,190. Defendant Weisbach commented on the results, in pertinent part, as follows:

> The acquisition of R&T Specialty, Inc., in the first quarter of this year once again demonstrates HA-LO's commitment to growth. [. . .] In addition, we believe that the consolidation of the California warehouse into our Niles facility will generate future operating efficiencies.

28. On May 15, 1998, HALO filed its Form 10-Q with the SEC for the first quarter of 1998, the period ending March 31, 1998, which was signed by defendant Gregory J. Kilrea, and confirmed the previously announced financial results. In addition, with respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

29. On July 30, 1998, HALO issued a press release announcing its financial results for the second quarter of 1998, the period ending June 30, 1998. The Company reported that net income reportedly rose 68% to $4,110,000 or $0.15 per share. Sales for the quarter were $127,888,000, representing a 30% increase from the second quarter of 1997. Defendant Weisbach stated, in the press release, that the Company was executing on its plan of internal growth and successful integration of acquisitions:

HA-LO's results for the quarter and first six months of this year demonstrate that our strategies of internal growth, acquisitions and adding complimentary marketing services are working well. The recently completed acquisition of UPSHOT has already identified several joint marketing opportunities. We will continue to meet the needs of our clients on a global basis.

30.    On August 14, 1998, the Company filed a Form 10-Q with the SEC for the second quarter of 1998, the period ending June 30, 1998, which was signed by defendant Kilrea and confirmed the previously announced financial results. In addition, with respect to the financial statements contained therein, the Form 10-Q stated:

The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

31.    On October 29, 1998, HALO issued a press release announcing its financial results for the third quarter of 1998, the period ending September 30, 1998.  According to the press release the Company experienced "record" results, with net income of $5,985,000 or $.20 per diluted share, a 43% increase over the previous year's third quarter. Sales rose a reported 29% for the quarter, to $143,192,000. Commenting on the results, defendant Weisbach stated that the Company was achieving its performance and growth targets:

HA-LO's third quarter and nine months results continue our record growth and performance, indicating that once again our strategy is achieving our objective. The exciting addition of Lipson Alport Glass & Associates and UPSHOT, leaders in their respective industries, build on our relationships with our customers, and strengthen our channels of distribution for promotional products and services on a global level.

32.    On November 13, 1998, the Company filed its Form 10-Q with the SEC for the third quarter of 1998, the period ending September 30, 1998, which was signed by defendant Kilrea and

confirmed the previously announced financial results. In addition, with respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

33.    The statements referenced above in paragraphs 27-32 remained alive and uncorrected throughout the Class Period.

### Materially False And Misleading Statements Made During The Class Period

34.    On February 18, 1999, HALO issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 1998  For the fourth quarter, the Company reported net income of $9,773,000, or $0.30 per share, representing a 39% increase over the fourth quarter of 1997. Sales for the quarter were reported as $173,948,000.  For the year 1998, the Company reported net income of $24,520,000, a 65% increase over 1997, and sales of $589,664,000, 27% more than 1997.  In the press release, defendant Weisbach reiterated the Company's "pattern" of rapid growth and accomplishment:

> HA-LO's fourth quarter and year end results continue our pattern of record growth. Overall, 1998 was a year of solid accomplishment for HA-LO. Despite some disappointment in our Telemarketing division, our recurring pretax earnings increased 79% to $51.2 million from $28.6 million in 1997. Excluding telemarketing, internal revenue growth was 25% for the year. [ . . . ]

35.    On March 30, 1999, HALO filed its Form 10-K for fiscal year 1998 with the SEC, which was signed by defendants Weisbach and Kilrea , among others, and confirmed the previously announced financial results and purported to contain audited financial statements.

36.     On April 29, 1999, HALO issued a press release announcing its financial results for the first quarter of 1999, the period ending March 31, 1999.  The Company reported another "record" quarter, with net income of $4,199,000, or $0.09 per share, and sales of $156,967,000. Defendant Weisbach commented on the results as follows:

> HA-LO's first quarter results continue our record growth and performance. We continue to execute our strategy of growth within our core promotional product group. In addition, our recent acquisitions of leading companies in the marketing services area continue to fulfill our vision of developing a complete Brand Marketing Organization- A Brand Marketing Organization that provides clients a competitive edge by reaching consumers at the most direct points of brand contact, including the internet.

