# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| RAYMOND SPAGNOLA, Individually And On Behalf Of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 02 C 0270 |
| GREGORY J. KILREA, LOU WEISBACH, JOHN R. KELLEY JR. and MARC S. SIMON, | ) ) ) | Judge James Holderman |
| Defendants. | ) ) | |

## NOTICE OF FILING

PLEASE TAKE NOTICE that on Tuesday, May 28, 2002, we filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, 219 South Dearborn Street, Chicago, Illinois, the *Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws*, a copy of which is hereby served upon you.

Dated: May 28, 2002

Respectfully submitted,

Marvin A. Miller
Jennifer Winter Sprengel
Matthew E. Van Tine
**MILLER FAUCHER AND CAFFERTY LLP**
30 North LaSalle Street
Suite 3200
Chicago, Illinois 60602
(312) 782-4880

## CERTIFICATE OF SERVICE

I, Marvin A. Miller, one of the attorneys for plaintiff, hereby certify that I caused the *Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws* to be served on all counsel on the attached service list by placing a copy of the same in the United States Mail at 30 North LaSalle Street, Chicago, Illinois this 28th day of May, 2002.

Marvin A. Miller

## SERVICE LIST

Lowell E. Sachnoff
David C. Bohan
Peter T. Berk
Sachnoff & Weaver, Ltd.
30 South Wacker Drive
Suite 2900
Chicago, Illinois 60606
(312) 207-1000

Steven P. Handler
Amy G. Goehring
McDermott, Will & Emery
227 West Monroe Street
Chicago, Illinois 60606
(312) 372-2000

Craig M. White
Angela Toscas
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 201-2530

Bart T. Murphy
Wildman, Harrold, Allen & Dixon
2300 Cabot Drive
Suite 455
Lisle, Illinois 60532
(630) 955-6392

Clifford S. Goodstein
Susan M. Greenwood
Milberg Weiss Bershad Hynes
 & Lerach LLP
One Pennsylvania Plaza - 49th Floor
New York, New York 10119

Marc I. Willner
Schiffrin & Barroway, LLP
Three Bala Plaza East
Suite 4000
Bala Cynwyd, Pennsylvania 19004
(610) 667-7706

Scott Poynter
Stewart Cearley
Cauley Geller Bowman & Coates, LLP
11311 Arcade Drive Suite 200
P.O. Box 25438
Little Rock, Arkansas 72212

Adam J. Levitt
Wolf Haldenstein Adler Freeman
& Herz LLC
656 West Randolph Street , Suite 500W
Chicago, Illinois 60661
(312) 466-9200



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DOCKETED

MAY 2 9 2002

|  |  |
|---|---|
| RAYMOND SPAGNOLA, Individually And On Behalf Of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) No. 02 C 0270 ) |
| GREGORY J. KILREA, LOU WEISBACH, JOHN R. KELLEY JR., MARC S. SIMON, LINDEN D. NELSON, BRADLEY KEYWELL, and ERIC LEFKOFSKY, | ) Judge James F. Holderman ) ) ) *JURY TRIAL DEMANDED* |
| Defendants. | ) |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiffs, by their undersigned attorneys, on behalf of themselves and the Class they seek to

represent, for their Amended Consolidated Class Action Complaint, make the following allegations

against defendants based upon the investigation conducted by and under the supervision of plaintiffs'

counsel, which included a review of United States Securities and Exchange Commission ("SEC")

filings by HA-LO Industries Inc., ("HA-LO" or the "Company"), as well as regulatory filings and

reports, securities analysts reports and advisories about the Company, press releases and other public

statements issued by the Company, and media reports about the Company. Plaintiffs' investigation

also included a review of documents filed in connection with HA-LO's bankruptcy proceedings and

interviews with individuals knowledgeable about HA-LO's business practices and operations.

Except as alleged herein, underlying information relating to defendants' misconduct and the

particulars thereof is not available to plaintiffs and the public and lies within the possession and

control of defendants and other HA-LO insiders, thus preventing plaintiffs from further detailing

27

defendants' misconduct at this time. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of purchasers of the common stock of HA-LO between February 18, 1999 and July 30, 2001, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As HA-LO has filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code, it is not named as a defendant herein.

2.     Throughout the Class Period, and prior thereto, defendants, HA-LO's officers and directors, repeatedly misrepresented and failed to correct prior misrepresentations regarding HA-LO's financial condition and prospects. Specifically, these misrepresentations concealed (i) that HA-LO's acquisition strategy had failed; (ii) that HA-LO's financial commitments related to its acquisitions meant a likely, if not inevitable, bankruptcy filing by HA-LO; and (iii) HA-LO's failure to comply with generally accepted accounting principles ("GAAP").

3.     Indeed, the financial statements of the Company made during the Class Period, all of which implicitly and/or expressly were prepared in conformity with GAAP, were materially false and misleading because the Company materially overstated its revenues, income and earnings. In addition, during the Class Period, defendants issued materially false and misleading statements concerning the acquisition of Starbelly.com, Inc., and the ability of HA-LO to reap financial benefits from that expensive acquisition. Finally, during the Class Period, defendants issued materially false and misleading statements concerning how HA-LO's financial shenanigans and failed acquisition strategy were leading the Company into bankruptcy.

## JURISDICTION AND VENUE

4.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

6.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of the materially false and misleading information, occurred in substantial part in this District. Additionally, HA-LO maintains its chief executive offices and principal place of business within this District.

7.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### *Plaintiffs*

8.     Lead Plaintiffs Howard Mittelman, David H. and Lauren S. Mendelson, Darren Lisse, Patrick A. Sheridan and Dan Lettieri were appointed Lead Plaintiffs pursuant to Agreed Order Appointing Lead Plaintiffs and Approving Lead Plaintiffs' Selection of Lead Counsel and Liaison Counsel, entered by the Court in this action on March 26, 2002. Lead Plaintiffs, as set forth in their certifications previously filed with the Court, purchased the common stock of HA-LO during the

Class Period and suffered substantial damage as a result of the wrongful acts of defendants as alleged herein.

***Defendants***

9.     HA-LO, a Delaware corporation with its principal executive offices in Niles, Illinois, filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code on July 30, 2001 and is therefore not named as a defendant herein. During the Class Period, HA-LO common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "HMK."

10.     Since the beginning of the Class Period, defendant Lou Weisbach served as HA-LO's Chief Executive Officer, President, and Chairman of the Board of Directors. Weisbach stepped down as President and Chief Executive Officer in November 1999, but continues to serve on HA-LO's Board of Directors. Since stepping down as CEO and President, Weisbach continued to received his $500,000 annual salary under a five year employment contract with HA-LO. The Company has represented that even after Weisbach stepped down as CEO and President, he retained "critical day-to-day responsibilities" at HA-LO.

11.     Defendant John R. Kelley Jr. has served as a director of HA-LO from August 1999 through the present. He served as Chief Executive Officer of the Company from November 1999 through February 2001. In addition he served as President of HA-LO from November 1999 through May 2000.

12.     Defendant Marc S. Simon has served as HA-LO's Chief Executive Officer from February 15, 2001 through the present. Prior to the Class Period, Simon served as a member a HA-LO's Board of Directors from 1992-1995 and was legal counsel to HA-LO as a partner of Neal, Gerber & Eisenberg, HA-LO's outside counsel.

- 4 -

13.     Defendant Gregory J. Kilrea has served, at all relevant times, as HA-LO's Chief Financial Officer.  As CFO, Kilrea had responsibility for all of HA-LO's reporting of its financial results and conditions.  However, during the relevant time period certain HA-LO Board members believed that Kilrea was unable "to maintain adequate controls and reasonably project HALO's financial condition."

14.     Defendant Bradley Keywell served as President of HA-LO from May 2000 to March 2001.  In addition, Keywell served as a director of the Company from May 2000 to June 23, 2001, when he resigned from the Board.  Keywell is related through marriage to defendant Nelson.

15.     Defendant Eric Lefkofsky served as Chief Operating Officer of HA-LO from May 2000 to May 2001.  He served as Vice-President and a director of the Company from May 2000 to August 2, 2001, when he resigned from the Board.

