**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**DOCKETED**

JAN 1 5 2004

RAYMOND SPAGNOLA, Individually And On
Behalf Of All Others Similarly Situated,

Plaintiffs, vs.

GREGORY J. KILREA, LOU WEISBACH, JOHN
R. KELLEY JR., MARC S. SIMON, LINDEN D.
NELSON, BRADLEY KEYWELL, and ERIC
LEFKOFSKY,

Defendants.

Case No. 02 C 0270

Judge James F. Holderman

FILED
JAN 1 4 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**PLAINTIFFS' MEMORANDUM OF LAW IN**

**OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT**

(Addressing issues of individual liability)

RECEIVED FOR FILING

04 JAN 14 PM 5: 09

CLERK
U.S. DISTRICT COURT

DOCS\173360v1



**TABLE OF CONTENTS**

**Page**

I. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT BASED ON THEIR PURPORTED FAILURE TO MAKE FALSE STATEMENTS ......................1

II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON SCIENTER GROUNDS ..........................................................................................3

    A. SCIENTER RELATED TO HA-LO'S OVERSTATEMENT OF STARBELLY GOODWILL ............................................................................5

    B. SCIENTER RELATED TO ACQUISITION OF STARBELLY ...........................6

    C. SCIENTER AS TO THE INTEGRATION OF STARBELLY ...............................9

    D. SCIENTER WITH RESPECT TO IMPROPER UPSHOT ACCOUNTING ALLEGATIONS ........................................................................10

    E. SCIENTER BASED ON MOTIVE AND OPPORTUNITY.................................13

III. DEFENDANTS ARE LIABLE AS CONTROL PERSONS.............................................14

    A. *Eric Lefkofsky*................................................................................................15

    B. *Brad Keywell*.................................................................................................17

    C. *John R. Kelley* ...............................................................................................18

    D. *Gregory Kilrea*..............................................................................................19

    E. *Linden Nelson* ...............................................................................................21

    F. *Lou Weisbach*................................................................................................23

IV. CONCLUSION..................................................................................................................26

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

In re Advanta Corp. Sec. Litig.,
180 F.3d 525 (3rd Cir. 1999) ........................................................................................3

Aldridge v. A.T. Cross Corp.,
284 F.3d 72 (1st Cir. 2002) ..........................................................................................5

Ballan v. Upjohn Co.,
814 F. Supp. 1375 (W.D. Mich. 1992) ........................................................................17

Buxbaum v. Deutsche Bank AG,
196 F. Supp. 2d 367 (S.D.N.Y. 2002) ..........................................................................3

In re Complete Mgmt., Sec. Litig.
153 F. Supp. 2d 314 (S.D.N.Y. 2001) ......................................................................3, 14

Cooper v. Pickett,
137 F.3d 616 (9th Cir. 1998) .........................................................................................2

Danis v. USN Communications, Inc.,
73 F. Supp. 2d 923 (N.D. Ill. 1999) ..........................................................................1, 14

In re Enron Corp. Sec., Derivative & ERISA Litig.,
No. H-01-3624, 2003 U.S. Dist. LEXIS 1668 (S.D. Tex. Jan. 28, 2003) ...................15

Ernst & Ernst v. Hochfelder,
425 U.S. 185 (1976) .......................................................................................................3

Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,
270 F.3d 645 (8th Cir. 2001) .......................................................................................14

Harrison v. Dean Witter Reynolds, Inc.,
974 F.2d 873 (7th Cir. 1992) ...........................................................................15, 16, 20

Howard v. Everex Sys.,
228 F.3d 1057 (9th Cir. 2000) .....................................................................................16

Lindelow v. Hill,
No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301 (N.D. Ill. July 19, 2001) ...................20

Marksman Partners L.P. v. Chantal Pharm. Corp.,
927 F. Supp. 1297 (C.D. Cal. 1996) ...........................................................................12

Case: 1:02-cv-00270 Document #: 188 Filed: 01/14/04 Page 4 of 32 PageID #:1858

In re McKesson HBOC Inc. Sec. Litig.,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................................12

In re MicroStrategy Inc. Sec. Litig.,
115 F. Supp. 2d 620 (E.D. Va. 2000) ...............................................................................13

Nathenson v. Zonagen Inc.,
267 F.3d 400 (5th Cir. 2001) ..............................................................................................4

Novak v. Kasaks,
216 F.3d 300 (2d Cir. 2000)..............................................................................................13

In re Oxford Health Plans, Inc., Sec. Litig.,
187 F.R.D. 133 (S.D.N.Y. 1999) .......................................................................................1

Pearson v. Youngstown Sheet & Tube Co.,
332 F.2d 439 (7th Cir. 1964) ..............................................................................................2

Press v. Chem. Inv. Servs. Corp.,
166 F.3d 529 (2d Cir. 1999)................................................................................................3

In re Raytheon Sec. Litig.,
157 F. Supp. 2d 131 (D. Mass. 2001) ...............................................................................12

Rehm v. Eagle Fin. Corp.,
954 F. Supp. 1246 (N.D. Ill. 1997) ...................................................................................13

SEC v. First Sec. Co.,
463 F.2d 981 (7th Cir. 1972) ............................................................................................15

Schaffer v. Evolving Sys., Inc.,
29 F. Supp. 2d 1213 (D. Colo. 1998)................................................................................18

Schiller v. Physicians Res. Group, Inc.,
342 F.3d 563 (5th Cir. 2003) ..............................................................................................2

Schwartz v. Celestial Seasonings,
124 F.3d 1246 (10th Cir. 1997) ........................................................................................18

In re Sears, Roebuck & Co. Sec. Litig.,
No. 02 C 7527, 2003 U.S. Dist. LEXIS 19126 (N.D. Ill. Oct. 23, 2003) .....................3, 16

Stavros v. Exelon Corp.,
266 F. Supp. 2d 833 (N.D. Ill. 2003) ................................................................................3

Steelco Stainless Steel, Inc. v. Federal Trade Com.,
187 F.2d 693 (7th Cir. 1951) ..............................................................................................2

DOCS\173360v1

iii

In re Stratosphere Corp. Sec. Litig.,
    1 F. Supp. 2d 1096 (D. Nev. 1998)........................................................................18

Sutton v. Bernard,
    No. 00 C 6676, 2001 U.S. Dist. LEXIS 11610 (N.D. Ill. Aug. 6, 2001)................1, 2

In re Time Warner Sec. Litig.,
    9 F.3d 259 (2d Cir. 1993).....................................................................................13

In re Westell Technologies, Inc. Sec. Litig.,
    No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867 (N.D. Ill. Oct. 26, 2001) ...................3

In re Unisys Corp. Sec. Litig.,
    No. 99-5333, 2000 U.S. Dist. LEXIS 13500 (E.D. Pa. Sept. 21, 2000) ...................14

Zuckerman v. Foxmeyer Health Corp.,
    4 F. Supp. 2d 618 (N.D. Tex. 1998) ......................................................................18

## FEDERAL STATUTES

15 U.S.C. § 78t(a) ..................................................................................................15

17 C.F.R. § 210.1-02(b)...........................................................................................19

## STATE STATUTES

805 ILCS 5/8.05........................................................................................................16, 18

In Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Plaintiffs explain why each of the statements or omissions is indeed false or misleading, indicating how HA-LO's officers and directors were aware of, or were reckless to, facts that contradicted the public statements made.

