## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**DOCKETED**
JAN 1 5 2004

| | |
|---|---|
| RAYMOND SPAGNOLA, Individually And On Behalf Of All Others Similarly Situated, | : |
| Plaintiffs, | :    Case No. 02 C 0270 |
| | :    Judge James F. Holderman |
| vs. | : |
| GREGORY J. KILREA, LOU WEISBACH, JOHN R. KELLEY JR., LINDEN D. NELSON, BRADLEY KEYWELL, and ERIC LEFKOFSKY, | : |
| Defendants. | :: |

MICHAEL W. D░░░░░S,
CLERK, U.S. DISTRICT C░░

**FILED**
JAN 1 4 2004

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

(Addressing issues of false and misleading statements)

E░░░░░░ ░░░░░░░░

0░░░░░ 14 ░░ 5:03

CLERK
U.S. DISTRICT COURT

DOCS\170832v1



## TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................2

I.    STATEMENTS CONTAINED IN HA-LO'S PRESS RELEASES AND
SEC FILINGS ON THE STARBELLY ACQUISTION ARE FALSE
AND MISLEADING ...........................................................................................2

    A.    Defendants' Statements Concerning the Acquisition of
Starbelly.com are Actionable...............................................................2

        1.    HA-LO Disregarded Negative Results of Due Diligence................3

            a.    HA-LO's Independent Consultant Advises
Against the Acquisition.........................................................4

            b.    HA-LO's Internal Due Diligence Team Raises Its
Concerns .................................................................................7

    B.    The Problems With Starbelly Revealed By Due Diligence Were
Reinforced By The Failed Integration And Demise Of Starbelly...............10

    C.    HA-LO's SEC Form 10-K For 1999 Should Have Disclosed The
Negative Due Diligence And The Operational Problems of
Starbelly ..............................................................................................14

    D.    "Risk Disclosures" in HA-LO's Proxy Statement Are Insufficient
To Shield Defendants From Liability ........................................................16

    E.    Defendants' Statements Can Not Be Discounted As Puffery When
Defendants' Knew Undisclosed Adverse Information ..............................17

II.    DEFENDANTS' FAILED TO DISCLOSE THE RELATIONSHIP
BETWEEN NELSON AND KEYWELL.............................................................18

III.    DEFENDANTS' STATEMENT IN HA-LO'S JANUARY 18, 2000
PRESS RELEASE WAS FALSE AND MISLEADING .....................................19

IV.    DEFENDANTS' STATEMENTS IN HA-LO'S APRIL 27, 2000 PRESS
RELEASE AND FORM 10-K FOR 1999 WERE FALSE AND
MISLEADING.....................................................................................................20

V.    DEFENDANTS' STATEMENTS IN HA-LO'S FORM S-3 WERE
FALSE AND MISLEADING................................................................................22

i

VI. HA-LO'S FINANCIAL STATEMENTS OVERSTATED GOODWILL FROM THE STARBELLY ACQUISITION.......................................................24

VII. DEFENDANTS' STATEMENTS IN HA-LO'S JULY 27, 2000 PRESS RELEASE WERE FALSE AND MISLEADING...............................................26

VIII. DEFENDANTS' STATEMENTS IN HA-LO'S OCTOBER 25, 2000 PRESS RELEASE WERE FALSE AND MISLEADING...................................28

IX. DEFENDANTS' STATEMENTS IN HA-LO'S FEBRUARY 15, 2001 PRESS RELEASE WERE FALSE AND MISLEADING...................................31

X. DEFENDANTS' STATEMENTS IN HA-LO'S FEBRUARY 19, 2001 PRESS RELEASE WERE FALSE AND MISLEADING...................................32

    A. The SEC Instructed HA-LO To Perform an FAS 121 Analysis................33

    B. Defendants Knew Or Were Reckless In Not Knowing That HA-LO Was Carrying An Overstated Assets On Its Books ............................34

        1. A significant decrease in the market value of an asset ...................34

        2. A significant change in the extent or manner in which an asset is used or a significant physical change in an asset ...............34

        3. A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator ..............................35

        4. An accumulation of costs significantly in excess of the amount originally expected to acquire or construct the asset ........35

        5. A current period operating or cash flow combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue ..............35

XI. DEFENDANTS' STATEMENTS IN HA-LO'S 2000 10-K WERE FALSE AND MISLEADING.............................................................................37

XII. DEFENDANTS' STATEMENTS IN HA-LO'S APRIL 6, 2001 PRESS RELEASE WERE FALSE AND MISLEADING...............................................37

XIII. DEFENDANTS' STATEMENTS IN HA-LO'S MAY 15, 2001 FORM 10-Q WERE FALSE AND MISLEADING.........................................................39

XIV. STATEMENTS THAT HA-LO WAS NOT A CANDIDATE FOR BANKRUPTCY WERE FALSE AND MISLEADING ......................................40

DOCS\170832v1

ii

XV.   DEFENDANTS' STATEMENTS IN HA-LO'S JUNE 14, 2001 PRESS RELEASE WERE FALSE AND MISLEADING..............................................41

XVI.   HA-LO'S SEC FILINGS CONTAINED FALSE AND MISLEADING STATEMENTS CONCERNING UPSHOT'S REVENUE RECOGNITION .............................................................................................41

CONCLUSION...........................................................................................................45

DOCS\170832v1

iii

## TABLE OF AUTHORITIES

**Page**

In re APAC Teleservices, Inc. Sec. Litig.,
  97 Civ. 9145, 1999 U.S. Dist. LEXIS 17908 (S.D.N.Y. Nov. 12, 1999) ................................18

In re Allaire Corp. Secs. Litig.,
  224 F. Supp. 2d 319 (D. Mass. 2002) ........................................................................................18

In re Apple Computer Sec. Litig.,
  886 F.2d 1109 (9th Cir. 1989) ...................................................................................................16

In re Next Level,
  1999 U.S. Dist. LEXIS 5653, (N.D.Ill. Mar. 31, 1999).......................................................17, 39

In re Computer Assoc. Class Action Sec. Litig.,
  75 F. Supp. 2d 68 (E.D.N.Y. 1999) ...........................................................................................17

In re Discovery Zone,
  943 F. Supp. 924 (N.D.Ill. 1996) ...............................................................................................15

Donovan v. ABC-NACO, Inc.,
  Case No. 02 C 1951, 2002 U.S. Dist. LEXIS 12797 (N.D. Ill. July 12, 2002) ........................18

Eckstein v. Balcor Film Investors,
  8 F.3d 1121 (7th Cir. 1993) ........................................................................................................16

Eisenstadt v. Centel Corp.,
  113 F.3d 738 (7th Cir. 1997) ......................................................................................................17

Gallagher v. Abbott Laboratories,
  269 F.3d 806 (7th Cir. 2001) .................................................................................................15, 32

Holstein v. Armstrong,
  751 F. Supp. 746 (N.D. Ill. 1990) ..............................................................................................15

Huddelston v. Herman & MacLean,
  640 F.2d 534 (5th Cir. 1981) ......................................................................................................17

Isquith ex rel. Isquith v. Middle S. Utils.,
  847 F.2d 186 (5th Cir. 1988) ......................................................................................................17

Kaufman v. Motorola, Inc.,
  Case No. 95 CV 1069, 1999 U.S. Dist. LEXIS 6303 (N.D. Ill. April 16, 1999)................15, 24

Lindelow v. Hill,
  Case No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301 (N.D. Ill. July 19, 2001) ..................17, 21

DOCS\170832v1

iv

Provenz v. Miller,
102 F.3d 1478 (9th Cir. 1996) ........................................................................................16, 24

United States v. Shelton,
669 F.2d 446 (7th Cir. 1982) ...............................................................................................18

Virginia Bankshares, Inc. v. Sandberg,
501 U.S. 1083 (1991).............................................................................................................39

In re Westell Techs., Inc., Sec. Litig.,
Case No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867 (N.D. Ill. Oct. 30, 2001) .......................15

## FEDERAL STATUTES

17 C.F.R. § 229.303(a)(1)-(3)...............................................................................................16

DOCS\170832v1

## INTRODUCTION

Summary judgment is appropriate only when there are no undisputed questions of material fact. In this case, not only are there many such questions, but indeed the great weight of the evidence suggests quite strongly that Plaintiffs will succeed on their claims at trial.

As set forth more fully below, Plaintiffs have amassed evidence that throughout the Class Period HA-LO attempted to cover up its declining business prospects with accounting shenanigans and quick-fix strategies whose great and obvious shortcomings were hidden from the market.

In 1998 and 1999, HA-LO's wrongdoing centered on false financial statements regarding UPSHOT, a subsidiary that appeared to be HA-LO's entrée into the lucrative advertising and direct mail market, but instead was an investment propped up by phony revenue recognition schemes.

Then, in early 2000, HA-LO found its quick fix, the $240 million acquisition of Starbelly.com, to which the Company went full speed ahead despite being advised by its technology advisors that there was little, if anything, to the acquisition. It is clear that John Kelley, HA-LO's Chief Executive Officer ("CEO") at the time, saw the acquisition as a market ploy, in order to have HA-LO ride the internet wave until, just months later, the market crashed. It is further clear that Greg Kilrea, HA-LO's Chief Financial Officer ("CFO"), had significant doubts about the acquisition, and that Lou Weisbach (Chairman of the Board) and Linden Nelson (Vice-Chairman of the Board) either did not care enough about a major transaction, or otherwise did not pay attention, to ask questions or to make sure disclosures to investors were adequate.

Once HA-LO committed itself to the Starbelly transaction, it became clear to insiders that the company was in major trouble, as integration efforts were failing and any hopes of making Starbelly functional died in the internet market crash. Even with this recognition, HA-LO's

officers and directors (now including Brad Keywell and Eric Lefkofsky, formerly of Starbelly) persisted in carrying hundreds of millions of goodwill for Starbelly on HA-LO's books, inconsistent with relevant accounting rules and with business prospects.

Starbelly's goodwill was not written down until April 2001, just three months before HA-LO's bankruptcy. At the time of the writedown HA-LO was clearly headed for bankruptcy, despite false statements from HA-LO insiders regarding HA-LO's purportedly strong prospects. Among other things, HA-LO faced obligations on preferred stock issued in connection with Starbelly that HA-LO simply did not have the cash to fund.

When the Company's false statements, described below, are read in conjunction with this background, it is clear that summary judgment for Defendants is completely inappropriate, and that, in fact, most of Defendants' defenses are legally and factually insufficient.

## ARGUMENT

### I. STATEMENTS CONTAINED IN HA-LO'S PRESS RELEASES AND SEC FILINGS ON THE STARBELLY ACQUISTION ARE FALSE AND MISLEADING

Throughout the Class Period, Defendants made false and misleading statements in HA-LO's press releases and SEC filings concerning the acquisition of Starbelly.com.[1] These statements are actionable under the Federal Securities laws. Defendants' arguments that these statements are inactionable because of prior disclosures or puffery fail.

#### A. Defendants' Statements Concerning The Acquisition Of Starbelly.com Are Actionable

HA-LO's acquisition of Starbelly was a complete failure. Defendants were always aware of the shortcomings of the acquisition based on reports from internal and external consultants, as

---

[1] The following documents contained false and misleading statements: HA-LO's January 18, February 17, April 27, May 5, July 27, and October 25, 2000 press releases; HA-LO's Form 10-K for year-ended 1999; and HA-LO's February 15, 2001 press release.