37.     On May 14, 1999, the Company filed its Form 10-Q with the SEC for its first quarter of 1999, the period ending March 31, 1999, which was signed by defendant Kilrea and confirmed the previously announced financial results. In addition, with respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

38.     On July 29, 1999,  HALO issued a press release announcing its financial results for the second quarter of 1999, the period ending June 30, 1999.  The Company's reported results were "in line with expectations included in the Company's pre-release dated July 1, 1999." For the second quarter, the Company reported $160,312,000 in sales, an increase of 16% over the 1998 second quarter with. Net income was $853,000, a decrease of 84% over the first quarter of 1998.

39.     On August 13, 1999, the Company filed its Form 10-Q with the SEC for the second quarter of 1999, the period ending June 30, 1999, which was signed by defendant Kilrea and confirmed the previously announced financial results.  In addition, with respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

40.     On October 8, 1999, HALO issued a press release announcing its financial results for the third quarter of 1999, the period ending September 30, 1999.  In the press release, the Company reported that it expects revenues of around $140-$150 million and a net loss per share of $.03-$.05. Defendant Weisbach characterized the recent weakness in the Company's performance as unavoidable but short-term and highlighted the Company's resiliency:

> We have long known that the promotional products industry could not forever keep up its historically phenomenal growth rates. We just didn't expect the slowdown to occur so dramatically, so soon. Fortunately,  our revenue diversification strategy is well underway. While we are experiencing the short-term pains of our transition to a brand marketing organization, we are confident that we can replicate the extraordinary growth that we brought to the promotional products business. Branding is corporate America's marketing tool of the millennium, and HA-LO has the competencies and relationships to profit from this trend HA-LO's real value as an organization is tied to the extraordinary values of corporate brands.

41.     On November 15, 1999, the Company filed its Form 10-Q with the SEC for the third quarter of 1999, the period ending September 30, 1999, which was signed by defendant Kilrea and confirmed the previously announced financial results.  In addition, with respect to the financial statements contained therein, the Form 10-Q stated:

The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

42.     On February 17, 2000, HALO issued a press release announcing its financial results for the fourth quarter and fiscal year 1999, the period ended December 31, 1999. For the fourth quarter of 1999, the Company reported sales of $185.8 million, a 6% increase over the fourth quarter of 1998. Net income for the quarter was $2 million, or $.04 per share. For the entire year 1999, the Company reported sales of $650.4 million, up 10% over sales in 1998, and earnings of $4.5 million, or $.09 per share. In the press release, defendant Kelley downplayed the Company's disappointing 1999 financial performance and highlighted beneficial strategic changes implemented during the year:

While 1999 was a disappointing year financially, it was an extraordinary year strategically. [. . .] The profitability slowdown in 1999 was more than a wake-up call. It catapulted us to take actions that ensure a valuable future for HA-LO's customers, employees and shareholders.

43.     On March 30, 2000, HALO filed its Form 10-K for fiscal year 1999 with the SEC which was signed by, among others, defendants Kelley, Weisbach and Kilrea. The Form reiterated the previously announce financial results for the fourth quarter and year ended December 31, 1999, and represented that the financial statements included in the Form 10-K were audited.

44.     On April 27, 2000, HALO issued a press release announcing its financial results for the first quarter of 2000, the period ended March 31, 2000. Sales for the quarter were reportedly $161.2 million and the Company incurred a net loss of $4.6 million, or $.09 per share. In the press release, defendant Kelley touted the benefits of a pending acquisition:

> The first quarter of 2000 marks the end of an era. [ . . .] The expected close of our
> Starbelly.com acquisition significantly changes HA-LO's financial outlook.  As we
> execute against our tightly-crafted integration plan, our focus will be on aggressive
> top-line growth through new client services, productivity gains and entrance into new
> markets.

45.     On May 15, 2000, the Company filed its Form 10-Q with the SEC for the first quarter

of 2000, the period ending March 31, 2000, which was signed by defendant Kilrea and confirmed the

previously announced financial results.  In addition, with respect to the financial statements contained

therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without
> audit, in accordance with generally accepted accounting principles for interim financial
> information and in conjunction with the rules and regulations of the Securities and
> Exchange Commission. Accordingly, they do not include all of the information and
> footnotes required by generally accepted accounting principles for financial
> statements. In the opinion of management, all adjustments (consisting only of normal
> recurring matters) considered necessary for a fair presentation have been included.