16.     Defendant Linden D. Nelson served as Vice Chairman of the Board of Directors of HA-LO from January 1997 to approximately June 2001.  At the time of HA-LO's acquisition of Starbelly.com in May 2000 (described below), Nelson was one of HA-LO's two primary shareholders.  While serving on the Board, Nelson received a yearly salary of $500,000.  Even after his Board membership ended, Nelson continued to serve as a consultant to HA-LO at an annual salary of $100,000.  Nelson is related through marriage to defendant Keywell.

17.     Each of the above officers and directors of HA-LO, by virtue of their high-level positions, were directly involved in the day-to-day operations of the Company, at the highest levels, and were privy to confidential and proprietary information concerning the Company, its subsidiaries, business, operations, growth, financial statements, and financial condition, as alleged herein. Defendants had access to adverse non-public information concerning matters alleged in this

Complaint through access to internal corporate documents, conversations, and other communications and contacts with corporate officers and employees, attendance at meetings of HA-LO's Board of Directors and committees thereof, and periodic reports and other information provided to them. Except to the extent set forth in this Complaint, plaintiffs and other members of the Class had no access to such information, which was, and remains solely under the control of defendants. Defendants were involved in drafting, producing, reviewing, and/or disseminating the materially false and misleading statements complained of herein. Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued regarding the Company and nevertheless approved, ratified, and/or failed to correct those statements, in violation of the federal securities laws.

18.     By reason of their management positions, their membership on HA-LO's Board of Directors, and their ability to make public statements in the name of HA-LO, defendants were and are controlling persons, and had the power and influence to cause (and did cause) HA-LO to engage in the unlawful conduct complained of herein.

19.     Throughout the Class Period, defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Defendants also were able to, and did, directly or indirectly, control the conduct of HA-LO's business, the information contained in its filings with the SEC, and its public statements. Moreover, defendants made affirmative statements to securities

- 6 -

analysts and the investing public at large, and participated in meetings and discussions concerning such statements.

## **SUBSTANTIVE ALLEGATIONS**

### **Background Facts**

20.     HA-LO described itself in its Form10-K for the year ended December 31, 2000, filed with the SEC on March 30, 2001, as a "full service, innovative brand marketing organization whose diverse marketing disciplines are centered around its client's brand." HA-LO's services included advertising, promotions, merchandising, direct and database marketing, retail planning and event, field and sports marketing. The Company's business was organized into two segments, promotional products and marketing services, with most of the Company's revenues deriving from the promotional products segment.

21.     In an effort to artificially inflate its stock price, prior to and during the Class Period, HA-LO engaged in a pattern and practice of growth through acquisitions. For example, in 1996, HA-LO acquired Market USA, a telemarketing service, for $67 million in cash. In 1997, HA-LO acquired Creative Concepts, a promotional products company, for approximately $65 million in stock. In 1998, HA-LO acquired UPSHOT, a marketing agency, for approximately $70 million in stock and Lipson, Alport, Glass & Associates ("LAGA"), a brand strategy and identity agency, for approximately $49 million in stock. In 1999, HA-LO acquired four promotional products companies with business in the United States and Europe.

22.     HA-LO promised growth and financial success from the Company's acquisitions. Instead, the costs of acquiring and maintaining these businesses (as well as future acquisitions) drove HA-LO into insolvency and bankruptcy protection.

23.     Having completely diversified its holdings, HA-LO's business began to suffer, and throughout 1999 sales of its promotional products declined.  According to several former employees, HA-LO was having trouble paying its manufacturing vendors as early as 1999.  According to a former manager in the Company's Fort Lauderdale office, sales representatives complained on an almost daily basis that vendors were not shipping product because they had not been paid.  In addition, when HA-LO failed to pay its bills, vendors began to cut HA-LO's credit lines.

24.     In December 1999, HA-LO announced that John Kelley would replace Lou Weisbach as HA-LO's President and CEO.  Prior to assuming these positions, Kelley was the President of UPSHOT, HA-LO's marketing subsidiary.

25.     Soon after defendant Kelley became CEO of HA-LO, the Company announced its purported new initiative: the "e-transformation" of HA-LO.  On January 13, 2000, Blair, William & Co. reported that under Kelley's leadership, HA-LO was developing a strategy "to bring technology into all facets of the company."

26.     HA-LO's management intended this "e-transformation" to be a quick fix that would lift the Company's stock price, which had declined precipitously since the beginning of 1999.  As an initial step of the "e-transformation," on January 18, 2000, HA-LO announced the signing of a definitive agreement to acquire Starbelly.com, Inc. ("Starbelly"), "the premier internet business solution for custom-decorated merchandise."  In May 2000, the acquisition was completed.

27.     Co-founded by defendants Bradley Keywell and Eric Lefkofsky in March 1999, Starbelly positioned itself as an on-line marketplace for corporations and consumers to purchase custom-decorated merchandise.  Keywell had a vision for Starbelly: "I've said it a thousand times: We all came from jobs that sucked.  So the challenge here at Starbelly is: Let's not suck."  Indeed, in an

- 8 -

effort to foster a hospitable work environment, Keywell would bring in to Starbelly a masseuse three times a week, a yoga instructor twice a week, and host an introspective "drum circle" once a month. Besides the back rubs and the ".com" in its name, Starbelly was nothing more than an unestablished t-shirt factory with total annual sales of $347,000.

28.     In January 2000, when Starbelly had been in existence for only 10 months, HA-LO agreed to acquire Starbelly in a deal that as of January 2000 was valued at $240 million. The deal closed in May 2000. The purchase price was a combination of cash ($19 million), common stock (17.1 million shares), and preferred stock (5.1 million shares). The primary recipients of these proceeds were defendants Lefkofsky and Keywell, who became officers and directors of HA-LO, and Chase Venture Capital Associates, L.P., now known as J.P. Morgan Partners (SIBC), LLC ("JPMP").

29.     Holders of the redeemable preferred stock, issued as part of the Starbelly.com purchase, were granted rights that enabled them to redeem their shares for a per share value of $10 or to convert each share to a share of the Company's common stock  The holders were required to make their redemption demands between May 5, 2001 and June 4, 2001. The Company was to make payment within 60 days after receipt of redemption notification. By the time the acquisition was completed in early May 2000, HA-LO's stock price was well below $10 per share, increasing the chances that the preferred shareholders would seek redemption of their shares at the fixed $10 per share price. The Company could avoid an enormous cash payout to the preferred shareholders only if HA-LO's stock price rose above $10 per share. However, even if HA-LO's stock price rose above $10 per share, HA-LO's preferred shareholders would also benefit, because their common stock (converted after redemption) would have an inflated value. Thus, defendants were motivated to

conceal the truth about HA-LO's deteriorated financial condition in an effort to inflate the Company's common stock price and avoid a cash payment to the preferred shareholders that HA-LO could not afford.

30.     The Starbelly acquisition was commenced without proper due diligence. For example, according to a former high-level HA-LO marketing employee, who worked on the Starbelly integration team, the marketing due diligence consisted of a single four hour meeting immediately prior to the announcement of the deal. According to a former HA-LO Vice President, the deal book for the acquisition was written vaguely with loosely defined terms. The due diligence consisted of discussions among management that were thin on substance, and lacked an in-depth examination of Starbelly's business plan. While Starbelly informed HA-LO of Starbelly's "impressive" client roster, according to a former HA-LO salesperson, after the merger when HA-LO representatives began to contact Starbelly's "clients" they found that Starbelly had failed to establish firm relationships and orders. This information, however, was not disclosed to the public. Moreover, this information indicates HA-LO's complete failure to exercise proper due diligence.

31.     The Starbelly acquisition was nothing more than insider dealing between defendants Keywell, Lefkosky and Nelson. Nelson, Vice Chairman of HA-LO's Board and one of its two largest shareholders, was related to Keywell through marriage. It was Nelson who first met with Keywell to discuss a potential merger between HA-LO and Starbelly. Not surprisingly, with Nelson's support, the acquisition was unanimously approved by the HA-LO Board. Defendants knew or were reckless in not knowing of Nelson's family relationship to Keywell, and the insider dealing that resulted. After the acquisition, Keywell and Lefkosky became HA-LO's largest shareholders. In addition, following

- 10 -

the acquisition, Keywell became HA-LO's President, Lefkosky became the Chief Operating Officer, and both were appointed to HA-LO's Board of Directors.