This brief assumes that Plaintiffs can withstand summary judgment on the falsity of the statements and omissions alleged, and addresses particular issues of individual liability raised by Defendants.

## I. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT BASED ON THEIR PURPORTED FAILURE TO MAKE FALSE STATEMENTS

There is no question that a defendant is liable for a statement he made. This includes, of course, statements in public filings that a defendant signed. Defendant are liable for those statements that were published by HA-LO's top management. As held by numerous courts both before and after the enactment of the PSLRA, misstatements contained in company documents may be presumed to be the collective work of that company's directors and officers and can serve as a sufficient basis for liability under Section 10(b). *See Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923, 939 n.9 (N.D. Ill. 1999) (citing *In re Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y. 1999).

The "group pleading" doctrine allows plaintiffs "to rely on the presumption that certain statements of a company, such as financial reports, prospectuses, registration statements, and press releases, are the collective work of those high-level individuals with direct involvement in the everyday business of the company." *Sutton v. Bernard*, No. 00 C 6676, 2001 U.S. Dist. LEXIS 11610, at *15 n.5 (N.D. Ill. Aug. 6, 2001) (citing *Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923, 939 n.9 (N.D. Ill. 1999)). In other words, under the group publication doctrine, a court does not have to consider the liability of each individual defendant for group published documents, but rather may presume that such documents "represent the collective work of []

individuals directly involved in the company's daily management." *Schiller v. Physicians Res. Group, Inc.*, 342 F.3d 563, 569 n.4 (5th Cir. 2003). Because a corporation can speak or act only through its agents, *see Pearson v. Youngstown Sheet & Tube Co.*, 332 F.2d 439, 447 (7th Cir. 1964); *Steelco Stainless Steel, Inc. v. Federal Trade Com.*, 187 F.2d 693, 697 (7th Cir. 1951), the group publication doctrine's presumption is a logical construct of corporate governance.

Here, none of Defendants challenge the allegations of the Amended Complaint (*see* ¶¶ 10-19) that Defendants, "by virtue of their high-level positions, were directly involved in the day-to-day operations of the Company[.]" Nor, as shown below with respect to allegations regarding control person liability, can they challenge the allegations that each Defendant participated in the management of the Company and was intimately knowledgeable of corporate matters underlying the alleged fraud. *Id.* These allegations are sufficient to invoke the presumption that Defendants are each liable for making or authorizing the false and misleading "group published" statements. *See Sutton*, 2001 U.S. Dist. LEXIS 11610 at *17-18 (where plaintiffs set forth the defendants' roles during the class period and alleged, inter alia, that the defendants were "top executives," ran the company as "hands on managers," and closely monitored the company's business performance, plaintiffs had sufficiently alleged liability for group published documents).

Even without the "group pleading doctrine," Defendants remain liable under § 10(b) for engaging in manipulative and deceptive acts in furtherance of a fraudulent scheme. Section 10(b) prohibits manipulative and deceptive practices, not just the making of false statements, as the United States Supreme Court has confirmed. In this case, Plaintiffs have set forth above Defendants' manipulative and deceptive practice of covering up HA-LO's declining financial situation through false representations of its financial statements and prospects. Accordingly, Defendants are subject to liability under § 10(b) even if they did not make a false and misleading

DOCS\173360v1

2

statement. *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1998) ("Central Bank does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme.").

## II.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON SCIENTER GROUNDS

To establish scienter, or the "mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), Plaintiffs must demonstrate facts "establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior[.]" *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534-35 (3rd Cir. 1999) (citation omitted); *see also In re Westell Technologies, Inc. Sec. Litig.*, No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867, at *34 (N.D. Ill. Oct. 26, 2001). Further, the element of scienter "is generally a question of fact, appropriate for resolution by the trier of fact[,]" and "even scienter issues based on 'fairly tenuous inferences' may survive summary judgment." *Buxbaum v. Deutsche Bank AG*, 196 F. Supp. 2d 367, 375 (S.D.N.Y. 2002) (citing *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)).

As a general matter, Defendants are deemed to "know of facts 'critical to [HA-LO's] core operations or to an important transaction that would affect [HA-LO's] performance.'" *In re Sears, Roebuck & Co. Sec. Litig.*, No. 02 C 7527, 2003 U.S. Dist. LEXIS 19126, at *11-12 (N.D. Ill. Oct. 23, 2003) (quoting *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003)). As the court in *In re Complete Mgmt. Sec. Litig.* held:

> As a practical matter, the individual defendants were the top management of CMI and it is inconceivable that they would have no conception of how GMMS, CMI's largest client – whose medical practice CMI contracted to manage – operated its business.

DOCS\173360v1

3

153 F. Supp. 2d 314, 325 (S.D.N.Y. 2001); *see also Danis*, 73 F. Supp. 2d. at 939 (as high level managers and directors, individual defendants may be presumed to have been aware of pervasive problems with company's provisioning, billing, and accounting systems and manner in which company represented sales and revenues in its financial statements).

Courts have reportedly drawn the inference that facts critical to a company's core operations or an important transaction are known to the company and its key officers. For example, in *Nathenson*, the Fifth Circuit held that the scienter element was satisfied as to patent statements because information regarding patent protection was "obviously important," critical to the company's core performance, and about which the CEO had "ample opportunity to become familiar[.]" *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001). Accordingly, by virtue of their positions, defendants Eric Lefkofsky (Chief Operating Officer and Director), Brad Keywell (President and Director), John Kelley (Chief Executive Officer and President), Greg Kilera (Chief Financial Officer), Lou Weisbach (Chairman of the Board), and Linden Nelson (Vice-Chairman of the Board) are deemed to have knowledge of HA-LO's operational and financial functions. Inasmuch, Defendants are deemed to be aware that the operational and financial results disseminated to the public were inaccurate because they depicted a viable business model operating at efficient levels when in truth the Company's facilities lacked sufficient capitalization, operating conditions were ineffective, and the balance sheets failed to properly account for the Company's earnings and intangibles.