DOCS\170832v1

2

well as internal documents detailing the problems HA-LO was experiencing with Starbelly. Defendants' public statements on the Starbelly acquisition, however, never reflected the adverse information known at the time each statement was made. Statements made in HA-LO's January 18, February 17, April 27, May 5, July 27, October 25, 2000, and February 15, 2001 press releases, as well as HA-LO's 1999 Form 10-K were false and misleading because they did not disclose that HA-LO failed to conduct proper due diligence of Starbelly and that Starbelly was not a fully functioning company. The statements in these documents all praised the Starbellly acquisition and its effect on HA-LO, misleading the market to believe that the $240 million acquisition was a success and HA-LO was benefiting from its "e-transformation." Defendants however, possessed adverse information that needed to be disclosed in order to keep these statements from being false and misleading. The truth, as Defendants knew, was that HA-LO's improper due diligence revealed that the Starbelly acquisition was not even remotely worth its $240 million purchase price. As integration of Starbelly began, and throughout the Class Period, Defendants knowledge of Starbelly's deficient technology was continually reinforced.

### 1.     HA-LO Disregarded Negative Results Of Due Diligence

Defendants contend that HA-LO conducted proper due diligence. Defendants point to HA-LO's hiring of Ernst & Young to investigate Starbelly's technology and HA-LO's own internal team that investigated Starbelly's technology. HA-LO, however, failed to conduct proper due diligence of Starbelly because Defendants recklessly ignored everything that was discovered during due diligence. During the Class Period, Defendants made statements about the Starbelly acquistion:

> Our acquisition of Starbelly.com is a cornerstone of HA-LO's e-transformation
> strategy and commitment to the future, igniting HA-LO for aggressive long-term
> growth and value creation through a combination of new market opportunities,
> operating efficiencies and infusion of innovative internet talent.;

DOCS\170832v1

3

The profitability slowdown in 1999 was a wake-up call. It catapulted us to take actions [the Starbelly acquisition] that ensure a valuable future for HA-LO's customers, employees and shareholders;

The expected close of our Starbelly.com acquisition significantly changes HA-LO's financial outlook;

The addition of Starbelly's sophisticated Internet business model . . . provides HA-LO with a strong platform for accelerated growth;

However, the [Starbelly] acquisition has already begun paying off as large corporations have bought into the marketing power of our industry-leading Internet platform;

Our results are just beginning to reflect the significant sales and productivity enhancements brought through last quarter's acquisition of Starbelly.com.;

Our results reflect momentum in our leading promotional products business, indicative of the sales and productivity enhancements brought by our technology-based business model.

Plaintiffs' Response to Kilrea ¶25.[2] These statements were false and misleading and are

actionable under the Federal Securities laws. At the time each of these statements were made,

Defendants knew that the due diligence had revealed significant problems with Starbelly's

business and technology that would affect its integration into HA-LO and ability to benefit the

Company. Not disclosing this adverse information rendered the statements false and misleading.

a.  **HA-LO's Independent Consultant Advises Against The Acquisition**

HA-LO engaged Ernst & Young to conduct an IT due diligence review on Starbelly.

Plaintiffs' Response to Kilrea ¶ 28 at 12. During late December 1999 and early January 2000,

Ernst &Young conducted due diligence and issued reports concerning Starbelly's software

capabilities and the proprietary nature of Starbelly's software system. On January 5, 2000, Ernst

& Young issued a report of its due diligence findings (the "January 5 Report"). *Id.* at 12-13.

---

[2]  "Plaintiffs' Response to Kilrea ¶ ___" refers to Plaintiffs' Response to Defendants' LR56.1(a)(3) Statement, filed herewith.

The January 5 Report raised numerous concerns that Ernst & Young had regarding the Starbelly acquisition. The January 5 Report focused, in part, on whether Starbelly's proprietary technology was worth the purchase price:

> We have been informed by our client [HA-LO] that one of the key drivers for the proposed $240M purchase price is the IT developed by the Company [Starbelly] to support their strategy is highly proprietary and not easily duplicated. In the course of our review, we have not seen evidence to support this assertion.

*Id.* at 13. Ernst &Young found that, according to Starbelly executives, only 15% of Starbelly's technology was proprietary. *Id.* The 15% proprietary technology, however, "refers directly to the Company's [Starbelly's] on-line product configuration system." *Id.* Ernst & Young found that "such systems have become commercially available in the past six months and the functionality of the Company's system may be duplicated through customization of an existing software package or acquisition of another promotional products company with similar capabilities likely at significantly lower cost than acquiring the Company." *Id.* For every category that Ernst & Young reviewed, it found problems with Starbelly's vision, estimated budgets, and technology:

IT Staffing and Structure

- Due to a constrained market for IT staff, "unless the Company is willing to pay higher than market salaries and fees to recruiters (both unbudgeted) they may not be able to staff their IT function to support proposed growth."

- As all of Starbelly's IT staff are retained "at will" and several staff were contractors, "there is a risk of departure of key IT staff that could materially impact the ability of the Company to execute their strategy."

IT Spending

- "Finally, the Company's projections for IT spending are based on a high level (revenue driven) business plan.. The Company was unable to provide justification for their IT spending estimates for the period 2000-2002. As such there is risk the Company's IT spending requirements may be higher than stated."

IT Infrastructure

- ". . . we are unable to establish the ability of the Company's hardware and networks to support their revenue projections or our client's intended use of the Company's IT assets. For the same reason, we were also unable to determine how much additional investment may be required to build and support the Company's operations on a go-forward basis."

Production Management Systems

- According to Starbelly's business model, its production management systems "will be either replicated at or interfaced with systems at key vendors and outsource decorators to provide seamless production management across multiple facilities. Plans detailing how this will be accomplished . . . detailed cost estimates to execute, etc. were not available at the time of our review and are not reflected in the Company's estimates of IT expenditure."

Back Office Systems

- As to Starbelly's back office software, Ernst & Young was unable to determine "what additional investment (i.e., in user licenses, reporting development, hardware upgrades, etc.) may be required to support the Company going forward" and due to implementation delays of certain software, "there may be significant additional investment required before these systems are operational."

Front-End Systems

- Starbelly's front -end systems, software designed to implement on-line stores and ordering, were not dissimilar from systems commercially available or being used by other promotional products companies.

IT Strategy and Planning

- Ernst & Young was "unable to detail or validate the Company's going-forward IT strategy." In their IT strategy, Ernst & Young felt that Starbelly "has considerable vision, but has not evidenced planning to support execution of that vision."

IT Operations

- "The Company has not developed a comprehensive set of policies and procedures to guide IT operations."

*Id.* at 13-14. In addition to the January 5 Report, Ernst & Young also sent a letter dated January 5, 2000 (the "January 5 Letter"), setting forth additional problems it saw with the Starbelly acquisition:

DOCS\170832v1

6

(i)     The target's ("Company's") strategy and plans to reach 2000-2002 revenue targets on which $240M purchase price is based are unclear.

(ii)    Our review suggests only one component of the Company's systems would require significant development to duplicate, which appears to conflict with the basis for the premium proposed to be paid for the company.

(iii)   We were unable to review or formulate a model of Ha-Lo's operations after the acquisition to provide a basis for understanding the potential benefits of this transaction to Ha-Lo.

*Id.* at 15. Ernst & Young was clear that it saw significant risks to the Starbelly acquisition and unless HA-LO took certain steps outlined in the January 5 Letter, Ernst & Young felt that "the transaction will be entered into more on 'faith' than on a sound basis for a strategic acquisition. While the target company's vision and presentation are very compelling, we are not yet confident this course of action represents the best interest of Ha-Lo." *Id.*

Ernst & Young essentially told HA-LO that Starbelly.com was flash with little substance and would be a money pit. The January 5 Letter and January 5 Report were sent to Jim Johnson, Kelley's designated point person to work with Ernst & Young. *See id.* After receiving the January 5 Letter and January 5 Report, Kelley had a phone conversation with Ernst & Young partner Larry Phelan. Mr. Phelan testified:

> When I got off the phone, my immediate internalization of the call was, unfortunately, this would be an individual and a company, an individual that will probably not engage us again and a company that would not provide us a reference.

*Id.* In other words, instead of accepting negative news and making appropriate disclosures, Kelley opted to shoot the proverbial messenger.

### b.     HA-LO's Internal Due Diligence Team Raises Its Concerns

In addition to the Ernst & Young reports, HA-LO had an internal due diligence team evaluate Starbelly's technology. The internal due diligence team was comprised of Thomas Hunt, Barry Margolin, and Dale Moir. Plaintiffs' Response to Kilrea ¶29 at 16. The internal due

DOCS\170832v1

diligence team prepared a report detailing its observations of Starbelly. *See id.* The report was sent to HA-LO's top management, including defendants Kelley, Kilrea, and Nelson. *Id.* The report, entitled E1 Project – Operational Integration Assessment (the "Integration Assessment"), determined that "[t]he costs and risks associated with this particular acquisition are high." *Id.* The Integration Assessment began by noting that Starbelly's business model "does not currently include 'hard goods' ordering – where hard goods represents 70% of promotional products sales." *Id.* HA-LO's promotional product sales were primarily of hard goods. *Id.* In addition, the Integration Assessment found that "[w]ith their existing systems, and for the foreseeable future, E1 [Starbelly] is not positioned to handle the transaction volume or variety that HA-LO would require. Their existing systems will require significant enhancement to handle E1's projected growth as a stand-alone company." *Id.* According to the Integration Assessment, Starbelly's technology was incapable of (1) supporting HA-LO's business; and (2) supporting Starbelly's own business plan. *Id.* The Integration Assessment further found that Starbelly was an "immature organization" and that "[d]ue to the chaotic nature of their current software development process, the ability of the organization to complete, maintain and extend the existing operating systems is a significant risk." *Id.* The Integration Assessment offered three plans to "achieve the objectives of the E1 acquisition." *Id.*. The most costly ($240 million) and the one with the longest time to completion (12-24 months) was to acquire Starbelly. *Id.* at 16-17. Alternately, HA-LO could purchase Starbelly and use Starbelly's on-line capability with HA-LO existing infrastructure. *Id.* at 17. This plan would require only 6 months to complete. Finally, HA-LO could build its own on-line capability and not purchase Starbelly. *Id.* This scenario would take 12 months and cost HA-LO $50 million. *Id.* HA-LO chose the longest and most expensive option. Defendants spent $240 million to purchase Starbelly.

The internal due diligence team also authored a memo on E1 Company Integration Readiness (the "Readiness Memorandum"). *Id.* at 17. The Readiness Memorandum was sent to defendants Kelley, Kilrea, and Nelson among others. *Id.* The Readiness Memorandum concluded that "[t]he E1 [Starbelly] business model and supporting systems are not yet capable of supporting HA-LO's business needs." *Id.* The Readiness Memorandum also noted that "[b]oth organizationally and technically, the E1 business model is still under development." *Id.* As for Starbelly personnel, "[t]he members of E1's organization have a limited understanding of the business issues associated with growing their business model into a national presence, with a revenue stream in the hundreds of millions." *Id.*

In addition to the Integration Assessment, Dale Moir prepared a memorandum (the "Moir Memorandum") to express additional opinions on the Starbelly acquisition. *See id.* The Moir Memorandum was sent to top HA-LO executives including Kelley, Kilrea, and Nelson. *See id.* The Moir Memorandum assessed the "degree of readiness" of each operational component of Starbelly. *Id.* The Moir Memorandum expressed deep concerns over the state of Starbelly's operations:

> The cumulative percentage of readiness is low. The overall business model is lacking the "hard goods" component of our business – the largest percentage, and significantly more complex than the "soft goods" capability under development. This indicates that an interim approach to conducting business under the Starbelly model is required upon acquisition. Furthermore, completing the implementation of the Starbelly business model will require significant additional investment in terms of calendar time and capital expenditures. The success of this strategy (organizational change via acquisition) hinges significantly on the integration plan, and on the sustained momentum of the Starbelly business model development.