46.     On July 27, 2000, HALO issued a press release announcing its financial results for the

second quarter of 2000, the period ended June 30, 2000.  Sales for the quarter were reportedly

$177.5 million, up 10.7% from the second quarter of 1999, and the Company incurred a net loss of

$11.7 million, or $0.20 per share.  Defendant Kelley stated the following regarding the May 5, 2000

acquisition of Starbelly.com:

> As expected, our results do not yet realize the impact of Starbelly.com.[ . . .]
> However, the acquisition has already begun paying off as large corporations have
> bought into the marketing power of our industry-leading Internet platform.  Our
> comprehensive integration plan is fully on track, and we expect to see significant
> operating efficiencies and new revenue opportunities in the months ahead.

47.     On August 14, 2000, the Company filed its Form 10-Q with the SEC for the second

quarter of 2000, the period ending June 30, 2000, which was signed by defendant Kilrea and

confirmed the previously announced financial results. In addition, with respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

48. On October 25, 2000, HALO issued a press release announcing its financial results for the third quarter of 2000, the period ended September 30, 2000. Sales for the quarter were reportedly $175.2 million, an increase of 18.9% from the same period of 1999. A net loss of $17.6 million, or $0.27, was reported for the quarter. With regard to HALO's recent efforts to increase productivity and sales growth, defendant Kelley stated the following:

> Our results are just beginning to reflect the significant sales and productivity enhancements brought about through last quarter's acquisition of Starbelly.com [ . . .] The number of business customers using our Internet solutions has grown rapidly since we introduces our four online service offerings earlier this quarter, and we have a healthy number of additional customer online stores in the pipeline. [ . . .]

49. On November 13, 2000, the Company filed its Form 10-Q with the SEC for the third quarter of 2000, the period ending September 30, 2000, which was signed by defendant Kilrea and confirmed the previously announced financial results. In addition, with respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

50.     On February 15, 2001, HALO issued a press release announcing its results for the

fourth quarter and year ended December 31, 2000. For the fourth quarter, sales were reportedly

$202 million, up 8.7% from the previous year's fourth quarter, and net loss for the quarter totaled

$15.9 million or $0.24 per share. Commenting on the Company's supposedly successful efforts at

increasing productivity, defendant Kilrea stated the following:

> Our results reflect momentum in our leading promotional products business, indicative
> of the sales and productivity enhancements brought about by our technology-based
> business model. [ . . .]

In a separate press release also issued on February 15, 2001, HALO announced that Marc

Simon will be replacing defendant Kelley as HALO's Chief Executive Officer.

51.     On April 27, 2001, HALO filed its Form 10-K for fiscal year 2000 with the SEC which

was signed by, among others, defendants Simon, Kelley, Kilrea and Weisbach. The Form reiterated

the previously announced financial results for the fourth quarter and year ended December 31, 2000,

and represented that the financial statements included in the Form 10-K were audited.

52.     On April 26, 2001, HALO issued a press release announcing its financial results for

the first quarter of 2001, the period ended March 31, 2001. The press release reported HALO's sales

as $113.4 million and a net loss of $28.7 million, or $0.41 per share.

53.     On May 15, 2001, the Company filed its Form 10-Q with the SEC for the first quarter

of 2001, the period ending March 31, 2001, which was signed by defendant Kilrea and confirmed the

previously announced financial results. In addition, with respect to the financial statements contained

therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without
> audit, in accordance with generally accepted accounting principles for interim financial
> information and in conjunction with the rules and regulations of the Securities and

Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

54.     The statements referenced above in paragraphs 27-52 were each materially false and misleading when made because they failed to disclose:

(a)     that a HALO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HALO's reported earnings;

(b)     that HALO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading; and

(c)     that HALO's business was deteriorating such that its management was employing improper accounting practices in an effort to conceal this negative trend.

### The Truth Begins To Emerge

55.     As detailed above, on November 23, 2001, HALO issued a press release announcing the restatement of its previously filed financial statements for the period 1998 to 2000, and that the Company "may also restate its first quarter 2001 Form 10-Q." If the Company does not restate the first quarter of 2001 figures, the restatement will have the effect of reducing HALO's previously reported pretax income by a total of $13.8 million. The total restatement figure rises to $15 million if the Company does restate the first quarter of 2001 results, which, according to the press release, may have under-reported HALO's pretax loss by an estimated $1.2 million.