32.     The acquisition of Starbelly purportedly represented defendants' plan to revolutionize HA-LO. The revolution failed. According to a former high-level HA-LO marketing employee who worked on the Starbelly integration team, there was never a clear plan for Starbelly's role within HA-LO. Within two months of the completion of the acquisition, in July 2000, HA-LO retired the Starbelly name and closed Starbelly's facility. The Starbelly website also went off-line. Nevertheless, defendants continued to represent that Starbelly would soon transform the Company.     3  3  .

HA-LO, however, continued to suffer from financial problems. According to a former HA-LO information technology employee, in November 2000, HA-LO laid off seventy technology employees, the majority of whom had come from Starbelly. In addition, throughout HA-LO's businesses, vendors complained of and demanded payment on overdue invoices.

34.     On February 15, 2001, HA-LO announced that defendant Marc Simon was replacing defendant Kelley as HA-LO's Chief Executive Officer.

35.     The change in leadership at HA-LO benefitted defendants Kelley and Simon. Kelley returned to his former position as president of UPSHOT. His salary was increased from $200,000 as HA-LO CEO to $500,000 as president of UPSHOT. In addition, Kelley was entitled to a $1 million bonus if HA-LO sold UPSHOT. Simon rejoined HA-LO at a $500,000 annual salary, a $75,000 signing bonus, a mandatory $100,000 bonus, plus options and performance bonus.

36.     The change in leadership, however, could not change that Starbelly was a worthless acquisition. Defendant Kilrea later stated: "Starbelly never lived up to the promises made by the

- 11 -

sellers. Notwithstanding the fact that HA-LO later invested tens of millions of additional dollars in the development of Starbelly, the latter did not produce a penny of value."

37.     On February 19, 2001, an article was published in <u>Crain's Chicago Business</u> concerning the value of HA-LO's Starbelly acquisition. The article quoted analyst Alexander Paris Jr. of Barrington Research Associates, Inc., who stated that Starbelly was undoubtedly impaired, and that the Company would be forced to write-down the goodwill recorded in connection with the acquisition before the end of 2001. In that article, defendants falsely denied that there would be a write-down.

38.     HA-LO's poor financial condition continued. By February 20, 2001, HA-LO owed its lenders $74 million under its revolving credit facility, HA-LO was in default on the loan for violations of financial covenants, and as HA-LO was only allowed to borrow $65 million, the loan was "out of formula" (i.e. overdrawn). In addition, HA-LO was in no position to obtain refinancing due to $14 million in accounts receivable and a $6 million cash flow operating loss. HA-LO had no cash nor any prospects for obtaining cash as all receivables were immediately applied to the overdrawn credit facility.     HA-LO never disclosed that these fundamental problems adversely affected its ability to obtain refinancing.

39.     As HA-LO's dire financial condition prevented it from making timely payments, its vendor payment problems escalated. As a result, certain HA-LO sales representatives began to use their personal credit cards in order to secure orders.

40.     In early March 2001, HA-LO's worsening financial situation forced Simon to retain Orrick, Herrington & Sutcliffe for advice about creditors' rights issues and Silverman Consulting,

- 12 -

a work-out specialist, for advice on business turnaround issues. HA-LO did not disclose these retentions.

41.     HA-LO's financial difficulties were aggravated by the terms of the Starbelly acquisition. In May 2001, the preferred shareholders would be able to redeem their preferred shares for $10 per share. Because HA-LO did not have the ability to withstand a potential $50 million cash payment, it was imperative that HA-LO avoid paying the preferred shareholders.

42.     In furtherance of this objective, on March 14, 2001, Simon called Stephen Murray of JPMP, the largest preferred shareholder, to ask that JPMP provide written assurance that it was in negotiations with HA-LO to amend the preferred stock redemption rights. Simon informed JPMP that without such written assurance, Arthur Andersen, HA-LO's auditors, would issue a "going concern" letter in connection with its year-end audit. As JPMP was not involved in negotiations with HA-LO, Murray refused to provide such assurance, and further instructed Simon not to make any representation to anyone regarding JPMP's position on the preferred stock redemption.

43.     Starbelly's poor performance and exorbitant cost to HA-LO, as well as the issue of the preferred stock redemption, affected the Company's relationship with Keywell and Lefkosky. The troubled relationship had worsened by April 2001, at the latest, and a renegotiation of the terms of the preferred stock was not a real possibility. Indeed, Keywell resigned as President in March 2001 and Lefkofsky resigned as Chief Operating Officer in May 2001.

44.     As described above, by February 2001, HA-LO was in technical default under its credit facility. Although the terms of the credit facility allowed HA-LO to borrow funds to pay the preferred shareholders, because HA-LO had already exceeded its credit limit, the Company would be unable to borrow additional money under the credit facility. In April 2001, defendants Simon and

Kilrea negotiated a revised credit facility, approved by the HA-LO Board, which eliminated the Company's ability to finance the preferred shareholders payment under the credit facility. Thus, HA-LO was without the ability to borrow money to pay the preferred shareholders.

45.     Despite the increasingly dire financial situation at HA-LO, on April 6, 2001, defendants announced that the Company had relocated its corporate headquarters to 5800 West Touhy Avenue in Niles, Illinois as of April 2, 2001. HA-LO's new headquarters, a dramatic seven-story building designed by internationally-reknowned architect Helmut Jahn, also had a dramatic price tag. The $63.5 million building cost HA-LO $11.5 million a year in rent. While HA-LO later blamed its bankruptcy in part on this relocation, it had known since 1998 of this expense. Moreover, HA-LO never disclosed prior to its bankruptcy filing that the expense of the new headquarters could potentially cripple the company.

46.     Shortly after announcing its relocation to its expensive new headquarters, the Company announced a massive restructuring and deeper losses. On April 26, 2001, two months after the Company denied that it planned to write-off the Starbelly goodwill, the Company announced a first quarter loss of $27.5 million and an anticipated second quarter restructuring charge of approximately $300 to $325 million, the major component of which was the write-down of goodwill resulting from the acquisition of Starbelly.

47.     On May 10, 2001, HA-LO announced the sale of Market USA, Inc., its telemarketing services subsidiary, to SR.Teleperformance. The total purchase price was approximately $32.5 million and the Company stated that it would use the proceeds to pay down outstanding debt.

48.     In May 2001, recognizing that the Company's insufficient and reckless due diligence during the Starbelly acquisition, and knowing that HA-LO could not pay the preferred shareholders,

Simon retained Skadden, Arps, Slate, Meagher & Flom to investigate whether Starbelly committed fraud in connection with the merger.

49.     On May 9, 2001, defendant Simon informed JPMP that HA-LO would not honor its redemption payment obligations and threatened JPMP with a suit for fraud in connection with the acquisition of Starbelly.

50.     The preferred shareholders, however, were not to be put off, and as of May 14, 2001, approximately 4,400,000 shares of preferred stock had been submitted to the Company for redemption, representing a pending payout of $44 million in cash.  As described above, HA-LO was not permitted to finance this payment under its revised credit facility.  HA-LO was firmly set on the road to bankruptcy, but HA-LO refused to disclose its inevitable insolvency.

51.     In May 2001, Simon held a conference call with HA-LO management.  In response to questions concerning a potential bankruptcy filing , Simon stated the bankruptcy was not in HA-LO's plans.  Then, on June 14, 2001, HA-LO held a shareholder meeting.  During the meeting, Simon assured investors that HA-LO was not a bankruptcy candidate.  In addition, Simon made similar representations in the July 2001 issue of The Counselor.

52.     In June 2001, HA-LO received a delisting warning letter from the NYSE.  However, Simon did not disclose this letter to the Board until late July, or to the public.

53.     Eventually, HA-LO was forced to reveal the truth.  On July 30, 2001, HA-LO announced that the Company filed for reorganization under Chapter 11 of the United States Bankruptcy Code.  The Company stated that factors behind the Company's decision included "several non-operating issues such as the lease on the headquarters building and the acquisition of Starbelly.com."

54.     That same day, the NYSE announced it was immediately seeking to delist shares of HA-LO's common stock because the Company was below the NYSE's continued listing criteria relating to a 30 days average share price of less than $1.00.