Because Plaintiffs have pled that Defendants possessed prior actual knowledge that their public statements were contradicted by undisclosed adverse facts, rendering such statements materially misleading, Plaintiffs need not rely solely on circumstantial allegations to create a strong inference of scienter. There simply exists no stronger inference of scienter than contemporaneous knowledge that publicly disseminated statements are false. Indeed, "the fact

DOCS\173360v1

4

that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (emphasis added).

## A. SCIENTER RELATED TO HA-LO'S OVERSTATEMENT OF STARBELLY GOODWILL

Plaintiffs' motion for partial summary judgment makes clear that more than sufficient evidence is in the record to withstand summary judgment for John Kelley, Greg Kilrea, Brad Keywell and Eric Lefkofsky with regard to HA-LO's overstatement of Starbelly goodwill. Particularly telling is an e-mail from Lefkofsky to Keywell, Kelley, and Kilrea:

> lets just flat out give up being cautious, concerned, detailed, conservative. lets stop listening to the voices of reason (that are probably totally right). we know that the only meaningful value to be created is through long term operational and financial results. we know that our market cap will only reflect consistant [sic] results over the long haul. but who gives a f**k. lets start having fun. lets get funky. lets announce everything. lets be WILDLY positive in our forecasts. when we announce, lets throw a ton of aggressive sh*t out analysts and answer every last f**king question  head on  with a number, a data point, a fact. lets take this thing its extreme and really pound it home. if we get whacked on the ride down  who fives a sh*t. is it going to [be] worse than today? is our market cap going to fall to 200N, 100M who the f**k cares. the stock is in the 3s. its at an all time low. we are about to be fried like f**king chicken. . . .lets be proactive  NOW. lets announce this sh*t next week. build a f**king crazy financial model on the plane and blow people away.

Response to Lefkofsky ¶31 at 25.[1] The record evidence presented in Plaintiffs' partial summary judgment motion clearly reflects that Kelley, Kilrea, Keywell, and Lefkofsky were privy to information regarding the true extent of HA-LO's financial perils. Response to Lefkofsky ¶ 31. In fact, e-mail correspondence in 2000 reflects that Lefkofsky not only knew but helped to engineer the dissolution of Starbelly as HA-LO's cash flow problems increased. Response to

---

[1] References to "Response to Lefkofsky ¶ ___" refer to Plaintiffs' Response to Defendants Eric Lefkofsky & Brad Keywell's Joint Local Rule 56.1(a)(3) Statement.

DOCS\173360v1

Lefkofsy ¶ 31 at 22 ("we are not, in any way shape or form, treating starbelly as a stand alone entity"); 23 ("we are in the process of terminating those employees and clients that do not fit in to the new halo branded solutions model." "at this point there is no starbelly.").

In short, contrary to HA-LO's favorable statements, Kelley, Kilrea, Keywell, and Lefkofsky knew facts suggesting that (i) Starbelly was not a fully functioning company because it lacked the necessary programs to allow for the processing of hard goods; (ii) Starbelly had failed to establish firm relationships and orders to support its business plan; (iii) there never was a clear plan for Starbelly's role within HA-LO; (iv) Starbelly was worth far less than that reported by HA-LO because FAS 121 required a substantial write down for loss of value to the asset as soon as it was recorded; (v) HA-LO's earnings were overstated; and (vi) HA-LO's financial statements were not prepared in accordance with GAAP. *See* EL 20046; EL 22744; EL 40881; EL 40886; EL 43181; EL 43281; EL 43300; KEY 050093; KEY 068048; KEY 094261; HALO 024213.[2]

Weisbach, who was Chairman of Board during the time, knew there were numerous layoffs that included Starbelly technology people, and that salespeople had to use their own personal credit cards for orders because of the poor financial position of HA-LO. Response to Kilrea ¶ 38. Both prior to the Starbelly deal and afterward, Mr. Weisbach knew that the dates the Board was given as "milestones" to be completed by Brad Keywell were never accomplished. Id. Weisbach even told Lekofsky several times that milestones were not being reached and Lekofsky confirmed that things just weren't happening. Id.

## B.    SCIENTER RELATED TO ACQUISITION OF STARBELLY

---

[2] The Court is respectfully referred to Plaintiffs' Corrected Memorandum of Law in Support of Their Motion for Partial Summary Judgment, and supporting papers, for a fuller discussion of the evidence of scienter against Kelley, Kilrea, Keywell, and Lefkofsky.

DOCS\173360v1

There is more than sufficient record evidence to withstand summary judgment with respect to defendants Kelley, Kilrea, Nelson, and Weisbach on allegations related to the Starbelly acquisition. While praising Starbelly as having a "sophisticated Internet business model" which would "ignit[e] HA-LO for aggressive long-term growth and value creation through a combination of new market opportunities, operating efficiencies and infusion of innovative internet talent," Kelley, Kilrea, Nelson, and Weisbach failed to disclose that the acquisition of Starbelly was completed without proper due diligence. Response to Kilrea ¶25; Response to Lefkofsky ¶ 16.

On January 5, 2000, Ernst & Young, HA-LO's independent consultant in connection with the Starbelly acquisition, issued a report of its due diligence findings (the "January 5 Report"). Response to Lefkofsky ¶ 8. Kelley was a direct recipient of the January 5 Report concerning Starbelly's software capabilities and the lack of proprietary nature of Starbelly's software system. Id. ¶ 11, 14. The January 5, 2000 Report and letter were sent to Jim Johnson, defendant Kelley's designated point person to work with Ernst & Young. Id. ¶ 11. After receiving the letter and report, defendant Kelley had a phone conversation with Ernst & Young partner Larry Phelan. Mr. Phelan testified:

> When I got off the phone, my immediate internalization of the call was, unfortunately, this would be an individual and a company, an individual that will probably not engage us again and a company that would not provide us a reference.

Id.

Kelley, along with Kilrea and Nelson, was also a direct recipient of HA-LO's internal due diligence reports. Id. ¶ 12. The internal due diligence team also authored a memorandum on Starbelly titled "E1 Company Integration Readiness," which was sent to Kelley, Kilrea, and Nelson, among others. Id. ¶ 13. In addition, Dale Moir prepared a memorandum (the "Moir Memorandum") to express additional opinions on the Starbelly acquisition, which was sent to

DOCS\173360v1

7

top HA-LO executives including Kelley, Kilrea, and Nelson. Id. When Mr. Moir brought his concerns directly to Kelley, however, Kelley championed the Starbelly acquisition in order to "pop" HA-LO's stock:

> I'm not certain of the exact quote, but in essence, he [Kelley] said it doesn't matter what we pay for the company [Starbelley], it's going to pop the stock so high that it will pay for itself . . . . Meaning that, you know, that the essence was it's a stock play not, you know, not that any other considerations were afoot.