*Id.* at 17-18.

Mr. Moir also brought his concerns to Kelley, but found that Kelley's interest in the Starbelly acquisition was limited to the benefits to HA-LO's stock price:

> I'm not certain of the exact quote, but in essence, he [Kelley] said it doesn't matter what we pay for the company [Starbelly], it's going to pop the stock so high that it will pay for itself. ... Meaning that, you know, that the essence was it's a stock play not, you know, not that any other considerations were afoot.

*Id.* at 18.

The Ernst & Young report, as well as HA-LO's internal due diligence, questioned the advisability of proceeding with the Starbelly acquisition given the lack of proprietary IT applications, the IT development costs, and the high price of the acquisition. Defendants ignored their advisors.

**B.     The Problems With Starbelly Revealed By Due Diligence Were Reinforced By The Failed Integration And Demise Of Starbelly**

After the acquisition, Keywell and Lefkofsky joined Kelley and Kilrea as HA-LO's top executives. As the founders of Starbelly, Keywell and Lefkofsky were intimately familiar with the shortcomings of Starbelly. Thus it is no surprise that even before the acquisition closed, Defendants knew there would be problems. Plaintiffs' Response to Lefkofsky ¶ 18.[3] On March 6, 2000, Lefkofsky sent an e-mail to Keywell detailing a conversation he had with Greg Kilrea. *See id.* at 14-15. Lefkofsky and Kilrea "tossed out several ideas to improve our cash position and allow us the flexibility to fix the business." *Id.* at 15. Lefkofsky reported that it was necessary to control money and either raise capital or secure financing "to insure that we don't hit the iceberg in front of us." *Id.* On March 15, 2000, Kilrea sent an e-mail to Kelley:

> need to spend some time when I get back. a lot of feedback re: the integration that is very concerning. we will not be successful if we're not able to teambuild, and right now, it doesn't seem like we're close. this is further to our conversation in phoenix re: problem focus vs. solution orientation. I am generally the last to be concerned, but certain things are not progressing well, and will not succeed if we continue down the current path at the same pace.

---

[3]     "Plaintiffs' Response to Lefkofsky ¶__" refers to Plaintiffs' Response to Defendants Eric Lefkofsky & Brad Keywell's Joint Local Rule 56.1(a)(3) Statement, filed herewith.

Id.

Immediately after the acquisition, e-mail correspondence between Lefkofsky and Kilrea show that the Starbelly business plan was abandoned and Starbelly ceased to operate as a separate business unit. *See* Plaintiffs' Response to Lefkofsky ¶ 31 ("we are reducing head counts in sales and moving our folks over to halo - i.e. old starbelly sales people that work with sloan on rfp's, accounts that we had that we are giving up to avoid account conflict with current halo salesreps"); ("in fact, we are terminating people to get g&a reductions. we are not, in any way shape or form, treating starbelly as a stand alone entity"). On June 8, 2000, Lefkofsky sent an e-mail to Kelley, Kilrea, and Keywell advising that they delay the launch to change HA-LO's name to Starbelly. *Id.* Lefkofsky listed several reasons for the delay including not having money to spend on a marketing campaign and not being ready to physically change the name throughout the organization. *Id.* One month later, HA-LO decided against adopting the Starbelly name. In a July 20, 2003 e-mail to Kelley, Kilera, and Keywell, Lefkofsky wrote: "in my mind and the mind of our management team, there is no starbelly any more. it is gone. . . . in short - there is no starbelly. it is halo and halo is it. this is integration and in the next 3-6 months there won't be a trace of starbelly left on the planet." *Id.* at 22-23.

HA-LO's troubles with Starbelly continued throughout the summer. An October 2000 Arthur Andersen memo stated: "The departure of the SB [Starbelly] developers required the Company to hire 8 consultants in late July/early August to assist in the completion of the Branded Solutions technology (which will replace the now defunct Star Stores)." *Id.* at 23. E-mail correspondence between Lefkofsky and Kilrea, portions of which we also copied to Keywell, further evidence the demise of Starbelly. *See id.* ("we made a decision to not continue to promote a system which fosters a lack of integration. there is no

starbelly. there is just halo."); ("it is in the best interests of the company to reduce starbelly's burn, reduce starbelly's independence, and force the integration of all key starbelly employees into halo assuming new roles with in the larger organization." "we are in the process of terminating those employees and clients that do not fit into the new halo branded solutions model." "at this point, there is no starbelly."). Arthur Andersen also noted the demise of Starbelly. In a memo prepared by during Andersen's 2000 audit engagement, it is noted that according to Mike Wheeler, VP of Promotional Products, and Hugh Robinson, Starbelly's controller, the Starbelly business model was disbanded in order for Starbelly personnel to work at HA-LO on the "integration of Starbelly into HA-LO." *Id.*

Starbelly was not performing as the Company had planned. *See id.* at 23 ("bottom line that HA-LO paid $240 mm for an entity that would help it grow to more than $1bb in revenues in three years"); at 23-24 ("we need to act quickly as we have been part of the bigger sh*t for most of may and all june and we are getting ready to close our third quarter. in the budget, starbelly was supposed to generate in the high 1M range in revenue - with the intercompany we are at about 1M"). Starbelly's Third Quarter 2000 revenues were only $1.1 million as compared to budgeted revenues of $4.7 million. *Id.* at 24. Arthur Andersen noted the shortfall and that "[d]ue to the poor performance of SB's [Starbelly's] Star Stores, HALO opted to discontinue their operation during the integration of SB into HALO. As such, sales and related costs fell below expectations." *Id.* On October 5, 2000, Lefkofsky complained to Kilrea about HA-LO's inability to properly project cash flows. *See id.* ("our cash flow projections leas than 4 weeks after we compiled them are wrong - I have the initial projections and I know the daily balances of our line, and the cash flows is off. our operating units have no ability to forecast cash flow - they have demonstrated that consistently.").

DOCS\170832v1

12

Lefkofsky realized that HA-LO was falling apart, that "the stock is in the toilet" and he proposed that "THE TIME TO GET RADICAL IS NOW. we need to shake this f**ker up. we need to get funky. we need to be bold." *Id.* at 24. Lefkofsky proposed a multi-part plan including:

> we give people a stand alone financial model of just promo products + starbelly + ford jv with 15+ a year in interest income. . . just in case we decide to sell. we let the street analyze it. we announce the 5M+ of yearly ebitda. we announce the positive cash flow. . . we build it up to be f**king huge for halo. we find a way to exceed 3rd quarter estimates. we find a way. we get aggressive. we proactively do sh*t to make sure that we are ahead of the estimates.

*Id.* Kilrea, in an e-mail to Lefkofsky, Kelley, and Keywell noted that he had "been throught [sic] the game of jacking up expectations to please the street. it's a vicious cycle once you enter it." *Id.* Lefkofsky was not deterred:

> so let's through [sic] our f**king hands up in the air. lets just flat out give up being cautious, concerned, detailed, conservative. lets stop listening to the voices of reason (that are probably totally right). we know that the only meaningful value to be created is through long term operational and financial results. We know that our market cap will only reflect consistant [sic] results over the long haul. but who gives a f**k. lets start having fun. lets get funky. lets announce everything. lets be WILDLY positive in our forecasts. when we announce, lets throw a ton of aggressive sh*t our analysts and answer every last f**king question - head on - with a number, a data point, a fact. lets take this thing its extreme and really pound it home. if we get whacked on the ride down - who gives a sh*t. is it going to worse than today? is our market cap going to fall to 200N, 100M who the f**k cares. the stock is in the 3s. its at an all time low. we are about to be fried like f**king chicken. . . . lets be proactive - NOW. lets announce this sh*t next week. build a f**king crazy financial model on the plane and blow people way.

*Id.* at 25. In the end, Kilrea agreed that he would "support the team decision." *Id.*

Lefkofsky's call to recklessness not withstanding, Defendants knew the hopelessness of their situation. On October 8, 2000, Kelley sent an e-mail to, *inter alia,* Lefkofsky, Keywell, and Kilrea:

> as numerous activities continue which i do not believe are appropriate for our current strategy (and these activities continue to distract an already overtaxed and uncohesive management team), i believe it is time to name lou weisbach chairman and ceo stating our renewed focus on promotional products this will help lead the company into it's next phase my attempts at keeping us focused are not effective

DOCS\170832v1

13

*Id.* Only five months after closing the Starbelly acquisition he orchestrated to bring about HA-LO's e-transformation, Kelley was throwing in the towel and trying to turn HA-LO back to its traditional roots. Kilrea shared Kelly's skepticism and concerns. In an e-mail dated October 9, 2000 to Lefkofsky, Kilrea gave his thoughts on HA-LO's predicament since the Starbelly acquisition: "we have finite management resources and tremendous integration issues we battle every day. . . .i would like to think we have learned as a company -- doing deals for the sake of doing deals is a losing strategy." *Id.* at 25-26. Lefkofsky's October 5, 2000 assessment of the situation at HA-LO was much more graphic: "the reality is that I'm concerned we're fu\*\*ed, tom's concerned we fu\*\*ed, and deep down inside I know that you are concerned too." *Id.* at 26.

By December 31, 2000 Defendants had discontinued technology spending on the internet web-store concepts contained in Starbelly's business model. *Id.* HA-LO would never recognize incremental revenues from the long-lived assets acquired by Starbelly. Indeed, projected financial statements prepared in December 2000 estimated HA-LO's revenue levels for 2000, 2001, and 2002 at levels equal to those of HA-LO projected *before* the Starbelly acquisition. *Id.*

**C.     HA-LO's SEC Form 10-K For 1999 Should Have Disclosed The Negative Due Diligence And The Operational Problems of Starbelly**

On March 30, 2000, HA-LO filed its Form 10-K for the year-ended December 31, 1999. The 1999 Form 10-K disclosed that "[s]ubsequent to year-end, the Company entered into a binding agreement to acquire an internet based promotional products company, Starbelly.com." Defendants' Lr56.1(a)(3) Statement at ¶23. As of March 30, 2000, Defendants had received four negative reports from consultants analyzing Starbelly. *See* Plaintiffs' Response to Kilrea ¶¶ 28, 29. In addition, Lefkofsky and Kilrea had exchanged e-mails with Keywell and Kelley cited problems that had occurred before the Starbelly

DOCS\170832v1

14

acquisition even closed. *See* Plaintiffs' Response to Lefkofsky ¶18 at 15 (need to control money and either raise capital or secure financing "to insure that we don't hit the iceberg in front of us."); ("a lot of feedback re: the integration that is very concerning. we will not be successful if we're not able to teambuild, and right now, it doesn't seem like we're close."). The existence of this adverse information made the disclosure in the 1999 10-K false and misleading and required Defendants to disclose the negative information concerning the Starbelly acquisition. *See Kaufman v. Motorola, Inc.*, Case No. 95 CV 1069, 1999 U.S. Dist. LEXIS 6303, at *24 (N.D. Ill. April 16, 1999) ("incomplete disclosures implicate a duty to disclose any additional information needed to rectify misleading statements.") (quoting *In re Discovery Zone*, 943 F. Supp. 924, 935).