### Undisclosed Adverse Information

56.     The market for HALO's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose,

HALO's common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued until November 23, 2001, when HALO admitted that its previously filed financial statements inflated revenues and earnings and this admission was communicated to, and/or digested by, the securities markets. Plaintiff and other members of the Class purchased or otherwise acquired HALO securities relying upon the integrity of the market price of HALO's securities and market information relating to HALO, and have been damaged thereby.

57.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of HALO's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, including, inter alia:

(a)     that the Company's financial statements were not prepared in accordance with generally accepted accounting principles and in accordance with the federal securities laws and SEC regulations concerning fair reporting;

(b)     that the Company's financial statements had not, contrary to the statements in the Form 10-Q's, been prepared in accordance with GAAP and its own accounting policies because HALO improperly recognized revenues, income and earnings;

(c)     that the Company's seeming growth was attributable, in part, to fictitious and improper accounting entries;

19

(d)    that the Company's estimates, projections and opinions as to its expected revenues, earnings, income and value of its stock were lacking in reasonable basis at all relevant times; and

(e)    it was not true that the financial statements in the Form 10-Q's contained all adjustments considered necessary for a fair presentation of the financial statements.

58.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about HALO's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of HALO and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

59.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting

20

the true facts regarding HALO, their control over, and/or receipt and/or modification of HALO's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning HALO, participated in the fraudulent scheme alleged herein.

**Applicability Of Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

60.     At all relevant times, the market for HALO's securities was an efficient market for the following reasons, among others:

(a)     HALO's stock met the requirements for listing, and was listed and actively traded on the NYSE Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, HALO filed periodic public reports with the SEC and the NYSE;

(c)     HALO regularly communicated with public investors _via_ established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     HALO was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

61.     As a result of the foregoing, the market for HALO's securities promptly digested current information regarding HALO from all publicly available sources and reflected such

information in HALO's stock price. Under these circumstances, all purchasers of HALO's securities during the Class Period suffered similar injury through their purchase of HALO's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

62.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of HALO who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against Defendants

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the

investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HALO's securities; and (iii) cause plaintiff and other members of the Class to purchase HALO's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

65.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for HALO's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

66.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

67.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of HALO as specified herein.

68.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of HALO's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about HALO and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of HALO's securities during the Class Period.

69.     Each of defendants' primary liability, and controlling person liability, arises from the following facts: (i) the defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each

of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

70.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing HALO's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of HALO's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of HALO's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired HALO securities during the Class Period at artificially high prices and were damaged thereby.

72.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of HALO, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their HALO securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Defendants

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     Defendants acted as controlling persons of HALO within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, defendants had the power to influence and control and did influence and control,

directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, each defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.     As set forth above, HALO violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to Section 20(a) of the Exchange Act for HALO's violations of law. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding plaintiff and the Class their reasonable costs and expenses incurred

in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 11, 2002

Raymond Spagnola, individually and on behalf
of all others similarly situated, Plaintiff

By: _____

Marvin A. Miller
Jennifer Winter Sprengel
Matthew E. Van Tine
**Miller Faucher and Cafferty LLP**
30 North LaSalle Street
Suite 3200
Chicago, Illinois 60602
(312) 782-4880

Steven G. Schulman
Samuel H. Rudman
**Milberg Weiss Bershad Hynes & Lerach LLP**
One Pennsylvania Plaza - 49th Floor
New York, New York 10119
(212) 594-5300

Paul J. Geller
Jack Reise
**Cauley Geller Bowman & Coates, LLP**
1 Boca Place
2255 Glades Road, Suite 421-A
Boca Raton, Florida 33431
(561) 750-3000

*Attorneys for Plaintiff*

Cauley Geller Bowman & Coates, LLP
One Boca Place
2255 Glades Road, Suite 421A
Boca Raton, FL 33431
(561) 750-3000
(561) 750-3364 Facsimile

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

RAYMOND SPAGNOLA ("Plaintiff"), declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.    Plaintiff has reviewed the Ha-Lo Industries complaint prepared by Cauley Geller Bowman & Coates, LLP, whom I designate as my counsel in this action for all purposes.

2.    Plaintiff did not purchase any common stock/securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate any private action under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.    The following includes all of Plaintiff's transactions during the Class Period specified in the complaint for the common stock/securities that are the subject of this action:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| Ha-Lo Industries | Purchase | 500 | 8-16-99 | $6.00 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Please list additional transactions on a separate sheet if necessary.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _3_ day of
_JANUARY_____, 2002.