55.     HA-LO's bankruptcy filing, however, was not the final news. On November 23, 2001, HA-LO issued a press release announcing that it would be restating its financial statements for fiscal years 1998, 1999 and 2000, and potentially for the first quarter of 2001, due to improper revenue recognition by a subsidiary. The Company explained that the restatement was necessary to "adjust accounts primarily at a non-core market services subsidiary. These adjustments, which were identified during the Company's internal financial review, relate principally to the recording of revenue." Specifically, the Company revealed that the restatement will affect its previously reported financial results as follows:

> -- a $6.9 million decrease in pretax income for 1998 (a 28% decrease in income) ;
> -- a $2.7 million increase in pretax loss for 1999 (a 9% increase in losses);
> -- a $4.2 million increase in pretax loss for 2000 (a 7% increase in losses); and
> -- a $1.2 million increase in pretax loss for the first quarter of 2001 (a 3% increase in losses).

Even if HA-LO never restates its first quarter of 2001 figures, HA-LO's press release indicates that it has previously over-reported pretax income (or under-reported pretax losses) by $13.8 million. If HA-LO does eventually restate its first quarter of 2001 figures, its press release indicates that an additional $1.2 million in pretax losses were under-reported. Six months after this public statement, however, in the face of hostile litigation, HA-LO still has not restated its financials

### Pre-Class Period Materially False And Misleading Statements

56.     On April 30, 1998, HA-LO issued a press release announcing record results for the first quarter of 1998, the period ended March 31, 1998. The Company reported net income of

- 16 -

$1,910,227, or $0.09 per share, a 199% increase over the first quarter of 1997. Sales rose a reported 31% over the 1997 first quarter, to $109,376,190.

57.     On May 15, 1998, HA-LO filed its Form 10-Q with the SEC for the first quarter of 1998, the period ended March 31, 1998, which was signed by defendant Gregory J. Kilrea, and confirmed the previously announced financial results.  With respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

58.     On July 30, 1998,  HA-LO issued a press release announcing its financial results for the second quarter of 1998, the period ended June 30, 1998.  The Company reported that net income reportedly rose 68% to $4,110,000 or $0.15 per share. Sales for the quarter were reported as $127,888,000, representing a 30% increase from the second quarter of 1997.

59.     On August 14, 1998, the Company filed a Form 10-Q with the SEC for the second quarter of 1998, the period ended June 30, 1998, which was signed by defendant Kilrea and confirmed the previously announced financial results.  With respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

60.     On October 29, 1998, HA-LO issued a press release announcing its financial results for the third quarter of 1998, the period ended September 30, 1998.  According to the press release the Company experienced "record" results, with net income of $5,985,000 or $.20 per diluted share, a 43% increase over the previous year's third quarter. Sales rose a reported 29% for the quarter, to $143,192,000.

61.     On November 13, 1998, the Company filed its Form 10-Q with the SEC for the third quarter of 1998, the period ended September 30, 1998, which was signed by defendant Kilrea and confirmed the previously announced financial results.  With respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

62.     The statements referenced above in paragraphs 56 - 61 remained alive and uncorrected throughout the Class Period.  These statements were each materially false and misleading when made because they failed to disclose:

(a)     that a HA-LO subsidiary was engaged in improper accounting practices that had the effect of materially overstating HA-LO's reported earnings; and

(b)     that HA-LO's financial statements were not prepared in accordance with GAAP and were therefore materially false and misleading.

**Materially False And Misleading Statements Made During The Class Period**

63.    On February 18, 1999, HA-LO issued a press release announcing its financial results for the fourth quarter and year-ended December 31, 1998.   For the fourth quarter of 1998, the Company reported net income of $9,773,000, or $0.30 per share, representing a 39% increase over the fourth quarter of 1997. Sales for the quarter were reported as $175,948,000.  For the year 1998, the Company reported net income of $24,520,000, a 65% increase over 1997, and sales of $589,669,000, 27% more than 1997.  In the press release, defendant Weisbach stated:

> . . . our recurring pretax earnings increased 79% to $51.2 million from $28.6 million in 1997. . . . internal revenue growth was 25% for the year.

64.    On March 30, 1999, HA-LO filed its Form 10-K for fiscal year 1998 with the SEC, which was signed by defendants Weisbach, Kilrea, and Nelson, among others, and confirmed the previously announced financial results and purported to contain audited financial statements.

65.    On April 29, 1999, HA-LO issued a press release announcing its financial results for the first quarter of 1999, the period ended March 31, 1999.  The Company reported another "record" quarter, with net income of $4,199,000, or $0.09 per share, and sales of $156,967,000.

66.    On May 14, 1999, the Company filed its Form 10-Q with the SEC for its first quarter of 1999, the period ended March 31, 1999, which was signed by defendant Kilrea and confirmed the previously announced financial results.  With respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial

statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

67.     On July 29, 1999, HA-LO issued a press release announcing its financial results for the second quarter of 1999, the period ended June 30, 1999. For the second quarter, the Company reported $160,312,000 in sales, an increase of 16% over the 1998 second quarter. Net income was $853,000, a decrease of 84% over the first quarter of 1998.

68.     On August 13, 1999, the Company filed its Form 10-Q with the SEC for the second quarter of 1999, the period ended June 30, 1999, which was signed by defendant Kilrea and confirmed the previously announced financial results. With respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

69.     On October 8, 1999, HA-LO issued a press release announcing its financial results for the third quarter of 1999, the period ended September 30, 1999. In the press release, the Company reported that it expects revenues of around $140-$150 million and a net loss per share of $.03-$.05.

70.     On November 15, 1999, the Company filed its Form 10-Q with the SEC for the third quarter of 1999, the period ended September 30, 1999, which was signed by defendant Kilrea and confirmed the previously announced financial results. With respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial

- 20 -

information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

71.     The statements referenced above in paragraphs 63 - 70 were each materially false and misleading when made because they failed to disclose:

(a)     that a HA-LO subsidiary was engaged in improper accounting practices that had the effect of materially overstating HA-LO's reported earnings; and

(b)     that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading.

72.     On January 18, 2000, HA-LO announced the signing of a definitive agreement to acquire Starbelly.com, Inc., "the premier internet business solution for custom-decorated merchandise." The press release stated in pertinent part:

The transaction brings together the industry's strongest players from the off-line and on-line worlds, combining HA-LO's market leadership and blue-chip customer relationships with Starbelly.com's sophisticated Internet business model. This marriage of off-line and on-line leadership positions HA-LO to redefine and dominate the global $75 billion branded and custom-decorated merchandise industry.

****

"Our acquisition of Starbelly.com is a cornerstone of HA-LO's e-transformation strategy and commitment to the future, igniting HA-LO for aggressive long-term growth and value creation through a combination of new market opportunities, operating efficiencies and infusion of innovative internet talent," said John Kelley, HA-LO president and chief executive officer.

****

Kelley said, "**Starbelly.com's revolutionary internet business model will expand HA-LO's penetration of the $15 billion promotional products market** through unprecedented client service, while also unleashing access to the broader $75 billion branded and custom-decorated merchandise market. While our focus will be rapid

- 21 -

top-line growth, we will enjoy margin improvements through technology-enabled operating efficiencies at every level of the supply chain. In addition, the incredible talent and passion of our combined management teams is an asset that will enable us to move at Internet speed."

73.     The statements in the January 18, 2000, press release were each materially false and misleading when made because they failed to disclose:

(a)     that HA-LO failed to conduct proper due diligence of Starbelly;

(b)     that Starbelly was not a fully functioning company and had neither the customer base nor operational capacity to support its business plan; and

(c)     that Starbelly was acquired by HA-LO only because of insider dealing between defendants Nelson, Keywell, and Lefkosky.

74.     In addition, defendant Keywell's statement that "Starbelly.com's revolutionary internet business model will expand HA-LO's penetration of the $15 billion promotional products market. . . ." was false and misleading when made because it falsely implied that there was a $15 billion Internet market for promotional products.  In fact, the entire promotional products market was a $15 billion industry and Internet sales of promotional products still was a developing and largely untested part of the industry.

75.     On February 17, 2000, HA-LO issued a press release announcing its financial results for the fourth quarter and fiscal year 1999, the period ended December 31, 1999.  For the fourth quarter of 1999, the Company reported sales of $185.8 million, a 6% increase over the fourth quarter of 1998. Net income for the quarter was $2 million, or $.04 per share.  For the entire year 1999, the Company reported sales of $650.4 million, up 10% over sales in 1998, and earnings of $4.5 million,

or $.09 per share. In the press release, defendant Kelley downplayed the Company's disappointing 1999 financial performance and highlighted beneficial strategic changes implemented during the year:

> While 1999 was a disappointing year financially, it was an extraordinary year strategically. . . . The profitability slowdown in 1999 was more than a wake-up call. It catapulted us to take actions that ensure a valuable future for HA-LO's customers, employees and shareholders.

76. The statements in the February 17, 2000 press release were each materially false and misleading when made because they failed to disclose:

(a) that a HA-LO subsidiary was engaged in improper accounting practices that had the effect of materially overstating HA-LO's reported earnings;

(b) that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading;

(c) that the "actions that ensure a valuable future for HA-LO's customers, employees and shareholders" (primarily the acquisition of Starbelly) were conducted without proper due diligence, leaving HA-LO with a company that was not fully functioning, had neither the customer base nor operational capacity to support its business plan; and was acquired by HA-LO only because of insider dealing between defendants Nelson, Keywell, and Lefkosky.

77. On March 30, 2000, HA-LO filed its Form 10-K for fiscal year 1999 with the SEC which was signed by, among others, defendants Kelley, Weisbach, Kilrea, and Nelson. The Form 10-K reiterated the previously announced financial results for the fourth quarter and year ended December 31, 1999, and represented that the financial statements included in the Form 10-K were audited.

78.     On April 27, 2000, HA-LO issued a press release announcing its financial results for the first quarter of 2000, the period ended March 31, 2000. Sales for the quarter were reportedly $161.2 million and the Company incurred a net loss of $4.6 million, or $.09 per share. In the press release, defendant Kelley touted the benefits of a pending acquisition:

> The first quarter of 2000 marks the end of an era. . . . **The expected close of our Starbelly.com acquisition significantly changes HA-LO's financial outlook**. As we execute against our **tightly-crafted integration plan**, our focus will be on aggressive top-line growth through new client services, productivity gains and entrance into new markets.

(Emphasis added).

79.     The statements referenced above in paragraphs 77 - 78 were each materially false and misleading when made because they failed to disclose:

(a)     that a HA-LO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HA-LO's reported earnings;

(b)     that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading;

(c)     that HA-LO failed to conduct proper due diligence of Starbelly;

(d)     that Starbelly was not a fully functioning company and had neither the customer base nor operational capacity to support its business plan;

(e)     that Starbelly was acquired by HA-LO only because of insider dealing between defendants Nelson, Keywell, and Lefkosky;

- 24 -

(f)    that, contrary to the "tightly-crafted integration plan" referenced by defendant Kelley, HA-LO had no strategy to integrate whatever assets Starbelly offered; and

(g)    that, because HA-LO had no strategy to improve its financial condition on account of its Starbelly acquisition, HA-LO's financial outlook could not reasonably be expected to change significantly for the better.

80.    On May 5, 2000, HA-LO announced the completion of its acquisition of Starbelly.com. The press release stated that the acquisition "positions HA-LO as the dominant Internet player in the $15 billion promotional products and custom-decorated merchandise industry." Commenting on the acquisition, defendant Kelley stated, "Today is a milestone in HA-LO's e-transformation and a great day for its customers, employees and shareholders. The addition of Starbelly's sophisticated Internet business model, along with HA-LO's market leadership and customer relationships, provides HA-LO with a strong platform for accelerated growth. Plans are well underway for a smooth integration."

81.    The statements in the May 5, 2000 press release were each materially false and misleading when made because they failed to disclose:

(a)    that HA-LO failed to conduct proper due diligence of Starbelly;

(b)    that Starbelly was not a fully functioning company and had neither the customer base, operational capacity, nor the "sophisticated Internet business model" to support its business plan; and

(c)    that Starbelly was acquired by HA-LO only because of insider dealing between defendants Nelson, Keywell, and Lefkosky.

82.     Indeed, contrary to the falsely positive statements in the May 5, 2000 press release, HA-LO executives knew or were reckless in not knowing that Starbelly was nothing more than a money-losing startup with scant assets beyond the ".com" at the end of its name. Defendant Kilrea later admitted that HA-LO had failed to exercise due diligence in investigating its $240 million investment: "Starbelly never lived up to the promises made by the sellers. Notwithstanding the fact that HA-LO later invested tens of millions of additional dollars in the development of Starbelly, the latter did not produce a penny of value."

83.     On May 3, 2000, the Company filed a Form S-3 Registration Statement registering the 4,909,031 shares of common, including the 829,156 shares issuable upon the conversion of convertible preferred stock, acquired by the selling shareholders of Starbelly. In the registration statement the Company disclosed:

> At any time during the 30-day period commencing on May 3, 2001, the holders of the convertible preferred stock issued in the Starbelly.com merger and upon exercise of assumed options will have the right to require us to redeem all or any part of their shares at a price per share in cash equal to the liquidation preference of $10.00 per share, plus any accrued and unpaid dividends. If holders of a significant number of shares of convertible preferred stock elect to have their shares redeemed, we will be required to borrow the funds necessary to pay the redemption price or to raise such funds through the public or private sale of debt or equity securities. As of May 1, 2000, the closing price of HA-LO common stock on the NYSE was $7.00 per share. There can be no assurance that adequate financing will be available to pay the redemption price or that the terms of any such financing will be satisfactory to us.

This warning was materially misleading, because it failed to disclose that the Company's troubled financial status ensured that HA-LO would be unable to finance the preferred shareholder payment.

84.     On May 15, 2000, the Company filed its Form 10-Q with the SEC for the first quarter of 2000, the period ended March 31, 2000, which was signed by defendant Kilrea and confirmed the

previously announced financial results. With respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

85. The statements referenced in HA-LO's Form 10-Q were each materially false and misleading when made because they failed to disclose:

(a)   that a HA-LO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HA-LO's reported earnings; and

(b)   that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading

86. On July 27, 2000, HA-LO issued a press release announcing its financial results for the second quarter of 2000, the period ended June 30, 2000. Sales for the quarter were reportedly $177.5 million, up 10.7% from the second quarter of 1999, and the Company incurred a net loss of $11.7 million, or $0.20 per share. Defendant Kelley stated the following regarding the May 5, 2000 acquisition of Starbelly.com:

> As expected, our results do not yet realize the impact of Starbelly.com. . . . However, **the acquisition has already begun paying off as large corporations have bought into the marketing power of our industry-leading Internet platform**. Our comprehensive integration plan is fully on track, and we expect to see significant operating efficiencies and new revenue opportunities in the months ahead. (Emphasis added).

- 27 -

87.    The statements in the July 27, 2000 press release were each materially false and misleading when made because they failed to disclose:

(a)    that a HA-LO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HA-LO's reported earnings;

(b)    that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading;

(c)    that HA-LO failed to conduct proper due diligence of Starbelly;

(d)    that Starbelly was not a fully functioning company and had neither the customer base nor operational capacity to support its business plan;

(e)    that Starbelly was acquired by HA-LO only because of insider dealing between defendants Nelson, Keywell, and Lefkosky;

(f)    that large corporations had not "bought into" the power of Starbelly, as Starbelly was operating at a net loss, and HA-LO was retiring the Starbelly name, shutting the Starbelly facility, and shutting down the Starbelly website.

88.    On August 14, 2000, the Company filed its Form 10-Q with the SEC for the second quarter of 2000, the period ended June 30, 2000, which was signed by defendant Kilrea and confirmed the previously announced financial results.  With respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial

statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

89. The statements in HA-LO's Form 10-Q were false and misleading when made because they failed to disclose:

(a) that a HA-LO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HA-LO's reported earnings; and

(b) that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading.

90. On October 25, 2000, HA-LO issued a press release announcing its financial results for the third quarter of 2000, the period ended September 30, 2000. Sales for the quarter were reportedly $175.2 million, an increase of 18.9% from the same period of 1999. A net loss of $17.6 million, or $0.27 per share, was reported for the quarter. The press release stated:

> This was the first full quarter that included the combined impact of the Company's acquisition of Starbelly.com, the leading business-to-business e-commerce marketer of promotional products. . . .

With regard to HA-LO's recent efforts to increase productivity and sales growth, the October 25, 2000 press release quoted defendant Kelley as stating:

> Our results are just beginning to reflect the significant sales and productivity enhancements brought about through last quarter's acquisition of Starbelly.com . . . The number of business customers using our Internet solutions has grown rapidly since we introduced our four online service offerings earlier this quarter, and we have a healthy number of additional customer online stores in the pipeline. . . .

91. The statements in the October 25, 2000 press release were false and misleading when made because they failed to disclose:

(a)     that a HA-LO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HA-LO's reported earnings;

(b)     that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading;

(c)     that HA-LO failed to conduct proper due diligence of Starbelly;

(d)     that Starbelly was not a fully functioning company and had neither the customer base nor operational capacity to support its business plan;

(e)     that Starbelly was acquired by HA-LO only because of insider dealing between defendants Nelson, Keywell, and Lefkosky.

(f)     that HA-LO was retiring the Starbelly name, shutting the Starbelly facility, and shutting down the Starbelly website.

92.     On November 13, 2000, the Company filed its Form 10-Q with the SEC for the third quarter of 2000, the period ended September 30, 2000, which was signed by defendant Kilrea and confirmed the previously announced financial results. With respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

93.     The statements in the Form 10-Q were materially false and misleading when made because they failed to disclose:

(a)     that a HA-LO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HA-LO's reported earnings; and

(b)     that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading.

94.     On February 15, 2001, HA-LO issued a press release announcing its results for the fourth quarter and year ended December 31, 2000. For the fourth quarter, sales were reportedly $202 million, up 8.7% from the previous year's fourth quarter, and net loss for the quarter totaled $15.9 million or $0.24 per share. Commenting on the Company's supposedly successful efforts at increasing productivity, defendant Kilrea stated the following:

> Our results reflect momentum in our leading promotional products business, indicative of the sales and productivity enhancements brought about by our technology-based business model. . . .

95.     The statements in the February 15, 2001 press release were false and misleading when made because they failed to disclose:

(a)     that a HA-LO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HA-LO's reported earnings;

(b)     that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading;

(c)     that HA-LO failed to conduct proper due diligence of Starbelly;

- 31 -

(d)     that Starbelly was not a fully functioning company and had neither the customer base nor operational capacity to support its business plan; and

(e)     that Starbelly was acquired by HA-LO only because of insider dealing between defendants Nelson, Keywell, and Lefkosky; and

(f)     that HA-LO was in default under its credit facility.

96.     On February 19, 2001 in an <u>Crain's Chicago Business</u> article concerning the value of the Starbelly acquisitions, a HA-LO spokeswoman stated: "We don't anticipate a writeoff of the Starbelly goodwill."

97.     The statement in the February 19, 2001 <u>Crain's</u> article was materially false and misleading when made because, as described below, not only did HA-LO know it had to write-off the Starbelly goodwill, but even worse, it knew it should have done so months earlier.

98.     On March 30, 2001, HA-LO filed its Form 10-K for fiscal year 2000 with the SEC which was signed by, among others, defendants Simon, Kelley, Kilrea, Weisbach, and Lefkofsky. In addition, the Form 10-K was signed by defendant Keywell, but the Form 10-K was amended on April 27, 2001 to remove Keywell's signature. The Form 10-K reiterated the previously announced financial results for the fourth quarter and year ended December 31, 2000, and represented that the financial statements included in the Form 10-K were audited.

99.     In the 2000 10-K, the Company stated that as of December 31, 2000, it was in violation of a covenant under its credit facility due to its operating results for the previous four quarters. The Company also stated that it had advised its banks it would be in violation at the end of the first quarter of 2001. According to the 10-K, as of December 31, 2000, the Company's

- 32 -

outstanding borrowings under its $80 million credit facility were $64.2 million, and, as of March 27, 2001 outstanding borrowings were $53.5 million, down from a peak of $71.9 million reached on February 9, 2001.

100.    The 2000 10-K included a discussion of the Company's strategies to "continue reducing its leverage," including  a cost reduction plan initiated by defendant Simon and the sale of its Market USA and LAGA business units.   The 2000 10-K stated that management believed expenses would be reduced by $10-15 million in 2001, the sale of the two business units would raise approximately $50 million, and that these actions would be sufficient to meet the Company's liquidity needs for 2001.

101.    The 2000 10-K also stated that the Company was precluded from borrowing on its credit facility to fund the preferred stock redemption.  The 2000 10-K further stated:

> "Management **is in the process of renegotiating** the terms of the preferred stock and **has received preliminary indications from the majority preferred stockholder** that this will result in some combination of an extension of payment terms of at least twelve months, modification of conversion rights, and revision of dividend rates for default payments." (emphasis added).

102.    The statements referenced in the 2000 10-K were each materially false and misleading when made because they failed to disclose:

(a)     that a HA-LO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HA-LO's reported earnings;

(b)     that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading;

- 33 -

(c)      that the potential sale of Market USA and LAGA, as well as cutting expenses would not solved the Company's liquidity problems because, at the very least, HA-LO needed liquid assets to repay $53.5 in outstanding borrowings as well as $40-50 million to pay the preferred shareholder redemption.

(d)      that under an agreement with its lenders, all receivables were directly applied to HA-LO's outstanding debt under the credit facility;

(e)      that HA-LO was unable to borrow under the credit facility to pay the preferred shareholders because defendants Simon and Kilrea had renegotiated, and the Board had approved, the credit to eliminate the provisions that allowed the credit facility to be used to pay the preferred shareholders;

(f)      that even before the credit facility had been renegotiated, it could not be used to pay the preferred shareholders because HA-LO was in default under the credit facility;

(g)      that HA-LO was not renegotiating the terms of the preferred stock and, indeed, the largest preferred shareholder, JPMP had refused to provide written assurance that such negotiations were taking place and had directed defendant Simon not to make any representations on JPMP's behalf regarding the preferred stock.

103.    On April 6, 2001, HA-LO issued a press release announcing that it had moved into its new headquarters. Commenting on the move, defendant Weisbach stated in the April 6, 2001 press release, "This is a very exciting time for HALO. The move to our new corporate headquarters signifies a fresh period of growth and prosperity as we reiterate our position as the industry leader."

- 34 -

104.    The statements in the April 6, 2001 press release were false and misleading when made because they failed to disclose that the Company's lease obligation on its new headquarters, approximately $11.5 million per year, combined with the pending $50 million cash payment to the preferred shareholders, as well as the Company's default on its credit facility placed HA-LO in a serious financial crisis, not in a position for "growth and prosperity."

105.    On April 26, 2001, HA-LO issued a press release announcing its financial results for the first quarter of 2001, the period ended March 31, 2001. The press release reported HA-LO's sales as $113.4 million and a net loss of $28.7 million, or $0.41 per share.

106.    The statements in the April 26, 2001 press release were materially false and misleading when made because they failed to disclose:

(a)    that a HA-LO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HA-LO's reported earnings; and

(b)    that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading.

107.    On May 15, 2001, the Company filed its Form 10-Q with the SEC for the first quarter of 2001, the period ended March 31, 2001, which was signed by defendant Kilrea and confirmed the previously announced financial results. With respect to the financial statements contained therein, the Form 10-Q stated:

> The accompanying financial statements have been prepared by the Company, without audit, in accordance with generally accepted accounting principles for interim financial information and in conjunction with the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for financial

- 35 -

statements. In the opinion of management, all adjustments (consisting only of normal recurring matters) considered necessary for a fair presentation have been included.

108.    The 2001 First Quarter 10-Q also stated, with respect to the preferred shareholders:

. . . . the Company has an obligation to holders of the redeemable preferred stock. **Management is attempting to renegotiate** the terms of the preferred stock. . . . **Preliminary discussions have been held with various preferred stockholders**. No resolution has been reached to date, and there can be no assurances that the terms of the preferred stock will be renegotiated.  (Emphasis added).

109.    The statements referenced in the 10-Q were each materially false and misleading when made because they failed to disclose:

(a)    that a HA-LO subsidiary was engaged in improper accounting practices which had the effect of materially overstating HA-LO's reported earnings;

(b)    that HA-LO's financial statements issued during the Class Period were not prepared in accordance with GAAP and were therefore materially false and misleading;

(c)    that HA-LO was not renegotiating the terms of the preferred stock and, indeed, the largest preferred shareholder, JPMP had refused to provide written assurance that such negotiations were taking place and had directed defendant Simon not to make any representations on JPMP's behalf regarding the preferred stock;

(d)    that Simon had informed JPMP that HA-LO would not honor its redemption payment obligations;

(e)    that HA-LO's relationship with Keywell and Lefkofsky had deteriorated to such an extent that a resolution of the preferred stock was highly unlikely; indeed, both Keywell and

Lefkofsky had resigned from their executive positions at HA-LO, and soon both would resign from the HA-LO Board;

(f)     that Simon had retained Skadden, Arps, Slate, Meagher & Flom to investigate whether Starbelly committed fraud in connection with the acquisition; and

(g)     that all receivable were directly applied to paying HA-LO's outstanding debt under the credit facility so that the Company had no means to pay the preferred shareholders.

110.    On June 14, 2001, the Company issued a press release which included the following highlight's from Simon's address to stockholders concerning the current state of HA-LO's business affairs:

- The Company's bank debt has been reduced from a high of $74 million in mid-February to $14 million this week.
- The Company has completed the divestitures of two of the Company's marketing service units: Market USA, a leading provider of inbound and outbound telemarketing services; and Lipson, Alport, Glass & Associates (LAGA), a brand strategy and identity agency. The Company has also divested its interest in iDentify, a licensing joint venture with Ford Motor Company.
- Promotional products receivable aging has been improved from 68 DSO (Days Sales Outstanding) in mid-February to 53 DSO as of this week. Collections on older receivables have improved, reducing the over 60-days receivables from $23 million in mid-February to $12 million as of this week.
- HALO is engaged in active negotiations with the owner of its corporate headquarters building and with certain preferred stockholders regarding the restructuring of these obligations.

111.    The statements in the June 14, 2001 press release were false and misleading when made because the failed to disclose:

(a)     that HA-LO was not renegotiating the terms of the preferred stock and, indeed, the largest preferred shareholder, JPMP had refused to provide written assurance that such

- 37 -

negotiations were taking place and had directed defendant Simon not to make any representations on JPMP's behalf regarding the preferred stock;

(b)     that Simon had informed JPMP that HA-LO would not honor its redemption payment obligations;

(c)     that HA-LO's relationship with Keywell and Lefkofsky had deteriorated to such an extent that a resolution of the preferred stock was highly unlikely; indeed, both Keywell and Lefkofsky had resigned from their executive positions at HA-LO, and soon both would resign from the HA-LO Board;

(d)     that Simon had retained Skadden, Arps, Slate, Meagher & Flom to investigate whether Starbelly committed fraud in connection with the acquisition; and

(e)     that all receivable were directly applied to paying HA-LO's outstanding debt under the credit facility so that the Company had no means to pay the preferred shareholders.

112.    Also on June 14, 2001, HA-LO's board of Directors meet.  During the Meeting, defendant Simon stated that HA-LO is not a candidate for Chapter 11 and that HA-LO is financially stable.

113.    The July 2001 issue of <u>The Counselor</u> quotes defendant Simon as stating: "Our troubled waters are behind us, and we've almost finished what we've set out to do. . . . By no means is this company a candidate for bankruptcy."

114.    The statements in the July 2001 issue of <u>The Counselor</u> were false and misleading when made because they failed to disclose:

(a)     that HA-LO had retained Orrick, Herrington & Sutcliffe and Silverman Consulting in March 2001 for advise on creditor rights and restructuring; and

- 38 -

(b)    that all receivable were directly applied to paying HA-LO's outstanding debt under the credit facility so that the Company had no means to pay the preferred shareholders.

115.    On July 30, 2001, the last day of the Class Period, HA-LO announced that the Company filed for reorganization under Chapter 11 of the United States Bankruptcy Code. The Company stated that factors behind the Company's decision included "several non-operating issues such as the lease on the headquarters building and the acquisition of Starbelly.com."

116.    After the announcement of HA-LO's bankruptcy, the Company's stock fell to $.05 per share, a 99% decline from the Class Period high of 14.06 per share on May 12, 1999.

## HA- LO'S FALSE AND MISLEADING FINANCIAL REPORTING

117.    Defendants represented that HA-LO's Class Period financial statements were prepared in accordance with GAAP. As set forth below, these representations were materially false and misleading because defendants caused HA-LO to issue false and misleading financial statements that misrepresented and/or artificially and improperly inflated the Company's operating results during the Class Period.

118.    As described above, prior to and during the Class Period, HA-LO was experiencing significant business problems that were not made known to the market. Defendants attempted to mask these problems, in part, by acquiring other companies using the HA-LO's inflated common stock as currency.    Ultimately, when confronted with the limited viability of HA-LO's business model, defendants, with knowledge, or in reckless disregard engaged in undisclosed self-dealing and caused HA-LO to acquire Starbelly.

119.    During the Class Period, HA-LO, in violation of GAAP, issued financial statements that failed to disclose the related-party nature of the Starbelly acquisition. Moreover, HA-LO failed

to timely record an impairment in the value of its investment in Starbelly. As a result of these manipulations, HA-LO issued financial statements during the Class Period that were materially false and misleading and that violated GAAP, as the defendants knew, or recklessly ignored. In these ways, unsuspecting investors were deceived about HA-LO's true operating results during the Class Period.

120. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

### False Accounting With Respect to the Starbelly Acquisition

121. GAAP, in Accounting Principles Board ("APB") Opinion No. 16, provided that the purchase method of accounting requires the acquiring entity to record the individual assets and liabilities of the acquiree at their fair market values at time of the acquisition.[1] The purchase method

---

[1] APB No. 16 was superseded subsequent to the Class Period.

also provides that the acquiror will report goodwill in accounting for an acquisition if, and to the extent that, the fair value of the consideration issued exceeds the fair values of the assets and liabilities acquired (i.e., goodwill generally equals the consideration issued minus assets received plus liabilities assumed).

122.    On or about January 18, 2000, HA-LO issued a press release announcing the signing of a "definitive agreement" to purchase Starbelly. The press release disclosed that the transaction was valued at $240 million. This press release was filed as an exhibit to the Company's Form 8-K filed with the SEC on or about January 21, 2000.

123.    On or about May 5, 2000, HA-LO issued a press release disclosing the completion of the Starbelly acquisition. The terms of the acquisition were not disclosed in the press release.

124.    On or about May 12, 2000, HA-LO filed an Form 8-K filed with the SEC. The Form 8-K contained Amendment No. 1 to the HA-LO/ Starbelly merger agreement dated April 11, 2000. This amendment also valued the acquisition at $240 million. The Form 8-K also included pro-forma financial statements that gave effect to the Starbelly merger transaction. Inexplicably, these pro-forma financial statements accounted for the Starbelly acquisition using a purchase price of $176 million. This amount was approximately $64 million less than the amount HA-LO disclosed when it signed its "definitive agreement" to purchase Starbelly in January 2000, and the amount noted in Amendment No. 1 of the HA-LO/ Starbelly merger agreement dated April 11, 2000.

125.    The Form 8-K revealed that **Starbelly's net sales in 1999 totaled $347,000 and its gross profit totaled only $38,000**.[2]

_____

    [2]    Gross profit equals sales minus costs of sales.

- 41 -

126.    The Form 8-K also disclosed that Ha-Lo utilized the "purchase method" in accounting for the acquisition of Starbelly.  As noted above, the "purchase method" of accounting required Ha-Lo to account for the individual assets and liabilities of Starbelly at their fair market value at time of the acquisition.  The Form 8-K disclosed that **approximately $163 million of the $176 million of the cost to purchase Starbelly, or 93%, was goodwill** (i.e., consideration issued to acquire Starbelly in excess of the fair value of net assets acquired from Starbelly).

127.    On or about August 14, 2000, HA-LO filed its Form 10-Q for the quarter ended June 30, 2000.  Footnote 5 to the Company's financial statements for the quarter ended June 30, 2000, included in the Form 10-Q, disclosed that the amount of goodwill recorded on the Starbelly acquisition totaled $226 million, or approximately $50 million more than the amount reflected in HA-LO's Form 8-K filed May 12, 2000.  When HA-LO filed its financial statements for the year ended December 31, 2000, the Company again changed the amount of goodwill it recorded on the Starbelly transaction,  disclosing that such amount approximated $210 million.

128.    HA-LO's Class Period financial statements were materially false and misleading in that they failed to disclose the reasons for the numerous material changes in goodwill it reported on the Starbelly acquisition.   Moreover, HA-LO's Class Period financial statements were otherwise materially false and misleading in that they failed to disclose the related-party nature of the Starbelly acquisition.

129.    GAAP, in FASB's Statement of Financial Accounting Standards ("SFAS") No. 57, requires that financial statements disclose related party transactions because, among other things, "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis."  Accordingly, SFAS No. 57 requires that financial statements include disclosures about

- 42 -

material related party transactions which include: (a) the nature of the relationship(s), (b) a description of the transaction, (c) the dollar amount of transactions for each period for which an income statement is presented, and (d) the amounts due from or to the related parties as of the date of each balance sheet. SFAS No. 57 indicates that transactions between an enterprise and its principal owners, directors, management, or members of their immediate families are examples of related party transactions. Pursuant to SFAS No. 57, immediate family members include those individuals who may influence a principal owner of the entity or a member of its management because of the family relationship. In addition SFAS No. 57 provides that a party is related if it can significantly influence management or can significantly influence the other transacting party to the extent that it may be prevented from fully pursuing its own separate interest.

130.     Because Keywell and Nelson were related by marriage, the Starbelly acquisition cannot be presumed to have been carried out at arms-length. Indeed, the preposterously high purchase price confirms this: **HA-LO paid an amount equal to almost 700 times Starbelly's 1999 sales**, and **the net assets acquired totaled less than10% of Starbelly's purchase price**.

131.     The foregoing facts indicate that HA-LO's financial statement disclosures concerning the Starbelly acquisition during the Class Period were materially false and misleading. Defendants knew, or recklessly ignored, that HA-LO's disclosures concerning the Starbelly acquisition violated GAAP, the principles of fair reporting and masked self-dealing by Defendants.

### Ha- Lo's Failure To Timely Record Impaired Goodwill

132.     Defendants compounded HA-LO's improper reporting of the Starbelly acquisition, and their statements were otherwise materially false and misleading, because the Company failed to timely record a charge against income for the impairment in the value of goodwill it recorded on the

Starbelly acquisition. Thus, in yet another way, HA-LO's Class Period financial statements were not presented in conformity with GAAP as well as the rules and regulations of the SEC, and misrepresented and distorted the Company's true operating results.

133.    GAAP, in SFAS No. 5, provides that financial statements recognize and report a charge to income when: a) information existing at the date of the financial statements indicates that it is probable (e.g., a likely chance) that an asset had been impaired, and, b) the amount of such impairment can be reasonably estimated.

134.    In addition, FASB's SFAS No. 121 required that where events or changes in circumstances indicate that the carrying value of the asset may not be recoverable, then: 1) the entity shall estimate the future undiscounted cash flows resulting from the use of the asset and its disposition, and 2) compare the estimated future cash flows against the carrying (i.e., the reported) value of the asset. If the sum of the expected future cash flows is less than the carrying value, the entity shall record an impairment loss. Pursuant to SFAS No. 121, if goodwill is associated with the assets subject to an impairment loss, the carrying value of goodwill is reduced to zero via a charge against earnings before an impairment loss is charged against the carrying value of the impaired asset.

135.    As noted above, it was widely known among HA-LO employees that the value of goodwill recorded upon the acquisition of Starbelly was highly inflated. Indeed, within two months of the completion of the Starbelly acquisition, HA-LO retired the Starbelly name, closed its facility, and shut down its web site.

136.    These circumstances indicated that the value of HA-LO's goodwill on the Starbelly acquisition was impaired as early as June 30, 2000 and certainly by the end of the September 30, 2000

- 44 -

quarter. Nonetheless, HA-LO failed to timely record a loss on the impairment in the carrying value of its reported goodwill in its Class Period financial statements in accordance with GAAP.

137.    Ultimately, in the Spring of 2001, just prior to its filing for relief under Chapter 11 of the Federal Bankruptcy Code, and only after realizing it could no longer inflate its operating results by ignoring the impairment in the value of its goodwill, the Company reported a $300 million restructuring charge, in part, to write off the goodwill associated with the Starbelly acquisition.

138.    As a result of the foregoing, HA-LO's Class Period financial statements concealed the truth concerning the Company's business, operations, and financial performance to the detriment of unsuspecting investors. In addition to the accounting improprieties noted above, HA-LO presented its Class Period financial statements in a manner which also violated at least the following provisions of GAAP:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

(c)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities

- 45 -

of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

        (d) The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

        (e)    The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

        (f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79); and

        (g) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

139.    At all relevant times, the market for HA-LO's securities was an efficient market for the following reasons, among others:

(a)      HA-LO's stock met the requirements for listing, and was listed and actively traded on the NYSE Stock Exchange, a highly efficient and automated market;

(b)      As a regulated issuer, HA-LO filed periodic public reports with the SEC and the NYSE;

(c)      HA-LO regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      HA-LO was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

140.    As a result of the foregoing, the market for HA-LO's securities promptly digested current information regarding HA-LO from all publicly available sources and reflected such information in HA-LO's stock price. Under these circumstances, all purchasers of HA-LO's securities during the Class Period suffered similar injury through their purchase of HA-LO's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

141.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful

cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of HA-LO who knew that those statements were false when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

142. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of HA-LO between February 18, 1999 and July 30, 2001, inclusive, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest. Also excluded from the class are all persons and entities that acquired HA-LO securities as part of the Starbelly acquisition.

143. The members of the Class are so numerous that joinder of all members is impracticable. According to HA-LO's Form 10-K for the year ended December 31, 2001, filed with the SEC on March 30, 2001, HA-LO had approximately 69.7 million shares of common stock outstanding as of March 13, 2001. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members

- 48 -

of the Class may be identified from records maintained by HA-LO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

144.  Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

145.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

146.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts about the business, operations, and financial statements of HA-LO;

(c)  whether defendants acted with scienter; and

(d)  to what extent the members of the Class have sustained damages and the proper measure of damages.

147.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages suffered by individual Class members may be relatively

- 49 -

small and the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against Defendants

148.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

149.    During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HA-LO's securities; and (iii) cause plaintiffs and other members of the Class to purchase HA-LO's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

150.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for HA-LO's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

151.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

152.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of HA-LO as specified herein.

153.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of HA-LO's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of HA-LO's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired HA-LO securities during the Class Period at artificially high prices and were damaged thereby.

154.     At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of HA-LO, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their HA-LO securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

155.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

156.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Defendants

157.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

158.     Defendants acted as controlling persons of HA-LO within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, defendants had the power to influence and control and did

- 52 -

influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

159.    In particular, each defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

160.    As set forth above, HA-LO violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to Section 20(a) of the Exchange Act for HA-LO's violations of law. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

- 53 -

(c)     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 28, 2002                     By: _____

Marvin A. Miller
Jennifer Winter Sprengel
Matthew E. Van Tine
**Miller Faucher and Cafferty LLP**
30 North LaSalle Street
Suite 3200
Chicago, Illinois 60602
(312) 782-4880

*Class Liaison Counsel*

Clifford S. Goodstein
Susan M. Greenwood
**Milberg Weiss Bershad Hynes
  & Lerach LLP**
One Pennsylvania Plaza - 49th Floor
New York, New York 10119
(212) 594-5300

Marc I. Willner
**Schiffrin & Barroway, LLP**
Three Bala Plaza East
Suite 4000
Bala Cynwyd, Pennsylvania 19004
(610) 667-7706

*Class Co-Lead Counsel*

Scott Poynter
Stewart Cearley
**Cauley Geller Bowman & Coates, LLP**
11311 Arcade Drive Suite 200
P.O. Box 25438
Little Rock, Arkansas 72212
(501) 312-8500

Adam J. Levitt
**Wolf Haldenstein Adler Freeman
  & Herz LLC**
656 West Randolph Street , Suite 500W
Chicago, Illinois 60661
(312) 466-9200

*Class Executive Committee*