Id. ¶ 14.

All four due diligence reports contained a negative assessment of Starbelly's technology and its ability to support HA-LO's business systems. Id. ¶ 16. These reports, however, were ignored by their recipients.

The record evidence is more than sufficient to establish the gross recklessness of Weisbach and Nelson. Weisbach never saw the E&Y report and never asked to see it. Response to Kilrea ¶ 38. He also never saw or heard about HA-LO's internal technology due diligence reports. Id. He thinks he should have had this information and if he had, he certainly would have asked a lot more questions. Id. Also, prior to the vote on the Starbelly transaction, Weisbach said he did not know a great deal about the management skills of Keywell and Lekofsky. Id.

Nelson, leading the charge in favor of the Starbelly transaction, was the one to introduce Starbelly to HA-LO. Id. ¶ 39. He had known both Brad Keywell and Eric Lekofsky for years. Id. ¶ 131. Nelson had attended Keywell 's wedding as Nelson's wife is a relative through marriage to Keywell. Id. Nelson and Keywell attended the same family gatherings a couple of times a year and. Nelson lives just three miles from Keywell's parents. Id. Nelson went to visit Starbelly's facilities three times prior to the deal, and he was on the phone during several negotiation sessions concerning various issues over the deal. Id. ¶ 39. Nelson single handedly

DOCS\173360v1

8

put the deal back together when it began to unravel in the wee hours of the night. Id. Furthermore, Nelson was a recipient of three important internal due diligence memos concerning the Starbelly technology and the serious concerns surrounding it. Id. ¶ 139.

Kilrea also knew the true nature of the Starbelly acquisition. Kilrea was provided with and had access to due diligence reports questioning the advisability of the Starbelly acquisition. Id. ¶ 37. Moreover, he was a named recipient of several due diligence reports. Id. As CFO, it was Kilrea's responsibility to correctly account for the Starbelly acquisition including goodwill. Id. Kilrea, however, never performed a FAS 121 analysis. Id.

## C. SCIENTER AS TO THE INTEGRATION OF STARBELLY

The evidence shows that Kelley, Kilrea, Lefkofsky, Keywell, Nelson, and Weisbach each had specific knowledge of the problems with the Starbelly integration. On March 6, 2000, Lefkofsky sent an e-mail to Keywell detailing a conversation he had with Greg Kilrea on the need to improve HA-LO's cash position "to insure that we don't hit the iceberg in front of us." Response to Lefkofsky ¶ 118. On March 15, 2000, Kilrea expressed his concerns that the integration would not succeed if they continued down the same path. Id. Indeed, problems with Starbelly continued to mount as Lefkofsky, Kilrea, Kelley, and Keywell sent and received detailed e-mails chronicling the breakdown and eventually abandonment of the Starbelly name and its technology. Id. ¶ 18.

Starbelly was also not performing as planned from a financial standpoint. Id. ¶31. Starbelly's inability to meet its projected revenues caused Lefkofsky complained to Kilrea about HA-LO's inability to properly project cash flows. Id. Lefkofsky realized that HA-LO was falling apart and proposed that "THE TIME TO GET RADICAL IS NOW." Id. Lefkofsky proposed a multi-part plan for HA-LO to get "funky." Id. Although Kilrea express reservations at acting only to please street expectation, he agreed to support any decision by the HA-LO team.

DOCS\173360v1

9

Id. The hopelessness tht Defendants felt was seen in Kelley's call for Weisbach to return as

CEO. Id. Nelson, however, opposed such a move. Response to Kilrea ¶ 39.

By December 31, 2000 Defendants had discontinued technology spending on the internet

web-store concepts contained in Starbelly's business model. Id. ¶25. HA-LO would never

recognize incremental revenues from the long-lived assets acquired by Starbelly. Indeed,

projected financial statements prepared in December 2000 estimated HA-LO's revenue levels for

2000, 2001, and 2002 at levels equal to those of HA-LO projected *before* the Starbelly

acquisition. Id.[3]

**D.      SCIENTER WITH RESPECT TO IMPROPER
          UPSHOT ACCOUNTING ALLEGATIONS**

Kelley argues that there is no evidence that he acted with scienter with respect to the

alleged accounting errors at UPSHOT. Kelley was President of UPSHOT during 1998–the year

in which $6.2 million was written off due to the unbilled receivables. Response to Kilrea ¶ 168.

The Auditing Standards Board defines the responsibilities of management towards financial

statements as follows:

> The financial statements are management's
> responsibility....Management is responsible for adopting sound
> accounting policies and for establishing and maintaining internal
> control that will, among other things, initiate, record, process, and
> report transactions (as well as events and conditions) consistent
> with management's assertions embodied in the financial
> statements. The entity's transactions and the related assets,
> liabilities, and equity are within the direct knowledge and control
> of management....Thus, the fair presentation of financial statements
> in conformity with generally accepted accounting principles is an
> implicit and integral part of management's responsibility.

---

[3] In plaintiffs' principal brief, they address allegations regarding a false and misleading statement
by Lou Weisbach regarding Ha-Lo's lease, as well as the reasons that Weisbach (and others)
knew his statement was false.

Id. Thus, as President of UPSHOT, defendant Kelley was directly responsible for designing the policies, procedures, and controls to ensure that UPSHOT's financial statements were GAAP compliant.

Kelley further argues that "he was only aware that Stenlund was investigating an 'issue'" at UPSHOT and "there is no evidence that [he] knew that the previous financial statements were incorrect in any way." *See* Def. Kilrea Facts Statement 169-170, 173-174. Contrary to Kelley's assertions, plaintiffs have direct evidence of Kelley's knowledge. In an e-mail dated January 28, 2001, Kelley states:

> . . .get rid of that loss, those costs for 2000, someway,
> somehow...maybe direct selling was a halo initiative for
> accounting purposes, I don't know, need help . . . but it's gotta go

Response to Kilrea ¶ 168.

As CFO, Kilrea's responsibilities included the day-to day financial management of HA-LO and the flow of information to Arthur Andersen, including information from UPSHOT. Id. ¶137. Kilrea controlled all information regarding the financial condition of HA-LO and was responsible for the accuracy of HA-LO's the public reports and releases. Id. Kilrea oversaw the preparation of HA-LO's false financial statements and signed all of HA-LO's SEC filings Id. To carry out his functions, Kilrea was privy to inside information concerning the HA-LO's operations and also received quarterly information regarding UPSHOT. Id. In December 1999, UPSHOT was HA-LO's most profitable subsidiary. Id. ¶ 114. At the same time, however, Arthur Andersen first questioned UPSHOT's receivables in December 1999. Id. Only three months earlier, an audit of UPSHOT found significant problems, particularly with respect to UPSHOT's revenue processes. Id. When Keith Stendlund assessed the problems at UPSHOT, his report found the same problems that existed at the time of the audit. Id.

DOCS\173360v1

11

There is no dispute that violations of GAAP, combined with other circumstances indicative of fraudulent intent, can raise a strong inference that defendants acted with scienter. *See, e.g., Marksman Partners L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996). Moreover, this case presents unusually strong allegations concerning the extent of the accounting improprieties that, further supports an inference of scienter. *See In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001) ("[P]laintiff has not alleged a mere technical violation of one of GAAP's proscriptions. Instead, the Complaint details numerous instances of accounting legerdemain that all serve to overstate the ledger of [the company.]"). The nature of defendants' GAAP violations was the overstatement of intangibles, which resulted in an overstatement of earnings. More importantly, the failure to write down the Starbelly goodwill indicated to the public that the value of the Starbelly acquisition had not been impaired. A strong inference of scienter may be drawn from these actions, "[a]fter all, books do not cook themselves." *In re McKesson HBOC Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).

Significantly, the revenue recognition that occurred in this case did not involve esoteric accounting principles. Rather, it involved deliberate violations of basic accounting concepts. Indeed,

> the inference invited by the large magnitude of the misstated financials and the repetitiveness of the GAAP violations takes on added significance if, as the Complaint alleges, the violated GAAP rules and Company accounting policies, are, in fact, relatively simple. This is so because violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious. Put another way, if the GAAP rules and MicroStrategy accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard.

*In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000).

DOCS\173360v1

12

## E.    SCIENTER BASED ON MOTIVE AND OPPORTUNITY

Defendants had the motive and opportunity to commit fraud. First, there is opportunity, as it is beyond "doubt[] that the defendants had the opportunity, if they wished, to manipulate the price of [the company's] stock." *In re Time Warner Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993). *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1253 (N.D. Ill. 1997) (officers, directors and substantial shareholders had opportunity to commit fraud). Motive exists where defendants could have secured a concrete benefit by the fraudulent misrepresentations alleged if their scheme was successful. *See Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) ("Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.").

HA-LO paid an exorbitant price for Starbelly -- 700 times Starbelly's 1999 sales. The Company, however, still faced the prospect of paying an additional $51 million in cash to the holders of the preferred stock issued in the Starbelly acquistion, who had the option of redeeming each of their preferred shares for one share of HA-LO common stock or $10. The preferred shareholders were required to make their redemption demands between May 5, 2001 and June 4, 2001, contingent upon whether HA-LO's stock was trading above $10 per share during this 30 day period. Thus, in the thirteen month period prior to the June 4, 2001 redemption cutoff, Defendants were highly motivated to make false and misleading statements concerning the purported benefits of the Starbelly acquisition to avoid a payout they could not afford.

Lefkofsky and Keywell owned a significant amount of stock in HA-LO as a result of the Starbelly acquisition. Kelley owned a substantial amount of stock in connection with the UPSHOT transaction. Weisbach and Nelson both were highly compensated, earning a half a million dollars a year, plus benefits and expenses and both were significant shareholders of HA-LO. Response to Kilrea ¶¶ 38-39. Thus, Defendants had motive and opportunity to artificially

DOCS\173360v1

13

inflate the Company's common stock. Such motives have been held to be highly probative of scienter. *See, e.g., In re Unisys Corp. Sec. Litig.*, No. 99-5333, 2000 U.S. Dist. LEXIS 13500, at *19 (E.D. Pa. Sept. 21, 2000) ("The threat of a billion dollar cash payment strikes the Court as a significant motive to inflate the price of stock.") *Complete Mgmt.*, 153 F. Supp. 2d at 328 ("[T]he artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement."). It is of no consequence that Defendants were ultimately unsuccessful in their scheme to artificially inflate the price of the Company's stock above $10 per share. *See Danis*, 73 F. Supp. 2d at 940 ("[P]laintiffs need not allege that the individual defendants were successful in their scheming, only that they planned to defraud."); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001) ("The ultimate profitability of a course of conduct is not conclusive of intent. Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight because the alleged misdeeds did not pay off."). Thus, Plaintiffs' evidence of motive add weight to their other scienter evidence.

## III.    DEFENDANTS ARE LIABLE AS CONTROL PERSONS

Plaintiffs have provided ample evidence to demonstrate that each Defendant is liable as a control person under Section 20(a) of the Securities Exchange Act of 1934 ("1934 Act"). Section 20(a) provides, in pertinent part:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable[.]

15 U.S.C. § 78t(a). "[T]he legislative history of the controlling person provision indicates control can be shown by ownership of stock, agency, a lease or a contract, and that the concept of control should be broadly construed with sufficient flexibility to cover many situations...." *In*

*re Enron Corp. Sec., Derivative & ERISA Litig.*, No. H-01-3624, 2003 U.S. Dist. LEXIS 1668, at *33 (S.D. Tex. Jan. 28, 2003).

In analyzing section 20(a), the Seventh Circuit has stated: "We have long viewed the statute as remedial, to be construed liberally, and requiring only some indirect means of discipline or influence short of actual direction to hold a control person liable." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992) (emphasis added) (quoting *SEC v. First Sec. Co.*, 463 F.2d 981, 987 (7th Cir. 1972), *cert. denied*, 409 U.S. 880 (1972)). The Seventh Circuit in *Harrison* set forth the following two-part test:

> We have looked to [(i)] whether the alleged control-person actually participated in, that is, exercised control over, the operations of the person in general and, then, [(ii)] to whether the alleged control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised. (Emphasis added)

*Id.* at 881.

Moreover, with respect to summary judgment, it is well established that determination of whether an individual defendant is a "'controlling person' under § 20(a) is a question of fact" that should be reserved for trial. *Sears*, 2003 U.S. Dist. LEXIS 19126, at *13. As Plaintiffs have presented evidence supporting their allegations of Defendants' control, the issue of control person liability is not appropriate for resolution on a motion for summary judgment.

## A.    Eric Lefkofsky

Defendant Lefkofsky argues that he is insulated from control person liability because he did not exercise actual control over defendants Weisbach, Kelly or Simon or have the power to prevent them from making publicly misleading statements. Lefkofsky Br. at 11. However, this argument lends no credence to Lefkofsky's motion for summary judgment because Plaintiffs are not required to prove that Lefkofsky exercised actual control to be liable under § 20(a). *See*

DOCS\173360v1

15

*Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Rather, to establish a claim for control person liability Plaintiffs must show that Lefkofsky "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison*, 974 F.2d at 881.

Lefkofsky exercised control over the operations of HA-LO as the Company's Chief Operating Officer. Lefkofsky admits that he participated in the day to day operations of the Company. Lefkofsky and Keywell's Joint Statement at ¶¶ 8, 25. Accordingly, the first prong of the test for control person liability is satisfied.

Lefkofsky also exercised control over the particular transactions in question. Illinois law mandates that all "business and affairs of [a] corporation shall be managed by or under the direction of the board of directors." 805 ILCS 5/8.05. Thus, as a matter of law, Lefkofsky, as a director of HA-LO, not only possessed the authority to control HA-LO's operations but was obliged to manage all aspects of HA-LO's affairs, including all corporate transactions and the related assets, liabilities, and equity. This position is further supported by the fact that Lefkofsky engaged in explicit conversations regarding HA-LO's financial condition as evidenced by an e-mail to Keywell, dated March 6, 2000, Lefkofsky reported that he and Kilrea had discussed possible fixes for HA-LO's financing problems "to insure that we [HA-LO] don't hit the iceberg in front of us." Response to Lefkofsky ¶18. As the Company's financial woes persisted, Lefkofsky declared that "THE TIME TO GET RADICAL IS NOW" and proposed the following multi part plan to facilitate his call to action:

> we give people a stand alone financial model of just promo products + starbelly + ford jv with 15+ a year in interest income. . .just in case we decide to sell. we let the street analyze it.
>
> we announce the 5M+ of yearly ebitda. we announce the positive cash flow. . .we build it up to be f**king huge for halo.

> we find a way to exceed 3rd quarter estimates. we find a way. we
> get aggressive. we proactively do sh*t to make sure that we are
> ahead of the estimates.

Id. ¶ 31. In addition, Lefkofsky signed HA-LO's Form 10-K for the year ended 2000. Lefkofsky's involvement in HA-LO's business operations and finances along with information received and discussed with other officers and directors shows that he exercised a general control over the Company and that he possessed the level of control necessary to find him liable as a control person. *See Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1389 (W.D. Mich. 1992) (holding a director can be found liable in his capacity as a controlling person on allegations that the director signed one or more of the company's annual or quarterly reports filed with the SEC that are alleged to be false or misleading); Response to Lefkofsky ¶¶ 16, 26, 31.

### B.  Brad Keywell

Keywell baldly contends that he is entitled to summary judgment on the basis that he acted in good faith and did not have any control over any person at HA-LO. Contrary to Keywell's assertions, the facts demonstrate that he generally participated in the operations of the Company and that he possessed the requisite level of control with regard to the Company's financial reports and press releases.

Keywell was HA-LO President and a Director who (1) assisted in the preparation and/or review of the false press releases and SEC filings (Response to Lefkofsky ¶ 27); and (2) had access to adverse non public information about HA-LO's business, finances, products, markets and present and future business prospects, including the information that rendered the statements in question false. Id. ¶¶ 23-27. As President, Keywell was directly responsible for HA-LO's presentations and representations to professional investors (id. ¶ 23), and as a Director, Keywell was obliged to manage the Company's corporate affairs. These facts sufficiently attribute the alleged fraud to Keywell under the group published doctrine, regardless of whether he was a

DOCS\173360v1

17

speaking or non speaking defendant. *See Schwartz v. Celestial Seasonings*, 124 F.3d 1246, 1254 (10th Cir. 1997); *Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1225 (D. Colo. 1998); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998); *Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp. 2d 618, 626-27 (N.D. Tex. 1998).

Keywell participated in the general operations of HA-LO and had the ability to control the specific activities upon which the § 10(b) violations are predicated (Response to Lefkofsky ¶¶ 23-27). Keywell concedes that he was intimately involved with strategic matters concerning the Company, business development, and investor relations. Lefkofsky and Keywell's Joint Statement at ¶¶ 7, 23. Keywell participated in the operations of the Company (Response to Lefkofsky ¶¶ 23-27).

Furthermore, as previously noted, Keywell, as a member of HA-LO's board of directors, had a legal duty to be involved in all aspects of HA-LO's business affairs, including financial matters. *See* 805 ILCS 5/8.05 ("business and affairs of [a] corporation shall be managed by or under the direction of the board of directors."). Keywell's involvement in HA-LO's financial affairs is readily apparent by the fact that he was involved in a chain of e-mails discussing operations and cash flow deficits (id. ¶23). In addition, as conceded by Keywell, his duties included making presentations to investment professionals and assessing existing and potential litigation against HA-LO. Lefkofsky and Keywell's Joint Statement at 7, 23-24. It goes against logic to surmise, as Keywell does, that as President with the foregoing responsibilities he was without effective control. The facts clearly show that Keywell had the power and authority to control or influence the conduct of HA-LO's business, the information in its filings with the SEC, and its public statements.

### C. *John R. Kelley*

Kelley argues that "there is no evidence that [he] actually exercised general control over HA-LO's operations, or that he had the power or ability to control the activity complained of, prior to November 9, 1999 or after February 22, 2001." Kelley Br. at ___. Kelley was President of UPSHOT in 1998 (*see* Def. Kilrea Facts Statement at ¶ 166), and that HA-LO acquired UPSHOT in June 1998. *See* Def. Kilrea Facts Statement ¶ 170.

The SEC defines an "affiliate" as:

> An affiliate of, or a person affiliated with, a specific person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

17 CFR § 210.1-02(b). As UPSHOT was a subsidiary of HA-LO after June 1998, UPSHOT was essentially under common control with its parent company, HA-LO. Thus, as UPSHOT's President, Kelley was a control person of HA-LO. Moreover, UPSHOT's financial records were "pooled" into HA-LO's financials for the year 1998 (*see* AA 012945), thus contributing directly to HA-LO's finances. Response to Kilrea ¶ 162.

Kelley also argues that he cannot be held liable for statements that were issued after February 22, 2001 when Marc Simon took over as CEO. On November 21, 2001, HA-LO filed a Form 8-K, which included a restatement of HA-LO's financial statements for the year 1998. The Form 8-K reported that $6.2 million of the $6.9 million write off for the year 1998 was related to UPSHOT unbilled receivables. Id. ¶168. Defendant Kelley was President of UPSHOT, a subsidiary of HA-LO, during 1998, and as such was responsible for any policies and procedures made during that time. Id. In addition, Kelley remained a director of HA-LO until July 2003. Kilrea Statement at ¶ 162.[4]

### D. *Gregory Kilrea*

---

[4] Kelley does not contest that he was a control person during his tenure as CEO of HA-LO.

Kilrea argues that he is not liable as a controlling person because he did not have the power to prevent Kelley from making publicly misleading statements. Kilrea Br. at 8. Plaintiffs, however, must demonstrate only that Kilrea "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison*, 974 F.2d at 881 (emphasis added).

Kilrea's position as HA-LO's CFO renders him a control person under Section 20(a). *See Lindelow v. Hill*, No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301, at *29 (N.D. Ill. July 19, 2001) (holding that individual defendants were control persons because "of their status as top-ranking company officials whose high level positions necessarily involve general oversight and direction."). Kilrea's responsibilities as CFO included "the overall financial management of the consolidated entity including, you know, day-to-day, you know, bank matters as well as compliance with SEC filings, etc." Response to Kilrea ¶ 37. Kilrea was also ultimately responsible for the flow of information to Arthur Andersen including UPSHOT's unbilled receivables and any reserves recorded on the balance sheet of HA-LO. Id. Furthermore, as HA-LO's CFO at all relevant times, Kilrea controlled all information regarding the financial condition of the Company and was responsible for the accuracy of the public reports and releases detailed in the Amended Complaint, and hence was liable for the representations contained therein. Id. Kilrea oversaw the preparation of HA-LO's false financial statements and signed all of HA-LO's SEC filings containing the overstated Starbelly goodwill. Id. In preparing the financial statements, Kilrea was responsible for "the review of the consolidated financial statements ensuring compliance with SEC reporting content, guidelines, time lines, etc." Id. In addition, Kilrea was on the e-mail distribution list of all HA-LO's top management and thus was privy to inside information concerning the company's operations. Id.

The facts clearly show that Kilrea had the power and authority to control or influence the conduct of HA-LO's business, the information in its filings with the SEC, and its public statements.

### E. Linden Nelson

Nelson became Vice Chairman of the Board of Directors of HA-LO beginning in January, 1997 until he resigned from the Board on March 20, 2001. Id. ¶ 39. He described himself as the rainmaker. Id. He was also an officer of HA-LO and his job function was to create sales and bring in accounts. Id. Nelson admitted he worked hard on getting his clients to do business with the other two divisions of HA-LO. (LAGA and UPSHOT). Id. Nelson agreed his responsibilities included initiating key client contacts as defined by the company and client strategies working with John Kelley; initiating key strategic alliances; and working with Mike Linderman to assist in the promotional products group because he "knew that end of the business and had key relationships better than anybody else[.]" Id.

Nelson received a salary of $500,000 per year from HA-LO.[5] Id. ¶ 128. Nelson also had no limit on his expenses and in his own words, he spent money "[w]ith the best of them." Id. His expenses ran approximately $150,000 per year. Id. While his office was in Detroit, he traveled to Chicago on business for HA-LO as often as 10 times per year. Id.

Nelson amended his employment agreement with HA-LO on or about May 25, 2000. Id. Pursuant to the amendment, Nelson had the right to participate; "if employee wishes, in a weekly operations update meeting with the president, chief executive officer and/or chief operating officer of the employee – employer. At such meeting the president and chief executive officer shall, at your request, update employee regarding material employer matters." Id.

___

[5] HA-LO paid Mr. Nelson that generous salary of $500,000 per year until the end of 2000 at which time he went on the "Identify" payroll. However, under an amended employment agreement, HA-LO agreed to pay Mr. Nelson $100,000 per year. Id. ¶ 126.

Nelson agreed that both he and Lou Weisbach were responsible for the overall direction and vision of the Company working with John Kelley:

> John was in the middle, and he had Lou on one side saying things to him and he had me on the other side saying things to him, and he tried to, the best of his ability, make everybody happy.

Id. Nelson and Weisbach were both large shareholders of HA-LO which further evidences their position of control. According to Nelson, (talking about himself and Lou Weisbach) "We still owned a lot of shares in this company and we both wanted - you know, we were very concerned about the company, you know, from our shareholders' position[.]" Id. ¶ 141.

With regard to the Starbelly transaction, it was Nelson who personally brought the Starbelly deal to HA-LO. Id. He had a relationship through marriage to Brad Keywell whom he had known for 5 years. Id. ¶ 13. He also visited Starbelly three times before the deal was approved, once because he wanted to be sure Brian Hermelin visited too, as he was the only Board member who hadn't been to Starbelly yet and it was before the vote. Id. ¶ 39.

Moreover, when negotiations over the terms of the Starbelly deal broke down, it was Nelson who they called in the middle of the night to use his influence to call Brad Keywell or Eric Lekofsky to get the parties to work things out. Id. He succeeded in bringing the parties back together. He was also involved in various other phone calls during the process of the negotiations. Id.

He testified that by June of 2000 (after the Starbelly deal closed) he was spending a lot of his time working on a joint venture between Ford Motor Company and HA-LO called "Identify"; however, he still had contact with people at HA-LO and kept up to speed with things that were going on. Id. ¶ 142. Nelson spoke to John Kelley "all the time" about internal matters going on at HA-LO. Id. He also received information about HA-LO's operations in the hallway or by "the

water cooler[.]" Id. In the fall of 2000, Nelson helped arrange a couple of meetings to help HA-LO sell LAGA and to raise equity. He even attended the first meeting in that regard. Id. ¶ 39.

Nelson himself even admitted that he was indeed involved in the day to day operations of HA-LO; he just said he wasn't "as involved operationally day to day." Id. But he was well aware that when John Kelley was CEO he was upset because "[t]here were a lot of personalities and egos that people were trying to deal with." Id. According to Nelson, HA-LO was made up of "fiefdoms" "[a]ll over the place." Id.

Weisbach also attested to Nelson's position of control. According to Weisbach, Nelson was part of a group that demanded Weisbach to resign the position of CEO of HA-LO "so they would have [B]oard control." Id. According to Weisbach, Nelson was in the "in group" and was "used to getting his way." Id. Weisbach stated that the Board agreed with his methodology of running the business and "would have been supportive to whatever I decided to do, ...except for the people that were part of the coup" – Nelson, Kelley and LAGA Management. Id. According to Weisbach, Linden "voiced concerns often about many things" virtually "on a daily basis[.]" Id. Mr. Weisbach recalled that Nelson fought "often" with Kilrea and Rich Magid, HA-LO's COO at the time, on all types of issues: "there was a daily routine going on between all three of them for an extended period of time." Id.

Finally, according to Weisbach, when HA-LO needed to replace John Kelley as CEO of HA-LO, Nelson made a firm and direct statement that he would oppose Weisbach coming back as CEO and said he "would never let it happen." Id. Indeed, it did not happen.

### F. Lou Weisbach

Lou Weisbach founded HA-LO in 1972. Id. ¶ 148. Twenty years later, he took it public. From the time it went public in 1992, until November 1999, he was the CEO and Chairman of the Board of Directors of HA-LO. Id. ¶¶ 148-49. When Weisbach stepped down as CEO, in

DOCS\173360v1

23

November, 1999, he remained Chairman of the Board of Directors. Id. ¶ 151. After stepping down as CEO and continuing to serve as Chairman, Weisbach was actively involved in the day to day operations of HA-LO. Id. ¶ 38.

Weisbach received a salary from HA-LO of $500,000 per year, health insurance, a car and expenses. Id. Weisbach traveled to national sales conventions and would speak directly to those in attendance. Id. Weisbach also had a lot of interface with Mike Linderman, HA-LO's National Sales Manager, who was the head of the promotional products group again because "that was the world they wanted me to be impactful in." Id. Weisbach agreed that even though he was no longer CEO, he lead key initiatives for the promotional products group working with Mike Linderman and others as determined. Id. Indeed, there was a great sensitivity and according to Weisbach, appropriately so, that the salespeople feel that Lou Weisbach was not disenfranchised from the Company because of the allegiance the sales people had for him. Id.

During the Starbelly acquisition, Weisbach used his influence to have HA-LO retain CSFB to conduct the fairness opinion on the Starbelly transaction because Weisbach had a friendly relationship with a lot of people at CSFB; Chaz Edelstein in particular. Id. Weisbach testified that he needed to get comfortable with the deal so it was important to him that he be comfortable with the banker. Id. Weisbach attended (non Board) meetings with officers of HA-LO to discuss the future of the Company and the opportunities that would come from the Starbelly transaction. Id. Weisbach testified that, between January 17, 2000 and May 3, 2000, after the Starbelly transaction was voted on until it closed, he knew what was going on inside HA-LO based on what he learned from being on the Board but also based on what he learned by being in the office and talking to the employees of HA-LO. Id.

Weisbach was asked by both John Kelley (CEO until 2/01) and Marc Simon (CEO as of 2/01) to use his "personal influence" to keep HA-LO's sales force intact and happy. Id. He was

DOCS\173360v1

24

told to do whatever he could to keep the promotional products group in tact and keep salespeople from leaving the company. Id. John Kelley and Marc Simon also looked to Weisbach to answer their questions. Id. Moreover, Weisbach testified that just "out of habit" and because he wanted to know what was going on within HA-LO, he would ask for sales information [outside of getting reports as a Board member]. He said, "I had a habit when I was CEO of the Company of having updated sales information all the time. So I do recall asking for that, and I would get those reports from time to time." Id. He also continued to maintain his office at HA-LO and was in his office "fairly often" and had conversations with the officers of HA-LO in their offices and in the hallways, as the atmosphere was "informal." Id. In fact, his office was very close to defendant Eric Lefkofsky's and they "would talk fairly regularly." Id.

Weisbach also spent time with client contacts both while he was CEO and afterward. For example, he spent a lot of time on the Coca Cola account, which he began working on while he was the CEO of HA-LO, and just continued working on during the post CEO period. Id. Not only did Weisbach continue to work with clients such as Coca Cola, he stated he was more than willing to be involved in other similar opportunities. He also was responsible for initiating key strategic alliances as defined by the Company and client strategies working with John Kelley. Id.\

Weisbach also used his influence when he stepped down as CEO to have Kilrea and Rich Magid (COO) retained by HA-LO for six months because in Weisbach's opinion, they had been incredibly loyal and capable employees. Id. He managed to accomplish that despite the fact that the Vice Chairman of the Board, Nelson, had often raised concerns about Kilrea's and Magid's abilities. Id.

After Marc Simon became CEO in February 2001, Weisbach even negotiated on behalf of HA-LO the possible merger of HA-LO and Devine Interventures. Id. He also contacted

DOCS\173360v1

25

American National Bank because he knew HA-LO was looking for credit and he had a prior relationship with them. He updated the bank on HA-LO's financials and asked them if they would be interested in looking at HA-LO's credit. Id. When HA-LO was experiencing cash concerns, Weisbach was also involved in contacting various vendors to try to work things out with them. Id.

Based on the above, it is clear that Weisbach exercised control over HA-LO in general and possessed the power and ability to control the fraudulent activities of Defendants, whether or not he actually exercised that power. At a minimum, it raises a question of fact sufficient to defeat Weisbach's motion for summary judgment.

## IV.    CONCLUSION

For all the foregoing reasons, Defendants' motions for summary judgment should be denied.

Dated January 14, 2004

Respectfully submitted,

MILLER FAUCHER AND CAFFERTY LLP

By: _____
Marvin A. Miller
Jennifer Winter Sprengel
Matthew E. Van Tine
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
(312) 782-4880

*Class Liaison Counsel and Designated Local Counsel*

MILBERG WEISS BERSHAD
    HYNES & LERACH LLP
Clifford S. Goodstein
Susan M. Greenwood
One Pennsylvania Plaza - 49th Floor
New York, New York 10119
(212) 594-5300

DOCS\173360v1

26

**SCHIFFRIN & BARROWAY, LLP**
Katharine M. Ryan
Marc I. Willner
Three Bala Plaza East
Suite 4000
Bala Cynwyd, PA 19004
(610) 667-7706

*Class Co-Lead Counsel*

**CAULEY GELLER BOWMAN &**
  **RUDMAN, LLP**
Jack Reise
1 Boca Place
2255 Glades Road, Suite 421-A
Boca Raton, Florida 33431
(561) 750-3000

**CAULEY GELLER BOWMAN &**
  **RUDMAN, LLP**
Curtis Bowman
J. Allen Carney
11311 Arcade Drive Suite 200
P.O. Box 25438
Little Rock, Arkansas 72212
(501) 312-8500

**WOLF HALDENSTEIN ADLER FREEMAN**
  **& HERZ LLP**
Adam J. Levitt
656 West Randolph Street, Suite 500 West
Chicago, Illinois 60661
(312) 466-9200

*Class Executive Committee*

DOCS\173360v1

27