When the 1999 10-K was filed, Defendants has already issued two false and misleading statements, on January 18, 2000 and February 17, 2000, concerning the Starbelly acquisition. In order to make these prior statements not misleading, Defendants were required to disclose the known adverse information about Starbelly when they made an additional statement about the acquisition in the 1999 10-K. *See* In re Westell Techs., Inc., Sec. Litig., 00 C 6735, 2001 U.S. Dist. LEXIS 17867, at *24 (N.D. Ill. Oct. 30, 2001) ("duty to disclose non-public material information arises when (a) disclosure is needed to make a prior statement not misleading") (quoting *Holstein v. Armstrong*, 751 F. Supp. 746, 748 (N.D. Ill. 1990).[4]

Under Items 303(a) and 303(b) of Regulation S-K, promulgated by the SEC under the Exchange Act, a public company has a duty to disclose in annual and period reports filed with the SEC, such as HA-LO's 1999 10-K, "known trends or any demands, commitments,

---

[4] Defendants' reliance on *Gallagher v. Abbott Laboratories*, 269 F.3d 806, 808 (7th Cir. 2001), is misplaced, as there, defendants received negative information after filing a 10-K.

events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results. 17 C.F.R. § 229.303(a)(1)-(3) and Instruction 3. The existence of four negative due diligence reports and serious financial and operational problems before the acquisition even closes are "events or uncertainties" that required disclosure in the 1999 10-K. [5]

### D. "Risk Disclosures" in HA-LO's Proxy Statement Are Insufficient To Shield Defendants From Liability

The "disclosures" that Defendants made in HA-LO's Proxy Statement do not relieve Defendants of liability for their false and misleading statements. Defendants argue that the disclosures in the proxy informed investors of "information sufficient to call [a] representation into question." Def. Br. at 3 (quoting *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1131-1132 (7th Cir. 1993)). *Eckstein*, however, is inapposite because there was no contention in that case that disclosures in a prospectus were inadequate. *See Eckstein* at 1132 ("plaintiffs do not contend that the risk disclosures in the prospectus were buried or indigestible"). The bland, unspecified risks identified in the proxy statement, such as Starbelly's "business system is new and unproven," do not transmit the truth to the public "with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by" Defendants. *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989). In order to immunize a defendant from liability, the purportedly counterbalancing disclosures "must be capable of being perceived as material and [their] significance . . . susceptible to common understanding." *Isquith ex rel. Isquith v. Middle*

---

[5]     Defendants' insistence that disclosure requirements are triggered only by insider trading or some other collateral activity, Kilrea Br. at 5, plainly is wrong.

*S. Utils.*, 847 F.2d 186, 202 (5th Cir. 1988). The disclosures in the Proxy Statement encompass general business risks that would be true for any acquisition.

The Proxy Statement's warnings of future risks, however, failed to disclose risks already known to Defendants -- *e.g.*, risks that were identified by Ernst & Young and HA-LO's internal consultants. *See, supra,* I.A.1 (a) and (b). *See, also, e.g., Huddelston v. Herman & MacLean,* 640 F.2d 534, 544 (5th Cir. 1981) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

**E.      Defendants' Statements Can Not Be Discounted As Puffery
When Defendants' Knew Undisclosed Adverse Information**

Defendants' statements are not inactionable puffery. Courts have consistently found that statements of opinion, as well as other subjective statements, are actionable if the speaker is aware of undisclosed facts that seriously undermine the statement's accuracy and if the statement, in context, would likely have been important to investors. *See, e.g., Lindelow v. Hill,* Case No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301, at * 12 (N.D. Ill. July 19, 2001) ("statements of opinion will be actionable if it is possible defendants 'said things that were so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price than it was worth ex ante'") (quoting *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 746 (7th Cir. 1997); *In re Next Level Sys. Sec. Litig.,* No. 97 C 7362, 1999 U.S. Dist. LEXIS 5653, at *17 (N.D. Ill. Mar. 31, 1999) (court held that statements "boasting" of the company's "bright future" were actionable where defendants were aware of significant problems that the company faced).[6]

---

[6]      *See also, e.g., In re Computer Assoc. Class Action Sec. Litig.,* 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (statements that "business is stronger than ever," that there was "strong worldwide demand" for the company's products, that their "business fundamentals are strong" and that the company "was solidly positioned for growth," were not puffing if defendants had knowledge of specific adverse business trends that undermined these statements); *In re APAC Teleservices, Inc. Sec. Litig.,* 97 Civ. 9145, 1999 U.S. Dist. LEXIS 17908, at *26 (S.D.N.Y. Nov.

Defendants' statements on the Starbelly acquisition cannot be dismissed an inactionable puffery. Defendants released these misleading statements into the marketplace, knowing they were false, in order to give the false impression that the Starbelly acquisition was a success that was benefiting HA-LO and causing the "e-transformation" of the Company. *See, supra*, I.A. (describing negative results of due diligence as well as problems HA-LO encountered with Starbelly). "[S]tatement[s] . . . made to foster a false market perception . . . are not mere puffery but instead constitute actionable statements." *In re Allaire Corp. Secs. Litig.*, 224 F. Supp. 2d 319, 335 (D. Mass. 2002). Courts in this Circuit have held that "'puffing' . . . relates to expressions of opinion," *United States v. Shelton*, 669 F.2d 446, 465 (7th Cir. 1982) (citation omitted), and where, as here, the alleged misrepresentations are specific and there is detailed undisclosed, adverse facts that render the statements false when made, such statements are actionable non-puffery. *See, e.g., Donovan v. ABC-NACO, Inc.*, Case No. 02 C 1951, 2002 U.S. Dist. LEXIS 12797, at *20-22 (N.D. Ill. July 12, 2002);

## II. DEFENDANTS' FAILED TO DISCLOSE THE RELATIONSHIP BETWEEN NELSON AND KEYWELL

Linden Nelson brought the possibility of the Starbelly acquisition to HA-LO. Plaintiffs' Response to Kilrea ¶ 39 at 27. He visited Starbelly three times before the deal was approved, once because he wanted to be sure Brian Hermelin visited too, as he was the only Board member who had not been to Starbelly before the vote. *Id.*

Defendants contend that the Proxy Statement disclosed that Nelson and Keywell "had been acquainted professionally and personally for several years." Kilrea Br. at 3. This disclosure, however, was insufficient. Nelson and Keywell were family. Mrs. Nelson's aunt

---

12, 1999) (statements that the company had a "track record" of "superior value to clients" generating increased sales and improved customer services were not simply puffing if the company knew, but failed to disclose, that its service was so poor it lost a contract with its largest customer).

DOCS\170832v1

is married to Mrs. Keywell's uncle. Plaintiffs' Response to Kilrea ¶ 131. As such Nelson had attended Keywell 's wedding. *Id.* In addition, Nelson and Keywell attended the same family gatherings a couple of times a year and Nelson lives just three miles from Brad Keywell's parents. *Id.*

Statement of Financial Accounting Standards ("SFAS") N. 57 requires that financial statements disclose related party transaction because, among other things, "[t]ransaction involving related parties cannot be presumed to be carried out on an arm's length basis." Plaintiffs' Response to Kilrea ¶ 13. SFAS 57 indicates that transactions between an enterprise and its principal owners, directors, management, or members of their immediate families are examples of related party transactions. *Id.* In addition, SFAS 57 provides that immediate family members include those individuals who may influence a principal owner of the entity or a member of its management because of the family relationship. *Id.*

## III. DEFENDANTS' STATEMENT IN HA-LO'S JANUARY 18, 2000 PRESS RELEASE WAS FALSE AND MISLEADING

HA-LO's January 18, 2000 Press Release expounded on the virtues of the Starbelly acquisition, including the effect of Starbelly's technology on sales of promotional products. According to defendant Kelley: "Starbelly's revolutionary internet business model will expand HA-LO's penetration of the $15 billion promotional products market." Defendants' LR56.1(A)(3) Statement at ¶40. This statement was false and misleading at the time that it was made. At December 1999, Starbelly's nine month existence had produced revenues of only $350,000. Plaintiffs' Response to Kilrea ¶27. In addition, Ernst & Young and HA-LO's internal due diligence team had already apprised Defendants that Starbelly's technology could not support HA-LO's business. Plaintiffs' Response to Kilrea ¶¶ 28, 29. Kelly's statement that it was Starbelly's "revolutionary **internet** business model" that would bring HA-LO into a $15 billion market was false and misleading because there was not a $15 billion Internet market and

there was no reasonable basis to state that a company with $350,000 in revenues whose technology was insufficient to support HA-LO could penetrate anything.

## IV. DEFENDANTS' STATEMENTS IN HA-LO'S APRIL 27, 2000 PRESS RELEASE AND FORM 10-K FOR 1999 WERE FALSE AND MISLEADING

In HA-LO's April 27, 2000 press release, defendant Kelly discussed the imminent closing of the Starbelly acquisition and its effects on HA-LO: "The expected close of our Starbelly.com acquisition significantly changes HA-LO's financial outlook." Defendants' LR56.1(A)(3) Statement at ¶ 41. In addition, Kelly stated that HA-LO would be executing its "tightly-crafted integration plan." *Id.* These statements were false and misleading because at the time they were made HA-LO's integration plan was already failing and the acquisition of Starbelly.com was a financial burden that threatened HA-LO. *See* Plaintiffs' Response to Kilrea ¶ 44.

Defendants contend that HA-LO had an integration plan. And they did have meetings at the bar across the street to discuss integration. Plaintiffs' Response to Kilrea ¶ 44. (technology integration meetings took place at Morse Land, a "bad-smelling place" across the street). E-mail correspondence between Kelly and Kilrea demonstrate that the "tightly-crafted integration plan" had begun to unravel well before the April 27, 2000 press release was issued. On March 15, 2000, Kilrea sent an e-mail to Kelley:

> need to spend some time when I get back. a lot of feedback re: the integration that is very concerning. we will not be successful if we're not able to teambuild, and right now, it doesn't seem like we're close. this is further to our conversation in phoenix re: problem focus vs. solution orientation. I am generally the last to be concerned, but certain things are not progressing well, and will not succeed if we continue down the current path at the same pace.

*Id.* (emphasis added).

Kelly's statement that the Starbelly acquisition would improve HA-LO's financial condition was not puffery. It was a statement that was false at the time it was made. *See*

DOCS\170832v1

20

*Lindelow*, 2001 U.S. Dist. LEXIS 10301, at * 12 ("statements of opinion will be actionable if it is possible defendants 'said things that were so discordant with reality that they would induce a reasonable investor to buy stock at a higher price than it was worth ex ante'") (citation omitted). HA-LO spent $240 million to purchase Starbelly at a time when HA-LO had $10.8 million in cash, $21.2 million of long-term debt, approximately 48 million shares of common stock outstanding, and no preferred stock outstanding. Plaintiffs' Response to Kilrea ¶ 27. In addition, Starbelly required significant capital. Starbelly's business plan required an infusion of $100 million in capital to fund software and hardware development and operating expenses in order to approach break even operating results on their projected $196 million revenues at year end 2002. Plaintiffs' Response to Kilrea ¶ 44 at 31. As of April 27, 2000, when Kelly assured the market that Starbelly would change HA-LO's financial outlook, HA-LO's financial well-being was in a tailspin.

On March 6, 2000, Lefkofsky sent an e-mail to Keywell detailing a conversation he had with Greg Kilrea. Plaintiffs' Response to Lefkofsky ¶ 18. Lefkofsky and Kilrea "tossed out several ideas to improve our cash position and allow us the flexibility to fix the business." *Id.* Lefkofsky reported that it was necessary to control money and either raise capital or secure financing "to insure that we don't hit the iceberg in front of us." Id. It was also well known within HA-LO that market conditions would hurt HA-LO's ability to raise capital for Starbelly. Plaintiffs' Response to Kilrea ¶¶ 44, 47. In a March 6, 2000 e-mail to Keywell, Lefkofsky reported on a meeting between himself and Greg Kilrea:

> . . . greg wants to move full steam ahead with raising 50M in preferred debt to replace a portion of our working capital facility. since raising equity at this point would be hard and costly, this seems to make sense. . . .he will also look at modeling the individual units on a stand alone basis so we can test the water and determine the market value of marusa, laga. . . in the event debt and equity can't be raised, this may be the alternative.

Plaintiffs' Response to Kilrea ¶ 44 at 31. HA-LO was contemplating additional debt and selling portions of the Company in order to finance Starbelly. Defendants' original plan to raise Starbelly capital through an equity offering, *see id.*, was doomed by the failing dot.com industry. *See* Plaintiffs' Response to Kilrea ¶ 54 ("Last week's technology bashing on the Nasdaq stock market underscored the growing belief that many Internet companies with thin or no profits remain overvalued. As a result, investors are casting a much more critical eye at thee businesses, raising the prospect that public financing for some may dry up."). Given the adverse financial conditions effecting HA-LO's ability to fund Starbelly, Kelly's statement that Starbelly would change HA-LO's financial condition was false and misleading and made without any reasonable basis.[7]

HA-LO's 1999 Form 10-K did not disclose any of the problems, described above, that HA-LO was experiencing with Starbelly. While Defendants contend that the 1999 10-K's silence was acceptable, Defendants had a duty to disclose known adverse information about the Starbelly integration and financial problems the acquisition was causing. *See, supra,* I.C.

## V. DEFENDANTS' STATEMENTS IN HA-LO'S FORM S-3 WERE FALSE AND MISLEADING

On May 3, 2000, HA-LO filed a Form S-3 Registration Statement. The Registration Statement made disclosures concerning the preferred stock that was being issued in connection with the Starbelly acquisition:

> At any time during the 30-day period commencing on May 3, 2001, the holders of the convertible preferred stock issued in the Starbelly.com merger and upon exercise of assumed options will have the right to require us to redeem all or any part of their shares at a price per share in cash equal to the liquidation preference of $10.00 per share, plus any accrued and unpaid dividends. If holders of a significant number of shares of convertible preferred stock elect to have their

---

[7] As discussed above, the "disclosures" in HA-LO's April 12, 2000 Proxy Statement do not shield defendants from liability on the statements in the April 27, 2000 press release. *See, supra,* I.D.

shares redeemed, we will be required to borrow the funds necessary to pay the redemption price or to raise such funds through the public or private sale of debt or equity securities. As of May 1, 2000, the closing price of HA-LO common stock on the NYSE was $7.00 per share. There can be no assurance that adequate financing will be available to pay the redemption price or that the terms of any such financing will be satisfactory to us.

Defendants' LR56.1(A)(3) Statement at ¶46).

The Registration Statement was false and misleading because it did not disclose that the Company's present financial troubles ensured that HA-LO would be unable to finance the preferred shareholder payment. The uninspired disclosure that "[t]here can be no assurance that adequate financing will be available to pay the redemption price or that the terms of any such financing will be satisfactory to us" is insufficient due to the non-disclosed adverse information within Defendants' possession. *See Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996).

At the closing of the Starbelly acquisition, there had been a disastrous downturn in the technology marketplace and the dot.com sector had "suffered a meltdown." Plaintiffs' Response to Kilrea ¶ 47. As of May 3, 2000, Defendants knew that they would be unable to raise any equity to finance Starbelly. *Id.* In a March 6, 2000 e-mail to Keywell, Lefkofsky reported that during a meeting between himself and Greg Kilrea it had been determined that "raising equity at this point would be hard and costly" *Id.* at 32-33. As a result, Defendants were considering selling off parts of HA-LO in order to obtain the $100 million required by Starbelly's business plan. *See id.* at 33("he will also look at modeling the individual units on a stand alone basis so we can test the water and determine the market value of marusa, laga. . . in the event debt and equity can't be raised, this may be the alternative."); (Starbelly's business plan required an infusion of $100 million in capital to fund software and hardware development and operating expenses in order to approach break even operating results on their projected $196 million revenues at year end 2002). The inability to finance Starbelly was an inability for HA-LO to be successful.

DOCS\170832v1

23

The Registration Statement did not need to "predict the future," but once Defendants made a disclosure concerning the HA-LO's ability to pay the preferred shareholders, that disclosure could not be misleading. *See Kaufman*, 1999 U.S. Dist. LEXIS 6303, at *24 ("incomplete disclosures implicate a duty to disclose any additional information needed to rectify misleading statements."). By withholding information concerning the current existing financial problems facing HA-LO, Defendants' statements in the Registration Statement were false and misleading. Because Defendants had actual knowledge that their ability to raise equity to finance Starbelly was seriously impaired, the statements in the Registration Statement were not forward-looking.

## VI. HA-LO'S FINANCIAL STATEMENTS OVERSTATED GOODWILL FROM THE STARBELLY ACQUISITION

Defendants consistently overstated the value of goodwill for the Starbelly acquisition. The fluctuating amount of goodwill, as seen in HA-LO's May 12, 200 Form 8-K, Form 10-Q for the quarter ended June 30, 2000, and Form 10-K for 2000, was not the result of changes in HA-LO's stock price, but Defendants failure to perform a FAS 121 analysis and properly account for the goodwill associated with the Starbelly acquisition. *See* Plaintiffs' Response to Kilrea ¶ 66.

FAS 121 requires that impairment losses be recognized at the time the recorded value of long-lived assets are less than the fair value of those assets. Plaintiffs' Response to Kilrea ¶ 54. Under FAS 121, impairment loss could occur as early of the date of acquisition. *Id.* The Starbelly acquisition was commenced to "pop" HA-LO' stock. *See id..* HA-LO's stock, however, dropped precipitously from January 18, 2000 to May 3, 2000 by 30%. *See id.* Due to the decline in HA-LO's stock, Starbelly's intangible assets had no value. *Id.*

In addition, FAS 121 suggests that fair value be determined by projecting undiscounted cash flows, at the lowest level, for long-lived assets for which there were cash flows and comparing those cash flows to the value of the asset. *Id.* For the long-lived assets acquired in

DOCS\170832v1

24

the Starbelly acquisition, cash flows sufficient to recover the costs of those assets within the five year amortization window for goodwill were never projected, as demonstrated by the pre-acquisition business plan. *Id.*

Finally, prior to the acquisition, Starbelly had long-lived assets with a net book value of $1.9 million, and consequently did not have significant exposure under FAS 121. *Id.* The acquisition price, however, allocated over $250 million to goodwill and other long-lived assets. *Id.* "The acquisition and the resulting allocation of the purchase price was an event and/or a change in circumstances that required that a review of the appropriateness of the carrying value of the long-lived assets be performed immediately in accordance with FAS 121, paragraph 5." *Id.*

At the time HA-LO acquired Starbelly, there were ample reasons to perform a FAS 121 analysis. These reasons continued to exist until HA-LO finally took a restructuring charge and wrote-down the value of the Starbelly goodwill. HA-LO's restructuring charge, however, came months too late. Projected financial statements prepared by HA-LO in December 2000 for a presentation to their bank, estimated revenue levels for 2000, 2001, and 2002 at levels equal to levels projected for HA-LO prior to the Starbelly acquisition. *See id.* Starbelly's revenue stream, almost nonexistent at the time of the acquisition, was nonexistent in the fourth quarter of 2000. *Id.* HA-LO's decision to abandon Starbelly and discontinue technology spending on the Starbelly business model meant that HA-LO would never realize incremental revenues from the long-loved assets acquired from Starbelly. *Id.*

Between the close of the Starbelly acquisition on May 5, 2000 and the announcement of the restructuring charge on April 26, 2001, Defendants caused HA-LO to make filings with the SEC that contained the Company's financial statements. HA-LO's Class Period financial statements were false and misleading because they overstated the amount of goodwill for the

Starbelly acquisition and failed to timely record a charge against income for the impairment in the value of the goodwill recorded on the Starbelly acquisition. HA-LO's Class Period financial statements were not presented in conformity with GAAP or the rules and regulations of the SEC, and they misrepresented and distorted the Company's true operating results. Defendants' statements of the amount of goodwill from the Starbelly acquisition were false statements.[8]

## VII. DEFENDANTS' STATEMENTS IN HA-LO'S JULY 27, 2000 PRESS RELEASE WERE FALSE AND MISLEADING

On July 27, 2000, HA-LO issued a press release containing the following quote from Kelly:

> As expected, our results do not yet realize the impact of Starbelly.com. . . . However, the <u>acquisition has already begun paying off</u> as large corporations have brought into the marketing power of our industry-leading Internet platform. <u>Our comprehensive integration plan is fully on track</u>, and we expect to see significant operating efficiencies and new revenue opportunities in the months ahead.

Plaintiffs' Response to Kilrea ¶ 58 (emphasis added). Kelly's statements about the success of the Starbelly acquisition were false and misleading. Defendants' narrow focus on the phrase "large corporations have bought into the marketing power of our industry-leading Internet platform" ignores the larger message of the statement -- following the successful Starbelly acquisition, the integration of HA-LO and Starbelly is leading to operating efficiencies and new revenue opportunities. The Starbelly acquisition was a $240 million transaction. It was the most money HA-LO had ever paid for an acquisition. Plaintiffs' Response to Kilrea ¶ 27. After the acquisition, the goodwill, although overstated, accounted for 60% of HA-LO's assets. *Id.* Having completed the Starbelly acquisition, its success was crucial to HA-LO's financial survival. The July 27, 2000 press release was not puffery, but a statement about the current state

---

[8] The Court is respectfully referred to Plaintiffs' Motion for Partial Summary Judgment and all supporting papers for a full discussion of Defendants' violations of the Federal Securities laws due to the overstatement of goodwill from the Starbelly acquisition.

DOCS\170832v1

26

of events at HA-LO post-acquisition that an investor would have found useful as a basis to decide whether to invest in HA-LO. The July 27, 2000 statements were also completely false at the time that they were made.

The "comprehensive integration plan" was not on track. HA-LO had planned on retaining Starbelly as a complete operating entity, thus making use of Starbelly's internet platform. Indeed, HA-LO even planned to change its name to Starbelly. Instead, HA-LO began to abandon Starbelly well before the July 27, 2000 press release. Immediately after the acquisition, e-mail correspondence between Lefkofsky and Kilrea show that the Starbelly business plan was abandoned and Starbelly ceased to operate as a separate business unit. Plaintiffs' Response to Lefkofsky ¶ 31 ("we are reducing head counts in sales and moving our folks over to halo - i.e. old starbelly sales people that work with sloan on rfp's, accounts that we had that we are giving up to avoid account conflict with current halo salesreps"); ("in fact, we are terminating people to get g&a reductions. we are not, in any way shape or form, treating starbelly as a stand alone entity"). On June 8, 2000, Lefkofsky sent an e-mail to Kelley, Kilrea, and Keywell advising that they delay the launch to change HA-LO's name to Starbelly. *Id.* Lefkofsky listed several reasons for the delay including not having money to spend on a marketing campaign and not being ready to physically change the name throughout the organization. *Id.* One month later, HA-LO decided against adopting the Starbelly name. In a July 20, 2003 e-mail to Kelley, Kilera, and Keywell, Lefkofsky wrote: "in my mind and the mind of our management team, there is no starbelly any more. it is gone. . . . in short - there is no starbelly. it is halo and halo is it. this is integration and in the next 3-6 months there won't be a trace of starbelly left on the planet." *Id.*

HA-LO's "comprehensive integration plan" was under siege. HA-LO was no longer absorbing Starbelly and its "industry-leading Internet platform." Instead, HA-LO was on a

DOCS\170832v1

27

salvage mission, looking for any way for Starbelly to help HA-LO. Starbelly, however, was not performing as planned. *Id.* ("bottom line that HA-LO paid $240 mm for an entity that would help it grow to more than $1bb in revenues in three years"); ("we need to act quickly as we have been part of the bigger sh*t for most of may and all june and we are getting ready to close our third quarter. in the budget, starbelly was supposed to generate in the high 1M range in revenue - with the intercompany we are at about 1M"). In the weeks leading up to the July 27, 2000 press release, Starbelly was performing poorly. Starbelly's Third Quarter 2000 revenues were only $1.1 million as compared to budgeted revenues of $4.7 million. *Id.* Arthur Andersen noted the shortfall and that "[d]ue to the poor performance of SB's [Starbelly's] Star Stores, HALO opted to discontinue their operation during the integration of SB into HALO. As such, sales and related costs fell below expectations." Id. Amidst these problems, Kelley's statement that the Starbelly acquisition was paying off was false and misleading.

## VIII. DEFENDANTS' STATEMENTS IN HA-LO'S OCTOBER 25, 2000 PRESS RELEASE WERE FALSE AND MISLEADING

On October 25, 2000, HA-LO issued a press release discussing its financial results for the Third Quarter 2000. The October 25, 2000 press release again praised Starbelly and its positive effect on HA-LO:

> Our results are just beginning to reflect the significant sales and productivity enhancements brought through last quarter's acquisition of Starbelly.com . . . The number of business customers using our Internet solutions has grown rapidly since we introduced our four online service offerings earlier this quarter, and we have a healthy number of additional customer online stores in the pipeline. . . .

Plaintiffs' Response to Kilrea ¶ 61.

Once again, Defendants presented to the market false and misleading statements about the post-acquisition status of HA-LO. Defendants characterize the abandonment of Starbelly as a trivial decision to not change the name of the Company. Kilrea Br. at 18. The abandonment of Starbelly, however, was also an abandonment of the Starbelly internet business model. An

DOCS\170832v1

28

October 2000 Arthur Andersen memo stated: "The departure of the SB [Starbelly] developers required the Company to hire 8 consultants in late July/early August to assist in the completion of the Branded Solutions technology (which will replace the now defunct Star Stores)." Plaintiffs' Response to Lefkofsky ¶31. Star Stores had been a central part of the Starbelly business model. The Aurthur Andersen memo also noted that according to Mike Wheeler, VP of Promotional Products, and Hugh Robinson, Starbelly's controller, Starbelly business model was disbanded in order for Starbelly personnel to work at HA-LO on the "integration of Starbelly into HA-LO." *Id.* E-mail correspondence between Lefkofsky and Kilrea, portions of which we also copied to Keywell, further evidence the demise of Starbelly's business model. *See id.* ("we are in the process of terminating those employees and clients that do not fit into the new halo branded solutions model." "at this point, there is no starbelly.").

At the time of the October 27, 2000 press release, Defendants' contemporaneous non-public statements tell a story of a company struggling not to fall apart after a disastrous acquisition. As discussed above, Starbelly's performance leading up to the Third Quarter 2000 was dismal (*see id.* ("we need to act quickly as we have been part of the bigger sh*t for most of may and all june and we are getting ready to close our third quarter. in the budget, starbelly was supposed to generate in the high 1M range in revenue - with the intercompany we are at about 1M") and any thought of keeping Starbelly as a separate entity had been abandoned. *See id.* ("in my mind and the mind of our management team, there is no starbelly any more. it is gone").

HA-LO's financial woes continued, prompting Lefkofsky , on October 5, 2000, to complain to Kilrea about HA-LO's inability to properly project cash flows. *See id.* ("our cash flow projections leas than 4 weeks after we compiled them are wrong - I have the initial projections and I know the daily balances of our line, and the cash flows is off. our operating units have no ability to forecast cash flow - they have demonstrated that consistently.").

DOCS\170832v1

29

Lefkofsky realized that HA-LO was falling apart, that "the stock is in the toilet" and he proposed that "THE TIME TO GET RADICAL IS NOW. we need to shake this f**ker up. we need to get funky. we need to be bold." *Id.* Lefkofsky proposed a multi-part plan including:

> we give people a stand alone financial model of just promo products + starbelly + ford jv with 15+ a year in interest income. . . just in case we decide to sell. we let the street analyze it. we announce the 5M+ of yearly ebitda. we announce the positive cash flow. . . we build it up to be f**king huge for halo. we find a way to exceed 3rd quarter estimates. we find a way. we get aggressive. we proactively do sh*t to make sure that we are ahead of the estimates.

*Id.* Kilrea, in an e-mail to Lefkofsky, Kelley, and Keywell noted that he had "been throught [sic] the game of jacking up expectations to please the street. it's a vicious cycle once you enter it."

*Id.* Lefkofsky was not deterred:

> so let's through [sic] our f**king hands up in the air. lets just flat out give up being cautious, concerned, detailed, conservative. lets stop listening to the voices of reason (that are probably totally right). we know that the only meaningful value to be created is through long term operational and financial results. We know that our market cap will only reflect consistant [sic] results over the long haul. but who gives a f**k. lets start having fun. lets get funky. lets announce everything. lets be WILDLY positive in our forecasts. when we announce, lets throw a ton of aggressive sh*t our analysts and answer every last f**king question - head on - with a number, a data point, a fact. lets take this thing its extreme and really pound it home. if we get whacked on the ride down - who gives a sh*t. is it going to worse than today? is our market cap going to fall to 200N, 100M who the f**k cares. the stock is in the 3s. its at an all time low. we are about to be fried like f**king chicken. . . . lets be proactive - NOW. lets announce this sh*t next week. build a f**king crazy financial model on the plane and blow people way.

*Id.* In the end, Kilrea agreed that he would "support the team decision." *Id.*

Lefkofsky's call to recklessness not withstanding, Defendants knew the hopelessness of their situation. On October 8, 2000, Kelley sent an e-mail to, inter alia, Lefkofsky, Keywell, and Kilrea:

> as numerous activities continue which i do not believe are appropriate for our current strategy (and these activities continue to distract an already overtaxed and uncohesive management team), i believe it is time to name lou weisbach chairman and ceo stating our renewed focus on promotional products this will help lead the company into it's next phase my attempts at keeping us focused are not effective

*Id.* Only five months after closing the Starbelly acquisition he orchestrated to bring about HA-LO's e-transformation, Kelley was throwing in the towel and trying to turn HA-LO back to its traditional roots. Kilrea shared Kelly's skepticism and concerns. In an e-mail dated October 9, 2000 to Lefkofsky, Kilrea gave his thoughts on HA-LO's predicament since the Starbelly acquisition: "we have finite management resources and tremendous integration issues we battle every day. . . .i would like to think we have learned as a company -- doing deals for the sake of doing deals is a losing strategy." *Id.* Lefkofsky's October 5, 2000 assessment of the situation at HA-LO was much more graphic: "the reality is that I'm concerned we're fu\*\*ed, tom's concerned we fu\*\*ed, and deep down inside I know that you are concerned too." *Id.*

## IX. DEFENDANTS' STATEMENTS IN HA-LO'S FEBRUARY 15, 2001 PRESS RELEASE WERE FALSE AND MISLEADING

On February 15, 2001, HA-LO issued a press release announcing the Company's Fourth quarter 2000 and year-end results. The press release also contained a quote from defendant Kilrea on the continuing success of the Starbelly acquisition:

> Our results reflect momentum in our leading promotional products business, indicative of the sales and productivity enhancements brought about by our technology-based business model. . . . .

Plaintiffs' Response to Kilrea ¶ 63.

The February 15, 2001 press release was false and misleading because at the time it was made, Defendants were aware of serious adverse conditions that were not disclosed. By December 31, 2000 Defendants had discontinued technology spending on the internet web-store concepts contained in Starbelly's business model. Plaintiffs' Response to Kilrea ¶ 27. HA-LO would never recognize incremental revenues from the long-lived assets acquired by Starbelly. Indeed, projected financial statements prepared in December 2000 estimated HA-LO's revenue levels for 2000, 2001, and 2002 at levels equal to those of HA-LO projected *before* the Starbelly

acquisition. *Id.* The "technology-based business model" that HA-LO acquired from Starbelly was not contributing to HA-LO.

The February 15, 2001 press release was also false and misleading because it failed to disclose that HA-LO was in default under its credit facility. Defendants argue that continuous and immediate disclosure is not required. *See* Kilrea. Bf. at 19 (citing *Gallagher*, 269 F.3d at 808-809). Defendants seek solace in the fact that HA-LO's default was announced 6 weeks later in HA-LO's March 30, 2001 Form 10-K for 2000. Kilrea Bf. at 19. The February 15, 2001 press release, however, announced HA-LO's year-end results for 2000 -- the same information that was the basis for the 2000 10-K. When the February 15, 2001 press release was issued Defendants knew that HA-LO had violated its credit facility. They chose to release year-end results that omitted this negative information. The financial information contained in the February 15, 2001 press release should have included the current adverse information concerning the credit facility to not be false and misleading.

## X. DEFENDANTS' STATEMENTS IN HA-LO'S FEBRUARY 19, 2001 PRESS RELEASE WERE FALSE AND MISLEADING

The goodwill associated with the Starbelly acquisition was overstated throughout the Class Period. On February 19, 2001 in a <u>Crain's Chicago Business</u> article, a HA-LO spokeswoman stated: "We don't anticipate a writeoff of the Starbelly goodwill." Defendants' LR56.1(A)(3) Statement at ¶ 65. This statement was false and misleading because the Starbelly goodwill was overstated, necessitating a writeoff. *See, supra*, VI. Defendants cite testimony by Kilrea that the writeoff was entirely due to Marc Simon. However, there is ample evidence that shows that Defendants were reckless in not taking the writeoff months earlier. *Id.* Defendants' failure was based on their refusal to properly account for the Starbelly goodwill by performing a FAS 121 analysis.

## A.    The SEC Instructed HA-LO To Perform an FAS 121 Analysis

Defendants knew that a FAS 121 analysis was required under GAAP. *See, supra,* VI. In addition, on March 17, 2000, the SEC sent a letter to Kelley commenting on HA-LO's Proxy Statement filed in connection with the Starbelly acquisition. Plaintiffs' Response to Kilrea ¶ 66. The March 17, 2000 letter specifically addressed the need for a FAS 121 analysis:

> We note your disclosure regarding realizability of underlying goodwill. Given your recent loss in the interim 1999 period and your proposed acquisition of an entity in the development stage, we believe you should have an impairment policy that substantially complies with SFAS 121 for all long-lived assets including goodwill. As a side matter, please confirm that all goodwill is evaluated under SFAS no. 121 as opposed to the 'enterprise method' for various portions of goodwill.

Id.

As a result of the SEC's May 17, 2000 letter, Defendants committed to performing a FAS 121 analysis. In discussing the May 17, 2000 letter from the SEC directing the performance of a FAS 121 analysis, Defendants' accounting expert testified:

> Q    Now, did in fact HA-LO adopt that policy with respect to the Starbelly transaction?
>
> A    I assume they did. I believe that that's what they indicated in their response, anyway.
>
> Q    They indicated -- HA-LO indicated in its response to the SEC that they would implement item No. 82 in Note 1.H for intangibles on page 16 of Exhibit 12 (EL-41-3--41049), correct?
>
> A    That's correct.

*Id.*

The March 17, 2000 letter was addressed to defendant Kelley. *Id.* It was produced from defendant Lefkofsky's files. *Id.* Defendant Kilrea, as CFO, would have been involved with any response to the SEC regarding accounting issues. Despite the SEC's direction for a FAS 121 analysis to be performed, Defendants never complied. Kilrea testified that a FAS

DOCS\170832v1

33

121 analysis was never performed. *See id.* (FAS 121 analysis was not performed in connection with the second quarter 2000 10-Q filing); (FAS 121 analysis was not performed for the third quarter 2000 10-Q filing); (FAS 121 analysis was not performed when filing year-end 2000 financial statements).

**B.      Defendants Knew Or Were Reckless In Not Knowing That
HA-LO Was Carrying An Overstated Assets On Its Books**

FAS 121, paragraph 4 states:  "An entity shall review long-lived assets and certain identifiable intangibles to be held and used for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable." *Id.* FAS 121, paragraph 5 lists five examples of "events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed." FAS 121. All five of these examples were present at HA-LO:

**1.      A significant decrease in the market value of an asset**

Starbelly was a dot.com significantly overvalued in the inflated technology market. Between the announcement of the Starbelly acquisition in January 2000 and the closing in May 2000, the technology market collapsed.  The dot.com bust lowered the value of Starbelly. Starbelly's value was comprised primarily of goodwill.  Any decrease in the value of Starbelly had to affect the value of that goodwill. *Id.*

**2.      A significant change in the extent or manner in which
an asset is used or a significant physical change in an asset**

Starbelly was acquired in order to bring about the e-transformation of HA-LO.  Almost immediately after the acquisition closed, HA-LO abandoned the Starbelly business model and Starbelly ceased to exist as an independent entity. *Id.*

DOCS\170832v1

34

3.    **A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator**

After the announcement of the Starbelly acquisition, the technology market suffered a sever decline. The dot.com industry was particularly hard hit. As a result, obtaining financing for dot.coms became increasingly difficult. Starbelly required a significant infusion of capital. Defendants had planned to obtain this funding through an equity offering. The change in the business climate of the technology market all but destroyed any prospect of HA-LO raising capital through an equity offering. *Id.*

4.    **An accumulation of costs significantly in excess of the amount originally expected to acquire or construct the asset**

After the acquisition, the costs associated with Starbelly continued to increase and exceed all budgeted expenses. In 2000, the monthly burn for Starbelly technology costs was "somewhere in the neighborhood of 2 and a half to $3 million per month." *Id.* The amount was "in excess of the budget" as the "original indication was that Starbelly would burn approximately 1 million to 1 and a half million per month." *Id.*

5.    **A current period operating or cash flow combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue**

Starbelly was to help contribute revenue of over $1 billion in three years. *See id.* ("bottom line that HA-LO paid $240 mm for an entity that would help it grow to more than $1bb in revenues in three years"). Starbelly, however, fell woefully short of this mark. For the Third Quarter of 2000, Starbelly's revenues were only $1.1 million as compared to budgeted revenues of $4.7 million. *Id.* Starbelly's revenue stream, almost nonexistent at the time of the acquisition, was nonexistent in the fourth quarter of 2000. *Id.* By December 2000, HA-LO's projected revenues for 2000, 2001, and 2002 were the same as pre-acquisition projections. *See id.*

Despite all the evidence that the Starbelly goodwill required an FAS 121 analysis, including the SEC ordering Defendants to perform such an analysis, Defendants continued to overstate the Starbelly goodwill. Defendants knew that an FAS 121 analysis was required. *See id.* They had specifically avoided one because HA-LO's accounting personnel knew that the SEC would question any write down of assets within one year of purchase:

> Q. What does a company gain by, for example, acquiring a new company and writing off the goodwill in its entirety within the first -- within that year? Is there a benefit to that -- to a publicly-held company?

> A. There's really no benefit other than removing the amortization stream that would occur over a longer period of time, but you are not getting the benefit because you are saying that you paid $240 million for a company, and if you are writing it off within one year, one could questions the reason why you acquired the company in the first place.

> Q. But there are a number of companies that did that, weren't there?

> A. That's correct.

> Q. And do you know why it is they did that and why the SEC was unkindly disposed toward it?

> A. I think it was once again just a quick they are disposed to the point when you write off any significant amount in a quick period of time without any substantiation behind it.

*Id. See also id.* ("So our evaluation also included that element which was the SEC staff was looking carefully at transactions of this type A, and B skeptical of writing off goodwill before such a time -- and, as I recall, defined as one year before such time as synergies of the transactions could be realized."). Defendants' protestations that the SEC would be suspicious of a goodwill write-down is contradicted by the SEC's directive that HA-LO perform a FAS 121 analysis. *See id.* Nevertheless, Defendants committed to performing a FAS 121 analysis. *See id.* (testifying that Defendants agreed to implement the SEC's directive to follow FAS 121). Despite Defendants' commitment to follow FAS 121, no analysis was ever performed and

Defendants continued to overstate the Starbelly goodwill in HA-LO's financial statements without regard to FAS 121.

## XI. DEFENDANTS' STATEMENTS IN HA-LO'S 2000 10-K WERE FALSE AND MISLEADING

HA-LO's Form 10-K for year-ended December 31, 2000 contained false and misleading statements concerning HA-LO's ability to meet its liquidity needs and HA-LO's negotiation with the preferred shareholders. Complaint ¶¶ 100-102. The 2000 10-K stated that HA-LO's liquidity needs for 2001 would be met by the sale of HA-LO's Market USA and LAGA business units for approximately $50 million. Plaintiffs Response to Kilrea ¶ 78. The sale of Market USA and LAGA, however, would not solve HA-LO's liquidity problems as HA-LO needed $50 million dollars just to pay the preferred shareholders. *Id.* HA-LO still owed another $50 million on its credit facility. *Id.* Defendants' statement concerning HA-LO's liquidity is not a forward-looking statement. As of the filing of HA-LO's 2000 10-K, Defendants knew the amount of outstanding borrowings under their credit facility, they knew that all receivables were to go directly to paying down the credit facility, and they knew that the preferred creditors could demand payment as of May 5, 2001. *Id.*

The 2000 10-K also repeated the false and misleading statement that HA-LO was negotiating with the preferred shareholders. As described below, this statement was not accurate. *See, infra,* XIII.

## XII. DEFENDANTS' STATEMENTS IN HA-LO'S APRIL 6, 2001 PRESS RELEASE WERE FALSE AND MISLEADING

On April 6, 2001, HA-LO issued a press release in which defendant Weisbach stated that "[t]his is a very exciting time for HA-LO. The move to our new corporate headquarters signifies a fresh period of growth and prosperity as we reiterate our position as the industry leader." *See* Defendants' LR56.1(A)(3) Statement at ¶ 82. This statement was false and misleading because,

DOCS\170832v1

37

as Weisbach testified, he had knowledge of the following facts at the time this statement was made:

> Before HA-LO moved into the building in April 2001, Linden Nelson complained about the building and scope and magnitude of the building..
>
> Prior to February 2001, HA-LO's business had materially dropped off and its cash position had significantly worsened.
>
> At the November 9, 1999 Board of Directors meeting, John Kelley expressed the view that he wished HA-LO had not entered into the lease and wanted to know if the Company could do anything to get out of it.
>
> Mr. Weisbach's view at the time of the November Board meeting was that HA-LO should do whatever was in the best interest of the Company "if the Company felt that it could negotiate its way out of the lease in a way that was better for the Company because of the changing financial climate, that that would be appropriate."
>
> "There was ongoing talk about trying to work something out relative to the lease. It came up on several occasions."
>
> When shown a copy of the January 12, 2001 Board minutes, Mr. Weisbach testified, "the cash position of the company was a concern of mine, yes." . . ."anything that related to the cash position of the company was a concern."
>
> When shown a copy of the February 27, 2001 Board minutes, Mr. Weisbach stated, "clearly the company had cash flow issues and liquidity issues."
>
> Cash flow was "absolutely" a big concern.
>
> If the decision was to be made all over again, Mr. Weisbach testified that he probably would have made a different decision.
>
> After the May 2000 Starbelly transaction Mr. Weisbach's decision would have clearly been different just because the company was strained financially. (Emphasis added).

Plaintiffs' Response to Kilrea ¶ 82. Weisbach's statements in the April 6, 2001 press release are not inactionable puffery, but rather a materially false concrete statement made with actual knowledge of its falsity. As of April 6, 2001, Weisbach had no reasonable basis to declare that the move into new headquarters "signified a period of growth and prosperity" when he was "absolutely" concerned about the Company's financial situation. *See Virginia Bankshares, Inc.*

DOCS\170832v1

*v. Sandberg*, 501 U.S. 1083, 1093 (1991) (sustaining actionability of statement that proposed merger was "fair", explaining that "such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading.)

Defendants claim that the terms of the lease were disclosed in HA-LO's Form 10-Ks for 1998 and 1999. However, "disclosure required by the securities law is measured not by literal truth, but by ability of material to accurately inform rather than mislead prospective buyers." *In re Next Level*, 1999 U.S. Dist. LEXIS 5653, at *19-20. By April 6, 2001, new problems with the lease necessitated disclosures once Weisbach aligned HA-LO's new headquarters with growth and prosperity. On April 2, 2001, Lefkofsky sent an e-mail to Marc Simon concerning the new building: "we have taken the approach, over the past year, that we want absolutely no publicity related to this building. it just can't look good to the outside world when it doesn't even look good to us." Plaintiffs' Response to Kilrea ¶ 83. In a subsequent e-mail, Lefkofsky described the tortured history of the building and HA-LO's attempt to rid itself of its lease obligations:

> we formed a real estate committee in early 2000 headed by marshall . . . to evaluate our options . . . after careful review, it was determined that the lease was so bad that we had very limited options in terms of getting out or fighting centerpointe. in may of 00, rich heise was appointed director of that committee and marshall stepped off. rich hired kev derderian to help evaluate the lease, try and sublet, but the bldg... we prepared for the board an analysis which laid out our options. long story short, we couldn't easily sublet, we couldn't get out, we couldn't sue centerpointe.

*Id.* Defendants, all members of HA-LO's board, were aware of the problems with the lease.

Weisbach's statement was thus false and misleading.

## XIII. DEFENDANTS' STATEMENTS IN HA-LO'S MAY 15, 2001 FORM 10-Q WERE FALSE AND MISLEADING

In HA-LO's Form 10-Q for the First Quarter 2001, Defendants stated:

> . . . . the Company has an obligation to holders of the redeemable preferred stock. Management is attempting to renegotiate the terms of the preferred stock. . . .

DOCS\170832v1

39

Preliminary discussions have been held with various preferred stockholders. No resolution has been reached to date, and there can be no assurances that the terms of the preferred stock will be renegotiated.

Defendants' LR56.1(A)(3) Statement at ¶ 80. This statement was false and misleading because, *inter alia*, HA-LO was not negotiating with the preferred shareholders. JPMorgan Chase, one of the largest preferred shareholders refused to provide HA-LO with a letter stating that they were in negotiations with HA-LO. Plaintiffs' Resposne to Kilrea ¶ 79. In a sworn statement, Stephen P. Murray, a partner of J.P. Morgan Partners, stated

4. In late March 2001, HALO's CEO Marc Simon, called me regarding the Series A Preferred redemption rights. Mr. Simon asked that JPMP provide written assurance that JPMP was in negotiations with HALO to amend the Series A Preferred redemption rights. Mr. Simon stated that if JPMP failed to provide such a letter, then HALO's auditor Arthur Andersen, would issue HALO a "going concern" letter in connection with its year-end audit.

5. I responded that neither I nor, to my knowledge, any other JPMP representative, had negotiated with HALO to amend the Series A Preferred redemption rights. I therefore declined to provide the written assurance Mr. Simon sought. I also refused to orally assure Mr. Simon that JPMP would consider amending the Series A Preferred redemption rights. Instead, I specifically instructed Mr. Simon *not* to make any representations to anyone regarding JPMP's position.

*Id.* In addition, Simon testified that HA-LO "never negotiated with Keywell." *Id.* Two of the largest preferred shareholders were not in negotiations with HA-LO at the time the May 15, 2001 10-Q was filed.

## XIV. STATEMENTS THAT HA-LO WAS NOT A CANDIDATE FOR BANKRUPTCY WERE FALSE AND MISLEADING

On July 30, 2001, HA-LO announced that the Company had filed for reorganization under Chapter 11 of the United States Bankruptcy Code. HA-LO stated that factors behind this decision included "several non-operating issues such as the lease on the headquarters building and the acquisition of Starbelly.com." Plaintiffs' Response to Kilrea ¶ 91. As described above, Defendants were aware of problems with the Starbelly acquisition and the lease on the new headquarters by April 2001. *See, supra*, XII. Yet in May and June of 2001, Marc Simon

DOCS\170832v1

40

continually stated that HA-LO was not a candidate for bankruptcy. Given that the very factors that HA-LO claimed were the cause of the bankruptcy were know by Defendants when Simon made these statements, the statements were false and misleading.

Defendants' argument that Simon's statements were made with a reasonable basis because during May and June HA-LO was negotiating with Foothill Capital for refinancing is a limp defense. Defendants now try to blame the Foothill Capital negotiations for HA-LO's bankruptcy, but by their own admission, the bankruptcy filing was caused by "several non-operating issues such as the lease on the headquarters building and the acquisition of Starbelly.com." Plaintiffs' Response to Kilrea ¶ 91.

## XV. DEFENDANTS' STATEMENTS IN HA-LO'S JUNE 14, 2001 PRESS RELEASE WERE FALSE AND MISLEADING

On June 14, 2001, HA-LO issued a press release that represented that "HA-LO is engaged in active negotiations . . . with certain preferred stockholders regarding the restructuring of these obligations." Defendants' LR56.1(A)(3) Statement at ¶ 107. As with the statements in HA-LO's Form 10-Q for the First Quarter 2001, this statement was false and misleading. *See*, *supra*, XIII.

## XVI. HA-LO'S SEC FILINGS CONTAINED FALSE AND MISLEADING STATEMENTS CONCERNING UPSHOT'S REVENUE RECOGNITION

During the Class period, HA-LO Financial Statements contained in its filings with the SEC were false and misleading. On April 26, 2001, when HA-LO announced that it was taking a restructuring charge, several of the amounts taken were "the correction of accounting errors that were specifically identifiable with a prior period." Plaintiffs' Response to Kilrea ¶ 109. Under GAAP, previously stated financials must be restated "if the effect of accounting errors are material to the previously issued financial statements." *Id.* The recognition of revenue at UPSHOT for 1998 and 1999 was one of the primary factors for HA-LO's planned restatement

DOCS\170832v1

41

announced in November 2001. *Id.* UPSHOT "[r]evenue was being recognized by creating an unbilled receivable ostensibly for work that was being done but was not yet billed under existing client contracts." *Id.* "The amount of the unbilled revenue account that could not be billed continued to grow from an amount of approximately $6.2 million at December 31, 1998 to in excess of $10 million by December 31, 2000." *Id.*

During the time that UPSHOT was improperly recognizing nonexistent revenue, Kilrea was HA-LO's CFO and Kelley was President of UPSHOT. When Kelley became CEO of HA-LO in November 1999, the revenue recognition errors still existed at UPSHOT. The Auditing Standards Board defines the responsibilities of management towards financial statements as follows:

> The financial statements are management's responsibility....Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management....Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

Plaintiffs' Response to Kilrea ¶¶ 167, 168. As President of UPSHOT, Kelley was directly responsible for designing the policies, procedures, and controls to ensure that UPSHOT's financial statements were GAAP compliant. There is direct evidence that Kelley knew of the accounting problems at UPSHOT. In an e-mail dated January 28, 2001, Kelley states:

> . . .get rid of that loss, those costs for 2000, someway, somehow...maybe direct selling was a halo initiative for accounting purposes, I don't know, need help . . . but it's gotta go

*See* Plaintiffs' Response to Kilrea ¶ 167.

As CFO, Kilrea's responsibilities included "the overall financial management of the consolidated entity including, you know, day-to-day, you know, bank matters as well as

DOCS\170832v1

42

compliance with SEC filings, etc." *See* Plaintiffs' Response to Kilrea ¶ 37. Kilrea also was ultimately responsible for the flow of information to Arthur Andersen including UPSHOT's unbilled receivables and any reserves recorded on the balance sheet of HA-LO. *See id.* Furthermore, Kilrea controlled all information regarding the financial condition of the Company and was responsible for the accuracy of the public reports and releases detailed in the Amended Complaint, and hence was liable for the representations contained therein. In addition, Kilrea oversaw the preparation of HA-LO's false financial statements and signed all of HA-LO's SEC filings. In preparing the financial statements, Kilrea was responsible for "the review of the consolidated financial statements ensuring compliance with SEC reporting content, guidelines, time lines, etc." *See id.* In addition, Kilrea was on the e-mail distribution list of all HA-LO's top management and thus was privy to inside information concerning the company's operations. *See id.*

Kilrea received quarterly information regarding UPSHOT in his position as CFO. *See* Plaintiffs' Response to Kilrea ¶ 114. These quarterly reports tracked expenses, net sales figures, and gross profits. *Id.* At December 1999, UPSHOT was HA-LO's most profitable subsidiary. *Id..* At the same time, however, Arthur Andersen first questioned UPSHOT's receivables in December 1999. *Id.* Only three months earlier, an audit of UPSHOT found significant problems:

- **Revenue Process**: Customer contracts are not always approved and have incomplete or missing data. A retainer arrangement was in effect since September of 1998 without a signed contract.

- **Accounts Receivable**: The accounts have not been reconciled and contained stale receivables and mispostings.

*Id.* The Audit Report also found that with respect to accounts receivable:

All current contracts should be reviewed to ensure signatures have been obtained. Future arrangements should not accept retainers until contracts have been formalized with all appropriate signatures.

DOCS\170832v1

43

> The receivable accounts should be reconciled monthly and reconciling items resolved timely. The accounting accrual reports should continue to be monitored weekly. Client quotes and estimates should be approved by an UPSHOT manager to decrease the risk of unsigned documents.

*Id.* The Audit Report reinforced this point: "The receivables account should be reconciled monthly. Receivables in excess of 90 days should be collected or written off and, if subsequently paid off, treated as recovery. The Ford and Sony receivables should be monitored closely for possible write off." *Id.* The Audit Report also recommended adopting new practices:

**Written policies and procedures**

To ensure there is adequate control of revenue and expenses, minimal policies and procedures should be established and formalized. This should include a formalized training process for new employees.

**Automated Time Tracking**

Management has indicated that system capabilities for automating hours will be evaluated with the implementation of the new accounting software. This initiative will improve the accuracy of determining accrued revenue. Adequate resources should be allocated for researching appropriate software packages. In the interim, management should consider preparing Excel spreadsheets or Access databases for tracking hours per job for all clients, especially if the software implementation date is extended. A temporary employee could be dedicated to this task until conversion is complete.

**Accounting Department Staffing**

Currently, the accounting department appears to be understaffed due to increasing workloads as a results of company growth. Duties should be segregated and workloads defined in the accounting department.

*Id..* The Audit Report was "intended for the information and the use of management of HA-LO Industries, Inc." *Id.*

The warnings of the Audit Report were ignored. Keith Stendlund's assessment of the problems at UPSHOT derived from the problems noted in the 1999 Audit Report:

> The Company [UPSHOT] did not have good systems and controls in place to manage their project estimates and often began work without signed estimates. Additionally, the business was essentially all project based as opposed to retainer based and thee was not good revenue visibility. The Company had poor billing efficiency which resulted in mush of the revenue for each accounting period

booked based on estimates. The Company did not have a good time reporting system in place to track employee hours resulting in revenue being booked based on unreliable estimates.

*Id..* The problems leading to UPSHOT's erroneous revenue recognition were thus known well before Keith Stenlund began his investigation during the Second Quarter of 2000.

## CONCLUSION

For all the foregoing reasons, Defendants' motions for summary judgment should be denied.

Dated:     January 14, 2004

Respectfully submitted,

**MILLER FAUCHER AND CAFFERTY LLP**

By:
Marvin A. Miller
Jennifer Winter Sprengel
Matthew E. Van Tine
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
(312) 782-4880

*Class Liaison Counsel and Designated Local Counsel*

**MILBERG WEISS BERSHAD
    HYNES & LERACH LLP**
Clifford S. Goodstein
Susan M. Greenwood
One Pennsylvania Plaza - 49th Floor
New York, New York 10119
(212) 594-5300

**SCHIFFRIN & BARROWAY, LLP**
Katharine M. Ryan
Marc I. Willner
Three Bala Plaza East
Suite 4000
Bala Cynwyd, PA 19004
(610) 667-7706

*Class Co-Lead Counsel*

DOCS\170832v1

45

**CAULEY GELLER BOWMAN &**
   **RUDMAN, LLP**
Jack Reise
1 Boca Place
2255 Glades Road, Suite 421-A
Boca Raton, Florida 33431
(561) 750-3000

**CAULEY GELLER BOWMAN &**
   **RUDMAN, LLP**
Curtis Bowman
J. Allen Carney
11311 Arcade Drive Suite 200
P.O. Box 25438
Little Rock, Arkansas 72212
(501) 312-8500

**WOLF HALDENSTEIN ADLER FREEMAN**
   **& HERZ LLP**
Adam J. Levitt
656 West Randolph Street, Suite 500 West
Chicago, Illinois 60661
(312) 466-9200

*Class Executive Committee*

DOCS\170832v1

46