SIGNATURE



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

**DOCKETED**
JAN 1 1 2002

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

**Plaintiff(s):** **Raymond Spagnola, individually and on behalf of all others similarly situated,**

County of Residence: Warren

Plaintiff's Atty: Miller Faucher and Cafferty LLP
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
(312) 782-4880

**Defendant(s):**Gregory J. Kilrea, et al.

County of Residence:

Defendant's Atty:

**02C      0270**

JUDGE HOLDERMAN

II. Basis of Jurisdiction:         **3. Federal Question (U.S. not a party)**

III. Citizenship of Principle
Parties (Diversity Cases Only)

Plaintiff:- **N/A**

Defendant:- **N/A**

MAGISTRATE JUDGE SCHENKIER

IV. Origin :                    **1. Original Proceeding**

V. Nature of Suit:              **850 Securities / Commodities / Exchange**

VI. Cause of Action:            **15 U.S.C. §§ 78j(b) and 78t(a)**

VII. Requested in Complaint

Class Action:**Yes**

Dollar Demand:

Jury Demand:**Yes**

U.S. DISTRICT COURT   02 JAN 11 AM 10: 31   FILED -ED4

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: _____

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

**DOCKETED**
JAN 11 2002

In the Matter of

RAYMOND SPAGNOLA, individually and on behalf of all others similarly situated,

v.

GREGORY J. KILREA, et al.

Case No. **02C 0270**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Raymond Spagnola, individually and on behalf of all others similarly situated, Plaintiff

JUDGE HOLDERMAN

MAGISTRATE JUDGE SCHENKIER

| (A) | (B) |
|---|---|
| SIGNATURE *Steven G. Schulman /m VT* | SIGNATURE |
| NAME Steven G. Schulman | NAME Marvin A. Miller |
| FIRM Milberg Weiss Bershad Hynes & Lerach LLP | FIRM Miller Faucher and Cafferty LLP |
| STREET ADDRESS One Pennsylvania Plaza, 49th Floor | STREET ADDRESS 30 North LaSalle Street, Suite 3200 |
| CITY/STATE/ZIP New York, New York 10119 | CITY/STATE/ZIP Chicago, Illinois 60602 |
| TELEPHONE NUMBER (212) 594-5300 | TELEPHONE NUMBER (312) 782-4880 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01916769 |
| MEMBER OF TRIAL BAR? YES ☐ NO ☒ | MEMBER OF TRIAL BAR? YES ☒ NO ☐ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☒ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☒ NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE *Samuel H. Rudman /m VT* | SIGNATURE |
| NAME Samuel H. Rudman | NAME Jennifer Winter Sprengel |
| FIRM Same as (A) | FIRM Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204446 |
| MEMBER OF TRIAL BAR? YES ☐ NO ☒ | MEMBER OF TRIAL BAR? YES ☐ NO ☒ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☒ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☒ | DESIGNATED AS LOCAL COUNSEL? YES ☒ NO ☐ |



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

**DOCKETED**

JAN 1 1 2002

In the Matter of

RAYMOND SPAGNOLA, individually and on behalf of all others similarly situated,

v.

GREGORY J. KILREA, et al.

Case Number: **02C 0270**

JUDGE HOLDERMAN

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Raymond Spagnola, individually and on behalf of all others similarly situated, Plaintiff

MAGISTRATE JUDGE SCHENKIER

| (E) | (F) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Matthew E. Van Tine | NAME Paul J. Geller |
| FIRM Miller Faucher and Cafferty LLP | FIRM Cauley Geller Bowman & Coates, LLP |
| STREET ADDRESS 30 North LaSalle Street, Suite 3200 | STREET ADDRESS 2255 Glades Road, Suite 421-A |
| CITY/STATE/ZIP Chicago, Illinois 60602 | CITY/STATE/ZIP Boca Raton, Florida 33431 |
| TELEPHONE NUMBER (312) 782-4880 | TELEPHONE NUMBER (561) 750-3000 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6186180 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☒ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☒ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☒ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☒ |

| (G) | (H) |
|---|---|
| SIGNATURE Jack Reise | SIGNATURE |
| NAME Jack Reise | NAME |
| FIRM Same as (F) | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☒ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☒ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |